

FILED

SEP 0 2 2008
SEP 02 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.)<br>ERUBY ABREGO #R-34111,<br><br>　　　　　Petitioner,<br><br>-Vs-<br><br><br>TERRY L. McCANN - WARDEN,<br>　Stateville Correctional Center,<br><br>　　　　　Respondent. | 08CV4978<br>JUDGE ZAGEL<br>MAG. JUDGE MASON<br>(Supplied by Clerk of Court)<br><br>The Honorable<br><br>Judge Presiding. |

## PRO-SE MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

　　　NOW COMES the Petitioner, **Eruby Abrego**, Pro-se, by Appearing in his own proper person, and files this "Memorandum of Law in Support of Petition for Writ of Habeas Corpus" which enumerates Petitioner's Seven-Claims for Habeas Corpus Relief which is as follows:

### I. INTRODUCTION

　　　"Democracy defends itself from anarchy by a degree it exalts process over passion. The supremacy of due process over raw emotion is even more compelling "the more reprehensible the charge", the more the defendant is in need of all constitutionally guaranteed protection for his defense." Danner v. Kentucky, 525 U.S. 1010, 119 S.Ct. 529, 530 (1998)(Scalia, J., dissenting from denial of certiorari).

　　　Thus, while the circumstances of a First Degree Murder or capital

case "excite a strong suspicion [] for which public clamor demands a victim," <u>Jumpster v. People</u>, 21 Ill. 375, 412 (1859), it is never the less "the duty of the judiciary calmly to poise the scales of justice [] undisturbed by the clamor of the multitude." <u>In re McDonald</u>, 16 Fed.Cas. 17, 19 (E.D. Mo. 1861)(Treat, J.).

> [C]apital cases present the situation in which the clash in the State Courts between parochial interests and emotion on the one hand and National law and liberties on the other is most likely to favor the former and threaten the latter-- precisely the situation in which the Framers saw a need for a Federal Appellate check on "a local spirit" and on a State Judicial System "too little independent" of that spirit "to be relied upon for the inflexible execution of the National Laws."

<u>Federal Habeas Corpus Practice and Procedure</u>, Leibman & Hertz, Lexis Law Publishing, Third Ed. at 101-102 (1998)(citations omitted).

Here, the "local spirit" of the Police and the Prosecutors combined to deny the Petitioner his Federal Constitutional rights. Serious constitutional questions have been raised in the "Petition for Writ of Habeas Corpus" that warrant a hearing, and, thereafter, the grant of the writ. While any one of these constitutional violations warrant the grant of the Writ, these errors cumulatively denied the Petitioner his Constitutional rights to a fair trial and sentencing Proceeding.

## II. HABEAS CORPUS REVIEW
### A.) Introduction

Habeas corpus is a remedy whose "most basic traditions and purposes" are to "avoid a grievous wrong--holding a person 'in custody in violation of the Constitution [][or laws or treaties] of the United States"'--and "thereby both [to] protect [] individuals from

-14-

unconstitutional convictions and [to] help[] to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair". O'Neal v. McAninch, 513 U.S. 432, 442, 115 S.Ct. 992, 997 (1995). Further, it is a remedy that "has been for centuries esteemed the best and only sufficient defense of personal freedom" which, if withdrawn, "risk[s] injury to an important interest in human liberty." Lonchar v. Thomas, 517 U.S. 314, 116 S.Ct. 1293, 1299 (1996), quoting, ex parte Yerger, 75 U.S. (8Wall.) 85, 95 (1869).

While there is a responsibility not to interfere with the sovereign power of the State, it is also the right and duty of the Federal Courts to conduct its judicial work in a manner that reflects the seriousness of inflicting the maximum Penalties upon a human being..

In fact, the Federal Court's "duty to search for constitutional error with painstaking care is never more exacting than in a First Degree Murder or Capital case." And, while it is recognized that not every imperfection in the deliberative process is sufficient, to set aside a State Court judgment, the severity of the sentence mandates a careful scrutiny in the review of any colorable claim of error.

### B.) History of the "Great Writ"

Anglo-American habeas corpus jurisprudence was founded on an early recognition that the "right of personal liberty" is an "absolute right" established on the firmest basis by the provisions of **Magna Carta** and a long succession of Statutes enacted under Edward III. Blackstone's Commentaries, Book III, Ch. 8, Secs. 119, 128-129 at 1115, 1126, Lewis' Ed., Reese, Welsh & Company (1897). Further:

> [w]e know-it is a maxim-that this right of liberty must have

-15-

had a  remedy, and, if none was known, one must have
been invented after 1215; and that one was invented before
1640 or 1679[.]   The great writ must have been contrived in
that interim. Hallam, Const. Hist.617, narrates that in the
case of a freeman detained in prison on a criminal charge
"it was always". that is before 1679, in his power to demand
of the King's Bench a Writ of Habeas Corpus[.].

Habeas Corpus: A Protean Writ and Remedy, George F. Longsdorf, 8 F.R.D.

179 (1949).

    This **Remedy that was Invented** was, in fact, the "great and

efficacious writ in all manner of illegal confinement [] **habeas corpus**

**ad subjiciendum;** [It was] directed to the person detaining another, []

commanding him to produce the body of the prisoner [] to do, submit to,

and receive,  whatsoever the judge or court awarded such writ shall

consider in that behalf." Blackstone Commentaries, Book III, Ch. 8, Sec.

131 at 1127, Lewis' Ed., Reese, Welch & Company (1897).

    Originally, the **Writ of Habeas Corpus** was simply a judicial

mechanism by which the sheriff or other custodian was commanded to

"have the body" of the incarcerated person before the Court. Notwith-

standing its early purposees and functions, its use as a means of

correction is well illustrated by cases decided in the latter part of

the fourteenth century.   Then in 1629, **"Chamber's Case"** confirmed that

the writ of habeas corpus had assumed a new role. [] The questioning of

the validity of commitments, previously an incidental effect of the

Writ, now became the major object. It was at this point, then, that the

writ of habeas corpus embarked upon its journey as 'the highest remedy

in law, for any man that is imprisoned."' The English Origins of the

Writ of Habeas Corpus: A Peculiar Path to Fame, William F. Dicker, 53

N.Y.U. Law Review 983, 1035 (1978). "the writ is particularly significant

because it goes much further than demanding the presentment of the

prisoner's body together with the cause of his taking and detention, in

that it includes an explicit statement of the Court's intention upon examination: 'in order that the King might give order for his delivery according to right and the law and custom of the realm."' Ducker, supra. at 1009.

Yet, abuse of the writ by the English Courts was common. Not only was the writ often ignored, but the Chancery Courts used the writ to defeat the jurisdiction of lower Courts and the Courts of Common Law used the writ to extend their jurisdiction. Ducker, supra. at 1009-1010. These abuses led to legislation that culminated in the passage of the "Habeas Corpus Act of 1679".  The Act formalized certain provisions of the habeas corpus law. For example, the new Act included penalties for evasion of the writ. but "all other cases of unjust imprisonment [were] left to the **habeas corpus at common law**". Blackstone Commentaries, Book III, Ch. 8, Sec. 137 at 1133, Lewis' Ed., Reese, Welsh & Company (1897). "It should be noticed that the [Act of 1679] did not grant anything new; that it did not make habeas corpus, but merely made it efficient  a writ, which was recognized as already existing." Habeas Corpus in the Colonies, A.H. Carpenter, 8 Am.Hist.Rev. 18, 19 (1902).

"Habeas Corpus came to America and became a part of the common and Statute Laws of the Several States and of the United States." Longsdorf, supra. at 181.  Habeas Corpus was "claimed as among the immemorial rights descended to [the Colonists] from the ancestors." Ex parte Yerger, 75 U.S. 85, 96 (1868). "[T]he habeas corpus, brought by our ancestors as their birthright, to this countrym was the common law habeas; that great embodiment of a free principle, which [was] born with the sturdy Roman [and] preserved by the free Saxon." In re McDonald, 16 Fed.Cas. 17, 31 (E.D. Mo. 1861)(Treat, J.).

-17-

The writ "was a common law writ and remedy. [] It was therefore common law in the Colonies and the several States." The Federal Habeas Corpus Acts: **Original and Amended**, George F. Longsdorf, 13 F.R.D. 407 (1953). "[T]he right of the colonists as regards the writ of habeas corpus rested upon the common law with the exception of South Carolina, which re-enacted the English statute.  The lack of Statute did not mean that the colonists had no protection for their personal rights, for the want was supplied by the common law, and also by the placing of habeas corpus provisions in their court laws." Carpenter, supra at 26.

Federal Court jurisdiction in habeas corpus cases was limited though, Pursuant to the "Judiciary Act of 1789", (1 Stat. 81), the United States Supreme Court "disclaim[ed] all jurisdiction not given by the Constitution or by the laws of the United States." Ex parte Bollman, 8 U.S. 75, 94 (1807). The "restriction is interposed by  the proviso to the fourteenth section of the Act. [] It is in these words" 'Provided, that writs of habeas corpus shall in no case extend to prisoner's in jail, unless they are in custody under or by color of the authority of the United States."'  One must remember, though, that the Supreme Court was not without power to review the decisions of a State's highest Court regarding constitutional questions. Section 25 of the Judiciary Act of 1789) (1 Stat. 85-87) extended writs of error as of right to State Prisoners. As "Writ of Error" review was restricted over the course of the years, habeas review was expanded. Thus, through this balancing of jurisdictional provisions, the Supreme Court has always been able to enforce a State prisoner's Federal constitutional rights by some method of review.  The Object of the proviso "was to prevent any possible conflict between Federal and State tribunals. [] The proviso simply inhibits [the Federal Courts] from sending the

-18-

writ to persons in legal custody in jail, unless there under the authority of the United States." Ex parte Des Roches, 7 Fed. Cas. 537, 539 (C.C. Cal. 1856); See also: In re McDonald, supra. at 22. Unquestionably, though, the Federal Courts had the power to grant the writ in all other cases it would reach at common law. Des Roches at 538.

The decisions of the Federal Courts refusing to grant habeas corpus relief because of a lack of "jurisdiction", though, in no way diminished the historical fact that habeas corpus lay to "test any restraint contrary to fundamental law." The Framers, as well as every Colonist, clearly expected that the States would fully and fairly make available the Great Writ as it was known at common law and in the Court rules of the various Colonies. Moreover, the Federal Constitution's Suspension Clause guaranteed that the writ would not be suspended except in extraordinary circumstances. This provision thus insured that if the State's failed in their responsibilities, the United States Constitution would authorize Federal intervention, since habeas corpus is a right of National Citizenship protected by the Privileges and Immunities Clause. See: Slaughter House Cases, 83 U.S. (16 Wall) 36, 114-115 (1872)(Bradley, J. dissenting).

As the Union aged, Congress found it necessary to amend the habeas corpus jurisdictional statutes from time to time because of the failings of the States. The experiences of history taught, and the National Congress was quick to recognize, that the States were not always true to the purposes of the Great Writ. Thus, Congress determined that the Federal Courts must have jurisdiction to enforce the fundamental purposes of the writ of habeas corpus to prevent **de facto** suspension the

-19-

Great Writ. [That certainly must have been the intention of the Habeas

Corpus Act of 1867 coupled with the 1866 proposal and the 1868 ratification

of the Fourteenth Amendment.].  Congress thus used, "[t]he habeas corpus

jurisdictional statute [to] implement[] the **Constitutional** command that

the writ of habeas corpus be made available." <u>See</u>: <u>Jones v. Cunningham</u>,

371 U.S. 236, 238, 83 S.Ct. 373 (1963).

  As the Supreme Court has noted:

> All the significant statutory changes in the Federal writ
> have been prompted by grave political crises. The first
> modification [] was made [] March 2, 1833 [] in response
> to South Carolina's nullification ordinance.  The Act
> provided that Federal Courts and Judges could release from
> State custody persons who had been acting under Federal
> authority.  The Act of August 29, 1842 [] which extended
> Federal habeas corpus to foreign nationals acting under
> authority of a foreign state, was prompted by British
> diplomatic protest following the trial of a Canadian
> soldier by a New York Court. [] The Act of February 5, 1867
> [] which extended Federal habeas to State Prisoners generally,
> was passed in anticipation of possible Southern recalcitrance
> toward Reconstruction legislation.

<u>Fay v. Noia</u>, 372 U.S. 391, 83 S.Ct. 822, at 828, fn. 9 (1963). In fact,

"the developement of habeas corpus can largely be attributed to the

unconscious forces of constitutional law. [] The writ became a viable

bulwark between the powers of government and the rights of the people [.]"

<u>Ducker</u>, supra. at 1054.

  "[T]he general spirit and genius of our institutions has tended

to the widening and enlarging of the **habeas corpus** jurisdiction of

the Courts and Judges of the United States." <u>Ex parte Yerger</u>, 75 U.S.

85, 102 (1868). In 1867, Congress sought to provide a Federal Forum for

State prisoners having constitutional defenses by extending the habeas

corpus powers of the Federal Courts to their constitutional maximum.

<u>Fay v. Noia</u>, supra. at 842.  The legislation was "of the most

comprehensive character. It br[ought] within the **habeas corpus**

-20-

jurisdiction of every Court and of every Judge every possible case of privation of liberty contrary to the National Constitution, treaties, or laws. It [W]as impossible to widen the jurisdiction." Ex parte McCardle, 73 U.S. 318, 325-326 (1867).

"[W]hen the 1867 Congress provided that persons restrained of their liberty in violation of the Constitution could obtain a writ of habeas corpus from a Federal Court, it undoubtedly intended [] to incorporate the common law uses and functions of this remedy." Legal History in the High Court - Habeas Corpus, Dallin Oaks, 64 Mich. Law Review 451, 452 (1966). In fact, "the Act of 1867 [] restored rather than extended the common law powers of habeas Judges." Fay v. Noia, supra. at 868, fn. 27. And, even though the appellate jurisdiction of the Supreme Court was rescinded by the Act of March 27, 1868, (14 Stat. 44), See: Lindh, 96 F.3d at 868, final action in habeas cases rested with the District and Circuit Judges. The Supreme Court in United States History, Charles Warren, Vol. II at 687, Little, Brown & Company (1935). Thus, since 1867, the full and complete common law usages of the Writ of Habeas Corpus have come within the "jurisdiction" of the Federal Courts.

Today, the United States Supreme Court consistently adheres to the principle that habeas corpus is, "at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 863 (1995). Statutes, Rules, Precedents and Practices control the Writs exercise. Within Constitutional constraints, they reflect a balancing of sometimes controversial objective which are normally for Congress to make, but which Courts will make when Congress has not resolved the question. Lonchar v. Thomas, 517 U.S. 314, 116 S.Ct. 1293, 1298 (1996).

Simply put, the "history of the writ indicates that it constitutes

-21-

a prompt avenue of redress for  grievances second to none." United
States ex rel. Norris v. Norman, 296 F.Supp. 1270, 1272-1273 (N.D. Ill.
1969)(Parsons, J.). And, even the passage of the AEDPA has not
undermined the "vital role" that the "writ of habeas corpus [] plays
in protecting constitutional rights." Slack v. McDaniel, 529 U.S. 473,
120 S.Ct. 1595, 1603 (2000).


### C.) Nature and Procedures of a Habeas Corpus Action.


Habeas Corpus, technically speaking, is a civil proceeding. O'Neal
v. McAninch, 513 U.S. 432, 115 S.Ct. 992, 996 (1995). "[T]he  traditional
characterization of the writ of habeas corpus as an original [] civil
remedy for the enforcement of the right to personal liberty, rather
than a stage of the State criminal proceedings or as an appeal therefrom,
emphasizes the independence of the Federal Habeas proceedings from what
has gone before." Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 841 (1963).

As the Supreme Court has noted:

> Habeas Corpus is not an appellate proceeding, but rather an
> original civil action in a federal court. (cites) [I]t is a
> new suit brought by [the petitioner] to enforce a civil right.
> (cite) Any possible doubt about this point has been removed
> by the statutory procedure Congress has provided for the
> disposition of habeas corpus petitions, a procedure including
> such non-appellate functions as the allegation of facts [] the
> taking of depositions and the propounding of interrogatories []
> the introduction of documentary evidence [] and, of course,
> the determination of facts at evidentiary hearing.
>   To be sure, habeas corpus has its own peculiar set of
> hurdles a petitioner must clear before his claim is properly
> presented to the District Court.  The petitioner must, in
> general, exhaust available State remedies (cite), avoid
> procedural default (cite), not abuse the writ (cite) and not
> seek retroactive application of a new rule of law. (cite) []
> But once they [the hurdles] have been surmounted – once the
> claim is properly before the District Court – a habeas
> petitioner, like any civil litigant, has had a right to a
> hearing where one is necessary to prove the facts supporting
> his claim (cites)

keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715, 1722 (1992).

Additionally, the Supreme Court has repeatedly noted the interplay
between statutory language and judicially managed equitable considerations
in the development of habeas corpus jurisprudence. <u>Schlup v. Delo</u>, 513
U.S. 298, 115 S.Ct. 851, 863 fn. 35 (1995).

> As the writ has evolved into an instrument that now demands
> not only conviction by a Court of competent jurisdiction (cite)
> but also application of basic constitutional doctrines of
> fairness (cite), Congress, the Rule writers, and the Courts
> have developed more complex procedural principles that
> regularize and thereby narrow the decretion that individual
> judges can freely exercise.  Those principles seek to maintain
> the Courts' freedom to issue the writ, aptly described as the
> "highest safeguard of liberty", (cite), while at the same time
> avoiding serious, improper delay, expense, complexity, and
> interference with the State's interest in the "finality" of its
> own legal process. (cites) These legal principles are embodied
> in statutes, rules, precedents, and practices that control the
> writ's exercise.

<u>Lonchar v. Thomas</u>, 517 U.S. 314, 116 S.Ct. 1293, 1298 (1996).

Simply put, "[W]hen a federal district court reviews a habeas
corpus petition pursuant to 28 U.S.C. § 2254, it must decide whether
the petitioner is 'in custody in violation of the Constitution or
laws or treaties of the United States.'  The Court does not review a
judgment, but the lawfulness of the petitioner's custody **simpliciter.**"
<u>Coleman v. Thompson</u>, 501 U.S. 722, 730, 111 S.Ct. 2546, 2554 (1991)
(citations omitted).


## 1.) Applicable Procedural Principles


Federal habeas relief is available only after a petitioner has
(a) given the State Courts a full and fair opportunity to review  a
claim ("fair presentment" leading to "exhaustion"); (b) has shown "cause
and prejudice" for the failure to raise the claim in State Court, or,

(c) when enforcing a default would lead to a "fundamental miscarriage of justice." Franklin v. Gilmore, 188 F.3d 877, 881-882 (7th Cir. 1999). The standard for reviewing alleged procedural defaulted claims has not been altered by the general provisions of the AEDPA. See: Weeks v. Angelone, 4 F.Supp.2d 497, 509-510 (E.D. Va. 1998). And, careful consideration must be given to the procedural status of each claim as "the rules for procedural default in habeas cases have become Byzantine in their complexity." Howard v. O'Sullivan, 185 F.3d 721, 724 (7th Cir. 1999).

### a.) "Fair Presentment" (The Sine Qua Non of "Exhaustion")

Generally, a federal court cannot address the merits of a habeas corpus petition unless the State Courts have first had a full and fair opportunity to review the petitioner's claims. Picard v. Connor, 404 U.S. 270, 275-76, 92 S.Ct. 509 (1971); farrell v. Lane, 939 F.2d 409, 410 (7th Cir.), cert. denied sub nom., Farrell v. McGinnis, 502 U.S. 944, 112 S.Ct. 387 (1991). The Seventh Circuit announced the guidelines for determining whether State Courts have had a fair opportunity to consider a federal claim in verdin v. O'Leary, 972 F.2d 1467, 1472-73 (7th Cir. 1992). The Court noted that:

> If the petitioner's argument to the State Court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar fact situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the State Courts to have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the Court must consider the specific facts of each case.

-24-

A federal constitutional claim is "fairly presented" to a State Court when both the operative facts and the controlling legal principles are submitted to that court. Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995); Verdin, 972 F.2d at 1474. The claim must be presented in such a way as to "fairly alert the State Court to any applicable [Federal] constitutional grounds for the claim." Green v. Peters, 36 F.3d 602, 605 (7th Cir. 1994), cert. denied, 115 S.Ct. 1703 (1995) (quoting, United States ex rel. Sullivan v. Fairman, 731 F.2d 450, 453 (7th Cir. 1984)). By doing so, a State court is afforded the opportunity to resolve the constitutional issue on federal grounds in accordance with federal rights. Verdin, 972 F.2d at 1473-76.

A habeas petitioner must only "fairly alert" the State Court of the federal constitutional grounds for his claims. The Claims presented in State and Federal Courts need not be exact replicas of each other to satisfy the fair presentment requirement. Howard v. O'Sullivan, 185 F.3d 721, 726 (7th Cir. 1999). What is important is that the substance of the federal claim be presented fairly. Porter v. Gramley, 112 F.3d 1308, 1315 (7th Cir. 1997), citing, Verdin. And, federal Courts must take care to "avoid hypertechnicality" in determining whether a claim is fairly presented. Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995). In fact, a "mere variation" of a previously presented claim will be considered. See: Wilks v. Isreal, 627 F.2d 32, 38 (7th Cir. 1980).

The United States Supreme Court has not implied that claims have to be raised "only by citing book and verse of the federal constitution." Picard v. Connor, 404 U.S. 270, 277-78, 92 S.Ct. 509 (1971); Verdin, 972 F.2d at 1474. A Petitioner may alert the State court that a Federal constitutional claim is at issue by relying on federal or State

-25-

cases employing federal constitutional analysis, See e.g. Williams v. Lord, 996 F.2d 1481, 1483 (2nd Cir. 1993), cert. denied, 510 U.S. 1120 (1994); Whipple v. Duckworth, 957 F.2d 418, 420-21 (7th Cir.) cert denied, 506 U.S. 876 (1992), or by alleging the claim using "magic words" that call to mind a specific federal constitutional right. See: e.g., Ford v. Georgia, 498 U.S. 411, 419, 111 S.Ct. 850 (1981); Beam v. Paskett, 3 F.3d 1301, 1305 (9th Cir.), cert. denied , 511 U.S. 1060 (1993)(State court challange to death penalty statute as "Unconstitutional arbitrary" alerted state court that Eighth Amendment Claim was at issue); McNulty v. Olim, 652 F.2d 1369, 1370 (9th Cir. 1981)(use of words "ineffective assistance" exhausted Sixth Amendment claim). Additionally, allegations of a pattern of facts that is well within the mainstream of constitutional litigation, United States ex rel. Sullivan v. Fairman, 731 F.2d 450, 454 n.8 (7th Cir. 1984), is sufficient to fairly present a federal constitutional claim so as to avoid procedural default.

It suffices that the substantial equivalent of a petitioner's federal habeas claim has been argued in the State proceedings.  The question really is "whether any of the petitioner's claims is so clearly distinct from the claims he has already presented to the State Courts that it may fairly be said that the State Courts have had no opportunity to pass on the claim." Humphrey v. Cady, 405 U.S. 504, 516 n.18, 92 S.Ct. 1048 (1972); accord, e.g., Vasquez v. Hillery, 474 U.S. 254, 260, 106 S.Ct. 617 (1986)("supplemental evidence [] did not fundamentally alter the [] claim [] considered by the State Courts"); Sanders v. United States, 373 U.S.1, 16, 83 S.Ct. 1068 (1963)("identical grounds [for exhaustion purposes] may often be proved by different factual allegations. So also, identical grounds may often be supported by different legal arguments, [] or be couched in different language, [] or vary in

-26-

immaterial respects."); <u>Wells v. Maass</u>, 28 F.3d 1005, 1008-09 & n.1
(9th Cir. 1994)(although petitioner's claims was presented in somewhat
different terms in State Supreme Court, Claim was adequately preserved
under State law because brief was sufficient "to put Oregon Supreme
Court on Notice" of central legal and factual elements of claim).

And, a habeas petitioner may reformulate somewhat the claims made
in State court. Exhaustion requires only that the substance of the
Federal Claim be fairly presented. <u>Carter v. Bell</u>, 218 F.3d 581, 606-
607 (6th Cir. 2000). "New factual allegations dod not render a claim
unexhausted unless they 'fundamentally alter the legal claim already
considered by the State courts"'. <u>Chacon v. Wood</u>, 36 F.3d 1459, 1468
(9th Cir. 1994), citing, <u>Vasquez v. Hillery</u>, 474 U.S. 254, 260, 106
S.Ct. 617, 622 (1986). At bottom, "[o]bviously there are instances in
which 'the ultimate question for disposition' [] will be the same
despite variations in legal theory or factual allegations urged in its
support." <u>Picard</u>, <u>Id</u>. at 277.

It <u>is</u> <u>important</u> <u>to</u> <u>note</u> <u>also</u> that where the State Court proceeds
to decide an allegedly defaulted claim on the merits, the Federal Court
may also consider that claim. <u>Robertson v. Hanks</u>, 140 F.3d 707, 709
(7th Cir.), <u>cert</u>. <u>denied</u>, 119 S.Ct. 189 (1998); See also <u>Harris v. Reed</u>,
489 U.S. 255, 262-63, 109 S.Ct. 1038, 1043 (1989); See also <u>Williams v.
Parke</u>, 133 F.3d 971, 973 (7th Cir. 1997), citing, <u>Coleman v. Thompson</u>,
501 U.S. 722, 735, 111 S.Ct. 2546 (1991). It is true that if a  State
Court refused to hear a Federal claim because it was not properly
presented to the State's courts, and the refusal was based on adequate
and independent State grounds, the Federal Courts are barred from
reviewing the claim. <u>Hogan v. McBride</u>, 74 F.3d 144, 146 (7th Cir.)
<u>modified</u>, 79 F.3d 578 (7th Cir. 1996). However:

> Federal Courts have not always been able to discern from the face of a State Court Opinion whether the Court actually relied upon a State Procedural Bar or whether the Court reached the merits of the federal claim (cites)  Reluctant to entangle the federal judiciary unnecessarily in deciphering State law claims, the Supreme Court has placed the burden on State Courts to make clear on what grounds, State or Federal, they base their decisions.  "In habeas, if the [State Court decision] appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate State ground, a federal court may address the Petition." <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 [.].

<u>Swofford v. DeTella</u>, 101 F.3d 1218, 1222 (7th Cir. 1996).

Thus, for a State ground to be considered independent and adequate, the State Court must "clearly and expressly" rely on that ground, and a federal court will presume that no such ground exists if it is not clear from the face of the opinion." <u>United States ex rel. Armstrong v. Burris</u>, 48 F.Supp.2d 1084, 1086 (N.D. Ill. 1999), citing <u>Coleman,</u> 501 U.S. at 735, 111 S.Ct. at 2546; See also <u>Jenkins v. Nelson</u>, 157 F.3d 485, 491 (7th Cir. 1998), <u>cert. denied</u>, 119 S.Ct. 2402 (1999)(where the State court decision does not include an express statement detailing its reliance on procedural default, habeas court concluded the claim was not procedurally barred.).

Moreover, a State Court's failure to follow firmly established and regularly followed State rules in finding a claim to be procedurally defaulted will preclude the State from relying on "default" to bar federal review. <u>See</u>: <u>Johnson v. Mississippi</u>, 486 U.S. 578, 588-89, 108 S.Ct. 1981, 1988 (1988); <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S.Ct. 850, 857 (1991). State Court decisions are not adequate to bar federal review unless they rest upon firmly established and regularly followed State practice. <u>Franklin v. Gilmore</u>, 188 F.3d 877, 882 (7th Cir. 1999).  Thus, a State Court's default rules are not "adequate" if they are inconsistently applied. <u>See</u>: e.g., <u>Moran v. McDaniel</u>, 80

-28-

F.3d 1261, 1269 (9th Cir. 1996).

To be "adequate", the State rule must be "firmly established and regularly followed." Franklin, Id. at 882; Rosa v. Peters, 36 F.3d 625, 633 (7th Cir. 1994). A basis of decision applied infrequently, unexpectedly, or freakishly may be inadequate, for the lack of notice and consistency may show that the State is discriminating against the federal rights asserted. Tredway v. Farley, 35 F.3d 288, 295 (7th Cir. 1994). In fact, this lack of notice or consistency in ruling by a State Court will not constitute an independent and adequate state ground. Lilly v. Gilmore, 988 F.2d 783, 785 (7th Cir. 1993), citing, Prihoda v. McCaughtry, 910 F.2d 1379, 1383 (7th Cir. 1990).

The proper time  for determining whether a procedural rule was firmly established and  regularly followed is the time of the purported default. For example, a petitioner cannot be expected to comply with a procedural rule that does not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed. Walker v. Ward, 167 F.3d 1339, 1344-1345 (10th Cir. 1999), cert. denied sub nom, Walker v. Edmondson, 120 S.Ct. 449 (1999).

Finally, although "forfeiture" is a question involving a State's internal law and procedures, resolving whether a petitioner has fairly presented his claim to the State Court, thus permitting federal review, is an intrinsically federal issue which must be determined by the Federal Court. See: Wydles v. Hundley, 69 F.3d 247, 251 (8th Cir. 1995); Harris v. Champion, 15 F.3d 1538, 1556 (10th Cir. 1994).

### b.) "Cause and Prejudice"

A federal court may address the merits of a procedurally defaulted claim if the petitioner can demonstrate "cause" sufficient to excuse the procedural default and "actual prejudice" resulting from a failure to obtain review of the merits. Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506 (1997); Lemons v. O'Sullivan, 54 F.3d 357, 360 (7th Cir.), cert. denied, 116 S.Ct. 528 (1995).

For a Petitioner to demonstrate sufficient "cause", there   must generally be some external impediment that prevented the petitioner from raising the claim. Edwards v. Carpenter, 529 U.S. 446, 120 S.Ct. 1587, 1591 (2000); Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986). Yet, the United States Supreme Court has not attempted to establish conclusively the contours of the "cause" and "prejudice" standards Amadeo v. zant, 486 U.S. 214, 221, 108 S.Ct. 1771 (1988).

While "cause" for procedural default generally involves "some objective factor exterior to the  defense [that] impedes [defendant/petitioner's] efforts to comply with the State's procedural rule", Murray, Id. at 488, the overall fairness of the entire proceeding may fall within the rubric of "cause" excusing procedural default. See: Wainwright v. Sykes, 433 U.S. 72, 95-96, 97 S.Ct. 2497(1977)(Stevens, J. concurring).

The concepts of "objective factor" and "external impediment" have broad application. For instance, the concepts encompass situations in which the federal or legal basis for a claim was not reasonably available to petitioner or in which Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment [which  the

-30-

Supreme Court has designated an 'objective factor external to the
defense' in that it 'must be imputed to the State.'] See: Coleman v.
Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2566-67 (1991); Murray v.
Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986).   Interference  by
the State, Amedeo v. Zant, 486 U.S. 214, 222, 108 S.Ct. 1771 (1991),
and legal novelty of a claim or failure to present a legal claim for
which the factual basis is not readily available, Reed v. Ross, 468
U.S. 1, 13-14, 104 S.Ct. 2901 (1984), may constitute "cause". Additionally
it is conceivable that the denial of access to the courts may constitute
"cause". Lamp v. State of Iowa, 122 F.3d 1100, 1105 (8th Cir. 1997).

Ineffective assistance of counsel can be "cause" for a petitioner's
default. See: e.g., United States ex rel. Barnard v. Lane, 819 F.2d 798
(7th Cir. 1987); See also: Coleman v. Thompson, 501 U.S. 722, 111 S.Ct.
2546, 2566 (1991). This includes situations where counsel fails to
raise a claim reasonably known to him. See: e.g., Amadeo v. Zant, 486
U.S. 214, 222, 108 S.Ct. 1771 (1988), or where counsel is unaware of
facts and the law. See: e.g., Wainwright v. Sykes, 433 U.S. 72, 98-99,
97 S.Ct. 2497 (1977); Estelle v. Williams, 425 U.S. 501, 515, 96 S.Ct.
1691 (1976).

Additionally, in certain situations, ineffective assistance of
post-conviction counsel should constitute "cause" to excuse procedural
default.   This is so because, while there may be no independent Sixth
Amendment right under the Federal Constitution, there is a statutory
right to counsel in Illinois post-conviction proceedings 725 ILCS
5/122-2.1(a)(1).  And, where representation by counsel is provided for,
it is the effective assistance of counsel that is mandated. See:  e.g.,
Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 847 (1993).  The

-31-

right to counsel would be a futile gesture unless it comprehended the
right to the effective assistance of counsel. Evitts v. Lucey, 469
U.S. 387, 105 S.Ct. 830, 837 (1985).  To deprive any petitioner of
the effective assistance of statutorily provided counsel would raise
a due process and equal protection violation.  This is so because
where a State provided a right, it cannot discriminate in the exercise
of that right. See: e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct.
585, 590 (1956).  That is, when the State opts to act in a field where
its action has significant discretionary elements, it must [] act in
accord with the dictates of the Constitution--and, in particular, in
accord with the Due Process Clause." Evitts v. Lucey, Id. at 839.
Moreover, the purpose of the Equal Protection Clause is to secure
every person within a State's jurisdiction against intentional and
arbitrary discremination, whether occasioned by the express terms of
a Statute or by its improper execution through duly constituted agents.
Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 1075
(2000).

An argument that the United States Supreme Court's holding in
Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546 (1991) precludes
representation by competent counsel on collateral review is erroneous.
Moreover, that argument is in direct conflict with the exceedingly
high standards demanded by counsel pursuant to Keeney v. Tamayo-Reyes,
504 U.S. 1, 112 S.Ct. 1715 (1992) and McCleskey v. Zant, 499 U.S. 467,
111 S.Ct. 1454 (1991). The Courts, on one hand, cannot demand flawless
performance of counsel in the presentation of issues on collateral
review to preserve them for habeas consideration and then, on the other
hand, maintain that counsel need not be effective during those collateral

-32-

proceedings.

While a criminal defendant is not constitutionally entitled to
the effective assistance of counsel in State habeas proceedings after
a constitutional claim has been exhausted on direct appellate review,
See: Williams v. Turpin, 87 F.3d 1204, 1210 (11th Cir. 1996), citing,
Finley, 481 U.S. at 555, 107 S.Ct. at 1993, the question has not been
squarely addressed in a "right to counsel" case whether a defendant is
entitled to the effective assistance of counsel on collateral review
where the constitutional issue has not been exhausted on direct review
and a State mandates effective representation of prisoners sentenced
to first degree murder offenses or death in the State Courts.   The
Seventh Circuit has recognized, though, that "[o]ne can imagine scenarios
where egregious attorney misconduct in a State postconviction proceeding
would make it unjust to hold a federal habeas petitioner to any resulting
default." Morrison v. Duckworth, 898 F.2d 1298, 1301 (7th Cir. 1990);
See also Williams v. Duckworth, 724 F.2d 1439, 1442 (7th Cir. 1984)
Henderson v. Sargent, 926 F.2d 706, 709 (8th Cir. 1991)(ineffectiveness
of counsel in a State collateral proceeding can constitute  cause).

To deny a Petitioner competent counsel on collateral review is
tantamount to telling the government that they can use trickery, deceit
and any means of illegality to gain a criminal conviction and then
preclude a petitioner from having any means of countering or attacking
the illegality of the conviction on collateral review.  Simply put, a
petitioner must have a means of countering the unconstitutionality of
his conviction where the first place to attack that conviction is on
collateral review.

An indigent defendant has a right to the effective assistance of
counsel for his one and only Direct Appeal that he has as a matter of

-33-

right. <u>Douglas v. california</u>, 372 U.S. 353, 83 S.Ct. 814 (1963). It
follows that an indigent has a right to the effective assistance of
counsel at the one and only proceeding where he can raise constitutional
claims for the first time. <u>See</u>: e.g., <u>McFarland v. Scott</u>, 512 U.S. 849,
114 S.Ct. 2568 (1994)(Indigent entitled to appointment of effective
counsel on collateral review).  To hold otherwise would result, in
certain cases, in a defendant being totally deprived of constitutionally
mandated effective representation.  One of the "scenarios" imagined by
the Seventh Circuit surely must have been the situation where trial
counsel is ineffective, that ineffectiveness could only be raised and
proved by matters outside the record (and would, therefore, not be
considered on direct review), and post-conviction counsel, in his
incompetence, totally fails to raise the Sixth Amendment claim. In
this situation, a defendant has been denied his constitutional rights.
There must be a remedy for this type of wrong.

Just as the Supreme Court has not established conclusively the
contours of "cause", neither has the Court established conclusively the
contours of the "prejudice" standard. <u>Amadeo v. zant</u>, 486 U.S. 214, 221,
108 S.Ct. 1771 (1988).  Prejudice requires more than mere possibility
of prejudice and the error must have "worked to [the Petitioner's]
**actual** and **Substantial disadvantage**." <u>United States v. Frady</u>, 456 U.S.
152, 170, 102 S.Ct. 1584 (1982).  Probably the most appropriate standard
for determining whether prejudice has occurred is to determine whether
the error "had substantial and injurious effect or influence in
determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 506 U.S. 619,
113 S.Ct. 1710 (1993). In Pre-AEDPA, <u>Brecht</u> was the standard. The
Seventh Circuit has not addressed if <u>Brecht</u> applies post-AEDPA. <u>Whitehead</u>
<u>v. Cowan</u>, 263 F.3d 708, 726, fn. 3, (7th Cir. 2001). And, When the

-34-

"matter is so evenly balanced that [the federal judge] feels himself
in virtual equipoise as to the harmlessness of the error," the Court
should find that the error is not harmless and grant relief on behalf
of the petitioner. O'Neal v. McAninch, 513 U.S. 432, 435, 115 S.Ct.
992 (1995).

Finally, procedural default will be excused in cases of newly
discovered evidence. Reed v. Ross, 468 U.S. 1, 104 S.Ct. 2901 (1984).

### c.) "Miscarriage of Justice"

Additionally, if failure to consider claims will result in a
"fundamental miscarriage of justice," procedural default will be
excused. Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995); Sawyer
v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 2518 (1992); Coleman v.
Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2565 (1991); McClesky v.
Zant, 499 U.S. 467, 111 S.Ct. 1454, 1470 (1991); Engle v. Isaac, 456
U.S. 107, 135, 102 S.Ct. 1558 (1982); Wainwright v. Sykes, 433 U.S. 72,
91, 97 S.Ct. 2497 (1977). The "miscarriage of justice" exception is
concerned with actual as compared to legal innocence. Sawyer, Id.at
339. If a petitioner asserts his actual innocence of the underlying
crime, he must show it is "more likely than not that no reasonable
juror would have convicted him" in light of the new evidence presented
in the habeas petition. Schlup, Id. at 324. On the other hand, if a
petitioner challenges the validity of his sentence, he must show "by
clear and convincing evidence" that no reasonable juror would have
found him eligible for that penalty in light of the new evidence. Sawyer,
Id. at 348. A claim of actual innocence is a "gateway" through which
a habeas petitioner must pass to have his otherwise barred constitutional
claim considered on its merits.

-35-

claim considered on the merits. Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853 (1993).

A Court must determine if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1956 (1999)(Souter, J., joined by Kennedy, J., concurring in part and dissenting in part), Quoting, Kyles v. Whitley, 514 U.S. 419. A "significant possibility" that the undisclosed evidence would place the actual result of the proceeding in question should be sufficient to warrant overturning a conviction or sentence. Strickler, Id. at 1957.

Simply put, the "very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected," Harris v. Nelson, 394 U.S. 286, 291, 89S.Ct. 1082 (1969), and that preclusive doctrines and formalities "yield to the imperative of correcting [] fundamentally unjust incarceration." Engle v. Isaac,  456 U.S. 107, 135, 102 S.Ct. 1558 (1982).


**d.) The Allegations Of This Petition Must Be Accepted As True**


The appropriate response to a "Petition for Writ of Habeas Corpus" is an answer that "responds to each allegation in the petition." Chavez v. Morgan, 932 F.Supp. 1152, 1153 (E.D. Wisc. 1996). To the extent that there is a dispute as to the facts, the State should raise the issue in the District Court or risk waiving the issue. Bland v. California Department of Corrections, 20 F.3d 1469, 1474 (9th Cir. 1994).

-36-

This is so because the failure to deny allegations in a pleading constitutes an admission of all those facts not denied. Shakman v. Democratic Party of Cook County, 533 F.2d 344, 352 (7th Cir. 1978)..

While Federal Rule of Civil Procedure 81(a)(2) recognizes the supremacy of the statutory procedures over the Federal Rules, the Rules of Civil procedure apply in habeas proceedings "to the extent that the practice in such proceedings is not set forth in statutes." Browder v. Director, Dept. of Corrections of Illinois, 434 U.S. 257, 98 S.Ct. 556, 562-563 (1978).  Thus, "[a]verments in a pleading to which a responsive pleading is required [] are admitted when not denied in the responsive pleading [.]" Fed.R.Civ.Pro. 8(d).

A procedure where the Respondent fails to admit or deny the allegations of the "Petition" is inappropriate.  As such, where there are disputed allegations raised in the Petition, this Court must accept those allegations as true.

### III. STANDARDS OF REVIEW

#### A. Applicability of the AEDPA (A Threshold Question)

Habeas corpus litigation involves complex procedural principles "that are embodied in statutes, rules, precedents, and practices that control the writs exercise." Lonchar v. Thomas, 517 U.S. 314, 116 S.Ct. 1293, 1298 (1996). And, while a habeas petition filed after April 24th, 1996 is presumptively governed by the AEDPA, Holman v. Gilmore, 126 F.3d 876 (7th Cir. 1997), only qualifying State Court decisions are subject to review under the statute.

This Court must make an initial inquiry to determine if the provisions of the AEDPA apply to the issues presented herein.

-37-

### 1). The AEDPA Does Not Apply Unless
### There Was An "Adjudication on the Merits"

One prerequisite to application of amended Section 2254(d) is clear from the statutory language. 28 U.S.C. Section 2254(d) states that "[a]n application for a writ of habeas corpus [] shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings <u>unless</u> the adjudication of the claim—resulted in a decision [.]" Thus, the 1996 Amendments affect only a "Claim that was adjudicated on the merits in State Court proceedings." <u>See</u>: e.g., <u>Liegakos v. cooke</u>, 106 F.3d 1381, 1385 (7th Cir. 1997); see also <u>Mainiero v. Jordan</u>, 105 F.3d 361, 365 fn. 5 (7th Cir. 1997). Thus, if there was no State court "adjudication", this court must disregard the amendments of the AEDPA and address the claim under prior habeas corpus precedents and rules. That is, simply "dispose of the matter as law and justice require." <u>Braun v. Powell</u>, 227 F.3d 908, 917 (7th Cir. 2001).

### 2). The AEDPA Does Not Apply Unless There Were
### "Findings of Fact" By the State Court

28 U.S.C. Section 2254(e)(1), regarding the preclusion of evidentiary hearings, does not apply where there have been no findings of fact by the State court. <u>Burris v. Parke</u>, 116 F.3d 256, 258 (7th Cir. 1997). Thus, in situations such as these, a hearing is required and this court must, again review the claim as if nothing happened on April 24th, 1996.

-38-

Moreover, where there are no specific fact findings by a State Court, there can be no presumption of correctness. See: Tippins v. Walker, 77 F.3d 682, 685 (2nd Cir. 1996). And, a finding not supported by the record carries no presumption of correctness. See: Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir. 1995), cert. denied, 116 S.Ct. 38 (1995).

### 3). The AEDPA Does Not Apply If It's Application Causes An Unconstitutional Result

The Petitioner is entitled to the issuance of the writ if application of the AEDPA causes an Unconstitutional result. The Supreme Court's holding in Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997)that the provisions of the Anti-Terrorism and Effective Death Penalty Act (Chapter 153 of the AEDPA) generally apply only to cases filed after the Act became effective, and does not imply that it applies where an Unconstitutional effect would result. And, because the Supreme Court held that the AEDPA was inapplicable to Lindh's case, the Court did not reach this issue.

### B. Standards For Deciding A Claim Under the AEDPA

"[I]n a world of silk purses and pig's ears, the [AEDPA] is not a silk purse of the art of statutory drafting." Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2068 (1997).  Thus, in attempting to discern exactly what the statute means, one must keep in mind that the statutory terms should be construed "to contain that permissible meaning which fits most logically and comfortably into the body of

-39-

both previously and subsequently enacted law [in order to] make
sense rather than nonsense out of the corpus juris." West Virginia
University Hospitals, Inc. v. Casey, 499 U.S. 83, 100-101, 111 S.Ct.
1338, 1147-48 (1991).

28 U.S.C. Section 2254(d), as amended, provides as follows:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State Court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State Court proceedings unless
> the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United States;
> or--
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State Court proceeding.

Thus, habeas relief will be granted if the adjudication of the
claim (1) resulted in a decision that was contrary to clearly established
federal law [], (2) resulted in a decision that involved an unreasonable
application of clearly established federal law [] or, (3) resulted in a
decision that was based on an unreasonable determination of the facts.

A State Court decision is "contrary to" Supreme Court precedent "if
the State Court arrives at a conclusion opposite to that reached  by
[the Supreme] Court on a question of law" or "if the State Court confronts
facts that are materially indistinguishable from a relevant Supreme
Court precedent and arrives at a result opposite to [that reached by the
Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495
(2000). An "unreasonable application" of Supreme Court precedent occurs
when "the State Court identifies the correct governing legal rule [] but
unreasonably applies it to the facts of the particular State prisoner's

case" or "if the State Court either unreasonably extends a legal
principle from [the Court's] precedent to or unreasonably refused to
extend that principle to a new context where it should apply." Id. at
407.

Moreover, when a case falls under 2254(d)(1)'s "contrary to" clause,
a habeas court reviews the State Court decision de novo to determine the
legal question of what is clearly established law as determined by the
Supreme Court and whether the State Court decision is "contrary to" that
precedent.  When the case fits within the "unreasonable application"
provision of 2254(d)(1), a habeas court defers to a reasonable State
Court decision. Denny v. Gudmanson, 252 F.3d 896, 900 (7th Cir. 2001).

The United States Supreme Court's decision in (Terry) Williams v.
Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000), clarified in several ways
the methodology to be employed by federal courts entertaining habeas
corpus petitions pursuant to 28 U.S.C. § 2254.  Under Williams, the
emphasis of the federal court's inquiry is on the nature and quality
of the State Court decision. Prior to doing the 2254(d) analysis,though,
the habeas court must first look at what the State court did with the
claim.  If the claim was not addressed by the State Court at all, then
Section 2254(d), by its own express terms, does not govern, and the
federal court's review of the claim is de novo. (See Section 3(A)(1),
supra). Likewise, if the claim was decided on State procedural grounds,
but not on the merits, then 2254(d), by its own express terms, does not
govern the federal court's review of the claim. (See Section 3(A)(2),
supra).  Thus, if this court determines that the Petitioner has overcome
the State court's procedural ruling, merits review by this Court is
de novo. And, finally, if the claim was decided on the merits, then

Section 2254(d) may apply, depending on the nature of the State Court's decision.

Moreover, if the State court did not provide any explanation for its denial of relief on the merits, then <u>Williams</u> suggests that 2254(d) should not govern the federal court's review of the claim. Without an explanation of what federal law the State court applied, and how it applied the law, the Section 2254(d)(1) analysis exemplified in <u>Williams</u> is impossible. Thus, only if the State court issued a decision setting forth its own judgment that the petitioner's constitutional claims lack merit, then Section 2254(d) will ordinarily apply.

If Section 2254(d) applies, it is the Federal Court's responsibility to identify the relevant "clearly established Federal Law." And, this "law" must have been "clearly established" at the time of the State Court decision at issue. In other words, whatever would qualify as an old rule under <u>Teague</u> will constitute "clearly established Federal Law" as determined by the Supreme Court of the United States under Section 2254(d)(1). <u>See</u>: <u>Williams</u>, 529 U.S. at 412. This is not to suggest that lower federal court decisions are entirely irrelevant in federal habeas proceedings. Rather, they remain useful in the task of identifying the content and scope of rules clearly established by the Supreme Court. <u>See</u>: e.g., <u>Richardson v. Bowersox</u>, 188 F.3d 973, 978 (8th Cir. 1999); <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877 (3rd Cir.)(en banc), <u>cert. denied</u>, 528 U.S. 824 (1999). Section 2254(d) analysis comes into play after the Court addresses the merits of the claim. That is, only after determining that a petitioner has shown constitutional error pursuant to independent review, does the Court determine whether the State court decision was "contrary to" or involved "an unreasonable application of" clearly established federal law. <u>See</u>: <u>Williams</u>, 529 U.S. at 399. (AEDPA

"placed a new restriction on the power of the federal courts to grant writs of habeas corpus"). In both Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113 (2000) and Weeks v. Angelone, 528 U.S. 225, 120 S.Ct. 727 (2000), the Court only discussed the applicability of Section 2254(d) after a thorough discussion of the merits of the claim at issue.

A State court decision will be contrary to United States Supreme Court precedent if the State Court applies a rule that contradicts the governing law in their cases. The State dicision can be "contrary to" United States Supreme Court ("Federal") law by identifying the wrong precedent, by identifying the correct precedent but misstating the rule of that precedent, by misunderstanding the rule established by the governing precedent, or by incorrectly determining that the governing precedent had been modified. A State court decision can be "contrary to" controlling decisions of the United States Supreme Court, in the sense of misinterpreting the Supreme Court's precedents, even though the State Court's reading of the relevant precedents is supported by a substantial number of other lower-court decisions, including a majority of the federal circuit court opinions on point. This was the case in Williams, in which the Supreme Court found any notion that Lockhart v. Fretwell clarified the Strickland standard of prejudice "contrary to" Strickland and Fretwell, notwithstanding the fact that nine federal circuits had read Fretwell as clarifying Strickland.

A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was objectively unreasonable. The Court may not issue the writ simply because that court concludes in its independent judgment that the relevant State court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must

-43-

also be unreasonable. Williams, 529 U.S. at 409.

Subsection 2254(d)(2) commands federal courts to assess the reasonableness of State court factual determinations "in light of the evidence presented in the State court proceeding"--that is, to look beneath the State court's factual conclusions to determine whether those conclusions are reasonable in light of the evidence that was before the State Court.  Subsection (d)(2) directs the federal court to scrutinize what the State court did with the evidence before it, and permits the grant of habeas corpus relief where the State Court's erroneous denial of relief "resulted" from an objectively "unreasonable determination of the facts [.]"  Thus, where the federal court believes the record evidence establishes a constitutional violation, Section 2254(d)(2) permits the grant of habeas relief if, in the federal court's judgment, the State court's denial of relief with respect to that violation "resulted" from an "unreasonable determination of the facts [.]" If the federal court agrees with a petitioner's assessment of the facts, neither Section 2254(e)(1) nor Section 2254(d) stands as a barrier to granting habeas relief.

Thus, simply put, for each individual claim that this Court determines is reviewable under the AEDPA, this Court's first task is to determine whether the State court erred in its analysis of controlling federal law. Then, the Court must assess whether the error was caused by an unreasonable application of controlling federal law under 28 U.S.C.§ 2254(d). See: Delgado v. Lewis, 223 F.3d 976, 980 (9th Cir. 2000).

When a State court summarily disposes of a claim without setting forth the legal or factual basis for its decision, an independent review of the record is required to determine whether the State court clearly

-44-

erred in its application of controlling federal law.  The claim must be reviewed **de novo** since the federal court is deprived of any State court analysis to examine for "reasonableness." <u>United States ex rel. Maxwell v. Gilmore</u>, 73 F.Supp. 1078, 1088-89 (N.D. Ill. 1999). Only by such an examination can the habeas court determine whether the State court's decision was objectively   reasonable under the <u>Williams</u> Standard. <u>Delgado</u>, <u>Id</u>, at 982.

The writ should issue when the federal court is firmly convinced that the State court was "simply wrong." In other words, the writ will issue when a habeas court is convinced that "clear error occurred." <u>Downs v. Hoyt</u>, 232 F.3d 1051 (9th Cir. 2000); see also <u>Van Tran v. Lindsey</u>, 212 F.3d 1143, 1153 (9th Cir. 2000)(clear error doctrine most nearly reflects the kind of respect for other court judgments that Congress and the Supreme Court felt was appropriate in habeas cases). Thus, under the AEDPA, if the answer to the federal court's "contrary to" or "unreasonable application of" inquiry is in the affirmative, the "province and duty of the judicial department to say what the law is," <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177-78 (1803), continues to require that the federal court grant relief.

## C. Right to an Evidentiary Hearing.

Ever since 1867, federal court's have had the authority and the responsibility to "hear and determine the facts, and dispose of the matter as law and justice require." <u>See</u>: Act of February 5, 1867, Ch. 28, Sec. 1; 14 Stat. 385-386; currently codified at 28 U.S.C. § 2243 (1996). Thus, whenever "there is a reasonable likelihood that the production of evidence will make the answer to the [Constitutional]

-45-

questions clearer," <u>Borden's farm Products Co. v. Baldwin</u>, 293 U.S.
194, 213, 55 S.Ct. 187 (1934)(Cardozo, J. concurring), the "essential
facts should be determined before passing upon grave constitutional
questions [.]" <u>Polk Co. v. Glover</u>, 305 U.S. 5, 10, 59 S.Ct. 15 (1938).

Generally, an evidentiary hearing is mandatory if (1) the merits
of the factual dispute were not resolved in the State hearing; (2) the
State factual determination is not fairly supported by the record as
a whole; (3) the fact-finding procedure employed by the State court was
not adequate to afford a full and fair hearing; (4) there is a substantial
allegation of newly discovered evidence; (5) the material facts were
not adequately developed at the State court hearing; or (6) for any
reason it appears that the State trier of fact did not afford the
habeas applicant a full and fair fact hearing. <u>Townsend v. Sain</u>, 372
U.S. 293, 313, 83 S.Ct. 745 (1963).

More importantly, though, a federal district court always has
the discretion to hold an evidentiary hearing. <u>Townsend</u>, <u>Id</u>. at 318;
See also: e.g.,<u>Lonchar v. Thomas</u>, 517 U.S. 314, 326, 116 S.Ct. 1293
(1996)("district court is afforded a degree of discretion in determining
whether to hold an evidentiary hearing", citing, Rule 8(a) of the Rule's
Governing Section 2254 Cases; <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. at 11-12;
<u>Townsend v. sain</u>, 372 U.S. at 318).  Moreover, the standards announced
in <u>Townsend v. Sain</u>, 372 U.S. 293, 83 S.Ct. 745 (1963), including the
requirement that a hearing is mandatory when a habeas petitioner has
alleged facts that, if proven, would entitle him to relief, are still
applicable even after the amendments made by the AEDPA. <u>See</u>: e.g.,
<u>Porter v. Gramley</u>, 112 F.3d 1308, 1314 (7th Cir. 1997).

-46-

While  the AEDPA does impose express limitations on the grant of
an evidentiary hearing and reduces considerably the degree of a district
court's discretion in granting a hearing, the district court may still
proceed to consider whether a hearing is appropriate or required under
Townsend, if the applicant has not failed to develop the facts in State
court. Burris v. Parke, 116 F.3d 256, 258 (7th Cir. 1997); Baja v.
Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); See also Turner v. Duncan,
158 F.3d 449, 458 (9th Cir. 1998)(when a habeas petitioner alleges facts
which, if proven, would entitle him to relief, and he did not receive a
full and fair hearing by a State court which found the relevant facts,
then he is entitled to an evidentiary hearing in the district court).
Simply put, a habeas petitioner who asserts a colorable claim to relief,
and who has never been given the opportunity to develop a factual record
on that claim, is entitled to an evidentiary hearing in federal court.
Smith v. Stewart, 241 F.3d 1191, 1197-1198 (9th Cir. 2001).

Section 2254 (e)(2), which proscribes when a petitioner is
**not** entitled to an evidentiary hearing, provides as follows:

(2) If the applicant has failed to develop the factual basis
of a claim in State court proceedings, the court shall
not hold an evidentiary hearing on the claim unless the
applicant shows that--

(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive
on collateral review by the Supreme Court, that was
previously unavailable; or
(ii) [newly discovered evidence] and

(B) the facts underlying the claim [establish the applicant's
actual innocence] of the underlying offense.

In Michael Wayne Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479
(2000), the United States Supreme Court has agreed with the view of
the Seventh Circuit described in Burris, supra. "In its customary and

preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something." Id. at 1488. Thus, "[u]nder the opening clause of Sec. 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel". Id. at 1488, citing Burris. "[C]omity is not served by saying a prisoner'has failed to develop the factual basis of a claim' where he was unable to develope his claim in State court despite diligent effort.  In that circumstance, an evidentiary hearing is not barred by Section 2254(e)(2)." Id. at 1491.

In short, a federal court is obliged to hold its own evidentiary hearing on habeas corpus if, amongst other factors, the factfinding procedures employed by the State were not adequate to afford a full and fair hearing, the material facts were not adequately developed at the State Court hearing, the applicant did not receive a full, fair and adequate hearing in the State court proceeding. Hamilton v. Texas, 497 U.S. 1016, 110 S.Ct. 3262, 3264 (1990); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1963), or the State court trier of fact has not reliably found the relevant facts. Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997). These standards announced in Townsend are still applicable even after the amendments made by the AEDPA. See: e.g., Fisher v.Lee, 215 F.3d 438 (4th Cir. 2000); Trotter v. Bunnell, 163 F.3d 607 (9th Cir. 1998). And, in fact, district courts still have general discretion to afford evidentiary hearings under Townsend. United States ex rel. Maxwell v. Gilmore, 37 F.Supp.2d 1078, 1090 (N.D. Ill. 1999).

With all of these above noted principles in mind, this Honorable Court should grant relief on the claims contained herein for the following reasons:

## CLAIM I

**The Trial Court Denied Petitioner His Due Process Right to Present A Defense When It Ruled Following A <u>Chambers</u> Hearing That Elizabeth Montalvo Could Not Testify As To A Jason Rodriguez's Admission That He, And Not Petitioner, Shot Garcia And Lugo, Where The Admission Was Sufficiently Trustworthy.  The Court Further Infringed On The Petitioner's Rights When It Ruled That, Although Montalvo Was Unavailable To Testify At Trial, Neither The Hearsay Nor Non-Hearsay Portion Of Montalvo's Testimony From The <u>Chambers</u> Hearing Could Be Introduced Into Evidence At Trial.**

The defense theory at trial was that Jason Rodriguez, Not the Petitioner, was guilty of shooting Garcia and Lugo.  This defense was unconstitutionally hindered, by the trial Court's decision to prohibit Elizabeth Montalvo from testifying as to certain inculpatory statements made by Rodriguez, (her boyfriend).  Montalvo testified at a pre-trial hearing that Rodriguez 'confessed' to her that he shot two people, one of whom was a Latin King, on the same day and in the same area that Petitioner was alleged to have shot Garcia and Lugo. (R.SS17).  Montalvo further provided non-hearsay testimony implicating Rodriquez, such as his leaving the day of the shooting wearing a black hooded sweatshirt, returning a few hours later acting nervously, closing the blinds, and leaving the house infrequently over the next few days (R.SS14-16). Rodriguez's statements to Montalvo satisfied the reliability concerns outlined in <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973), as they were corroborated by the manner, timing, and location of the shooting, as well as by numerous witness descriptions of the shooter which <u>matched</u> "Rodriguez and <u>not</u> Petitioner.  The Statements were spontaneous and against Rodriguez's penal interests.  The inculpatory Statements therefore bore persuasive assurances of reliability, such that their exclusion deprived Petitioner of a fair trial. Furthermore, the Trial Court erred in refusing to allow Montalvo's pre-trial testimony to be introduced at

-49-

trial, as she had become unavailable, and her prior testimony was subject to extensive cross-examination. Because Petitioner's Due Process right to Present a Defense was violated by the Court's decision to preclude him from calling an exonerating witness, this Honorable Court should Grant the Writ of Habeas Corpus.

A.  **The Trial Court Erred In Prohibiting Montalvo From Testifying At Trial Where Her Testiminy Met The Standards For Admission enunciated in "Chambers", as measured by the Four "Chambers Factors For Reliability.**

In Chambers v. Mississippi, the United States Supreme Court held that, where hearsay testimony regarding a declaration against penal interest bears adequate assurances of trustworthiness and is critical to the defense, its exclusion deprived the Petitioner of a fair trial in accord with Due Process. 410 U.S. at 302; People v. Thomas, 171 Ill.2d 207, 664 N.E.2d 76 (1996). The Court found that, while statements against penal interests had been traditionally viewed as less trustworthy than statements against propriety or pecuniary interests (a viewpoint subject to much scholarly criticism), such statements can be considered sufficiently trustworthy for admission at trial under certain circumstances. Chambers, 410 U.S. at 300. The Court identified four factors to assist the determination of the reliability of a declaration against penal interest: (1) the declaration was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the declaration is corroborated by some other evidence; (3) the declaration is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant. Id. at 300-01.

-50-

These factors are merely guidelines to admissibility rather than hard and fast requirements and the presence of all four factors is not a condition of admissibility. People v. Tenney, 205 Ill.2d 411, 435, 793 N.E.2d 571 (2002). The guiding principle is that a declaration against penal interest will be admissible as an exception to the hearsay rule where the declaration was made under circumstances that provide considerable assurance of its reliability by objective indicia of trustwothriness. Thomas, 171 Ill.2d 216. The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. Id. at 218.

The Trial Court's analysis of these factors and subsequent denial of the defense motion to allow Montalvo's testimony was in clear error and constituted an abuse of discretion. While the Court agreed that the Statements to Montalvo concerning his shooting of a Latin King were against Rodriguez's penal interests, it found that the admission was not made spontaneously, and was not corroborated. (R.HHH16, 26, 62)

These determinations run contrary to the evidence adduced at the hearing.

Beginning with the third Chambers factor, it is undisputed that the statement was "contrary to" Rodriguez's penal interest and was self-incriminating. This factor is the "bedrock" for the hearsay exception at issue, and therefore must be present. People v. Tenney, 205 Ill.2d 401, 436, 793 N.E.2d 571 (2003). A declaration against penal interest is one that would be admissible against the declarant in a criminal prosecution. Id. It does not have to be a confession, but must involve exposure to criminal liability. Id., citing 2 J. Strong,

-51-

McCormick on Evidence § 319(b), at 323-24 (5th ed. 1999); accord.
Fed. R. Evid. 804(b)(3)(the declaration, at the time of its making,
must tend to subject the declarant to criminal liability, so that a
reasonable person in the declarant's position would not have made
the statement unless the declarant believed it to be true).

In this case, Montalvo testified that Rodriguez told her before
he left on March 22, 1999, that he had to "take care of something," and
that he had something to "prove". (R.SS15) When Rodriguez returned, he
laid low for two days, then, at the behest of a friend, absconded.
(R.SS17) Before he left, Montalvo questioned Rodriguez about what was
going on. (R.SS17) Rodriguez responded that he had 'proved' something
by shooting a Latin King; he described how he got out of the car,
approached the Latin King on belmont, heard someone say "Watch that
black guy," looked the man in the eye, and shot him and one other
person. (R.SS18) Rodriguez left the house and told Montalvo he would
come back as soon as everything was clear. (R.SS19) Two days later,
he came back and told Montalvo that the police had arrested someone
else for his crime. (R.SS20) These statements, in which Rodriguez
admitted to consciously and purposefully shooting two people, are
clearly contrary to his penal interest, and thus, the third Chambers
factor was met in this case. See Tenney, 205 Ill.2d at 436-437
(declarant's statement that he committed home evasion clearly against
his penal interest).

Next, to satisfy the First Chambers factor, the statement must
be spontaneously made to a close acquaintance a short time after the
crime. Rodriguez's statements were made to a close acquaintance.
Montalvo was his live-in girlfriend and the mother of his child. (R.SS25)

-52-

The statements were shown to be spontaneous, and they were made within days of the shooting. Therefore, the trial court's conclusion that the first factor had not been met was erroneous. <u>Tenney</u>, is once again instructive. There, the Court noted that a statement to a good friend or family member is inherently more reliable than a statement made to a police officer. <u>Id</u>. at 438-439. Thus, the fact that Rodriguez made the Statement to his live in girlfriend weighs in favor of admission, as the statement in <u>Tenney</u> was made to the declarant's girlfriend. As for the spontaneity requirement, the <u>Tenney</u> Court held that a statement made under similar circumstances as the one made in the instant case was spontaneous. There, the girlfriend asked the declarant "What the hell was going on?" (<u>Here</u>, Montalvo asked Rodriguez "What was going on?") vertually identical questions--and in response the declarant in <u>Tenney</u> informed her that he had broken into and ransacked a woman's house, and his friend had shot the woman. <u>Id</u>. at 432. (<u>Here</u>, Rodriguez's response was that he had 'proved something by shooting a Latin King and another person on Belmont, and heard someone say "Watch that Black guy", Looked him in the eye and shot him".). The Court in <u>tenney</u>, found the statements in response to the girlfriend's questioning were spontaneous, which contradicting to the trial court's assessment in this case that an answer to a demanding question should not be considered spontaneous. and therefore the Trial Court erred and deprived Petitioner his right to present a defense.

The final aspect of this <u>Chambers</u> factor is that it be made in close temporal proximity to the crime confessed. In <u>people v. Anderson</u>, 291 Ill.App.3d 843, 851, 684 N.E.2d 845 (1st Dist. 1997), the Court held that two days is indeed a "short" period of time as required by

-53-

Chambers. As the Anderson Court noted, the events described in the statements are still fresh in the declarant's mind within two days, and therefore a statement made in this time frame should be considered reliable. Id. In fact, in People v. Human, 331 Ill.App.3d 809, 773 N.E.2d 4 (1st Dist. 2002), the Court found that a declarant's confession made 33 days after the crime should have been admitted. Thus, because the statements were made spontaneously to the declarant's girlfriend a short time after the shooting, the first Chambers factor has also been met in this case.

Next, Petitioner maintains that the trial court wrongly decided that the second Chambers factor, the corroboration factor, had not been met. The Court's findings that Rodriguez's statements to Montalvo had not been corroborated conflicted with the evidence presented at the hearing. (R.HHH62) The defense submitted numerous points of corroboration between Rodriguez's description of the shooting and the other evidence presented. While some of the corroboration stemmed from Nicasio Santiago's testimony, which the Court found unworthy of belief, there were enough corroborating facts outside his testimony to satisfy the Chambers corroboration requirement. First, Rodriguez told Montalvo that he shot two people on Belmont, a Statement corroborated by the fact that both Lugo and Garcia were shot on Belmont. Second, Rodriguez told Montalvo that the shooting occurred at Belmont and the shooting actually occurred at Belmont and Monticello. Third, most of the eyewitnesses described the offender as a dark-complected Hispanic between 5'7" and 6' tall. A mugshot of Rodriguez showed him to be dark complected, and the accompanying description reported that he was a Black-Hispanic standing 5'7". (R.WW44) The descriptions also

-54-

showed that the shooter wore a black hooded sweatshirt, and Montalvo
testified that Rodriguez wore a "Black hooded sweatshirt" when he
left the house. (R.WW27, 37, SS15) <u>Fourth</u>, Lugo testified that he was
a Latin King, and Rodriguez wa an OA, and Rodriguez told Montalvo
before he left that "he had to prove something", and two days later
when Rodriguez returned he told Montalvo that he "Shot a Latin King".
(R.SS17).

Finally, Santiago testified at the <u>Chambers</u> hearing that he
personally witnessed Rodriguez, and not the petitioner, fire the
weapon. (Supp.R.A.-35)  Santiago testified that he knew Rodriguez lived
with his girlfriend and their baby, and that he was with Rodriguez throughout
the afternoon of the offense. (Supp.R.A-10, A-29). Santiago explained
that Rodriguez used the gun Santiago retrieved from Cane's apartment,
and that Santiago returned the gun after the shooting. (Supp.R. A-19)
and that Rodriguez wore a brown hoody that appeared Black, and that
Santiago acted as the lookout while Rodriguez fired. (Supp.R. A-11, A-32)
In essence, Santiago fully corroborated Rodriguez's statements to
Montalvo along with the numerous other points of corroborating evidence.

The Illinois Supreme Court stated with regard to the corroboration
factor: "It must be remembered that this factor requires only that the
statement be corroborated by 'some other evidence in the case." <u>Tenney</u>,
205 Ill.2d at 407, quoting <u>Chambers</u>, 410 U.S. at 300. The <u>tenney</u> Court
further relied on a discussion of the corroboration factor  in
<u>Commonwealth v. Drew</u>, 397 Mass. 65, 75 n.10, 489 N.E.2d 1233, 1241 n.10
(1986):

> In determining whether the declarant's statement has been sufficientl
> corroborated to merit its admission in evidence, the judge should not
> be stringent..If the issue of sufficiency of..corroboration is close,
> the judge should favor admitting the Statement. In most such instance
> the good sense of the jury will correct any prejudicial impact.

Finally, the Tenney Court approvingly referenced the federal approach
to the admission of such exculpatory statements by quoting United
States v. Garcia, 986 F.2d 1135, 1141 (7th Cir. 1993): The district
court does not need to be completely convinced that exculpatory
statements are true prior to their admission. Such a high burden was
not intended by the corroboration requirement of [Fed. R. Evid.]
804(b)(3). The District Court must find only that sufficient corroborating
circumstances exist and then permit the jury to make the ultimate
determination concerning the truth of the statements.

From this framework, it can be seen that the defense burden to
show "some" corroboration, as outlined by the Illinois Supreme Court,
is a small one, such that the trial court should favor admission.
and contrary to the factual determinations of the Illinois Courts, the
aforementioned points of corroboration met this burden.

The trial court here found that certain corroborative facts were
not indicators of the statement's reliability because they were
"probably" widely known within the OA gang. (R.HHH60) This reasoning
was legally unsound. In People v. Nally, 216 Ill.App.3d 742, 769, 575
N.E.2d 1341 (2d Dist. 1991), the court held that there was sufficient
corroboration even though the State argued that the corroborating facts
were widely reported by the media. There, the declarant's confession
to a shooting included knowledge that a gun had been left behind,
described the type of gun used, and explained the source of beer cans
left near the scene. Id. at 769. "Although the State argues that much
of the information contained in [the declarant's] testimony was also
widely reported in the press, and therefore cannot be regarded as
corroborative, we believe that such concerns go more to the weight to
be accorded such testimony rather than admissibility." Id.

In _People v. Human_, the defendant was convicted of battery and aggravated assault after firing a pellet gun into a group of teenagers. 331 Ill.App.3d at 810. The four victims who saw the shooter's face identified a photograph of the defendant, and a police officer testified that the defendant had lived near the scene of the crime and had previously complained about the neighborhood teenagers trespassing and littering. _Id_. at 812.  After the defendant was arrested, defendant's then brother-in-law admitted his guilt to the police, an assistant State's Attorney, and his parents. _Id_. at 814.  The trial court ruled the confession inadmissible because it was not corroborated. _Id_. at 815.  The Court reversed defendant's conviction, finding the declarant's confession should have been admitted as it contained sufficient indicia of reliability. _Id_. at 817. It was obviously against his penal interest, was made to a close acquaintances 33 days after the crime, and was corroborated by the fact that testimony at trial established he owned a pellet gun and was at defendant's home the night of the incident. _Id_. Even though the State's eyewitnesses viewed a photograph of the declarant and stated that he was not the shooter, his confession was sufficiently trustworthy to warrant admission into evidence. _Id_.

The final _Chambers_ factor is whether the declarant was available for cross-examination.  In this case, it does not appear that the defense bothered to subpoena Rodriguez, as he likely would not have testified without immunity. _See_: _People v. Caffey_, 205 Ill.2d 52, 792 N.E.2d 1163 (2001)(where declarant invokes right against self-incrimination and State refuses to grant immunity, declarant is considered unavailable for cross-examination).

-57-

At least at the minimum, Three of the four, if not all four Chambers factors have been met in this case, and therefore Rodriguez's inculpatory statements should have been admitted. The exclusion of this testimony was severely detrimental to Petitioner's case, and the exclusion 'prejudiced' petitioner's right to present a complete defense, in that it hindered his ability to present 'fully' his defense. Petitioner's defense hinged on his ability to implicate Rodriguez in the crime. While this was done partly through Santiago's testimony, Montalvo would have been able to testify as to Rodriguez's 'exact words', and corroborated Santiago's testimony in the process, which in turn would have allowed the jury to better access the 'credibility' of Santiago's overall testimony. The fact that Rodriguez admitted his guilt to his girlfriend would have solidified Petitioner's defense at trial, and therefore, the error should not be deemed harmless.

In accordance to the precedent of the Illinois Courts, as well as existing United States Supreme Court precedent, the existence of the majority of the Chambers factors adequately satisfied the question of reliability, and therefore mandates the issuance of the Writ of Habeas Corpus in this case as Petitioner was denied his Constitutional right to present a 'complete defense' and thus, denied a fair trial.

B. **The Trial Court Erred In Prohibiting The Defense From Introducing Montalvo's Testimony At The Hearing Into Evidence Where Montalvo Was Unavailable And Had Been Subject To Cross-Examination.**

Elizabeth Montalvo testified not only about her boyfriend Jason Rodriguez's incriminating Statements about the instant Murder, but also about his threats and abuse of her. Montalvo detailed how she had to obtain an Order of Protection against him. It is not surprising,

then, that Montalvo became unavailable to testify at trial, ignoring
a subpoena.  The Circuit Court issued a Warrant for her arrest based
on the defense's motion for a rule to show cause why she should not
be held in contempt of court. (R.YYY74)  Montalvo never appeared. The
defense filed a motion to admit her prior testimony. (C.229) The Trial
Court denied the motion. (R.AAAA89).

The trial court's decision constituted reversible error because
Montalvo's testimony was  necessary to the defense, and its exclusion
was 'severely prejudicial'.  While the Court had already barred Montalvo's
ability to testify as to Rodriguez's inculpatory statements, Petitioner
maintained these were admissible. (See Subsection A above), and therefore
Montalvo's entire testimony at the hearing should have been admitted
and entered into the trial record.  In the alternative, the trial court
erred in refusing to admit even a redacted version of her prior testimony,
which could have informed the jury of Rodriguez's actions and clothing
he wore before, during, and after the shooting.  Such information was
essential to Petitioner's defense that Rodriguez, and not Petitioner
was responsible for the crime, and the Court's  decision to bar that
testimony that had been subject to extensive cross-examination requires
this Court to grant the Writ of Habeas Corpus and Reverse Petitioners
conviction.

A defendant's right to call witnesses on his behalf and present
a complete defense is a fundamental Constitutional guarantee essential
to Due Process. Chambers, 410 U.S. at 294. As a general rule, testimony
given at a prior hearing or proceeding by a witness who is unavailable
to testify at the subsequent proceeding is admissible as an exception
to the hearsay rule where the issues are substantially similar and

-59-

where the party against whose interest the testimony is offered had
an adequate opportunity to cross-examine. People v. Lawson, 193 Ill.
App.3d 396, 398, 549 N.E.2d 968 (5th Dist. 1990), citing; People v.
Doss, 161 Ill.App.3d 258, 514 N.E.2d 502 (4th Dist. 1987).

The State Courts of Illinois have long contended and agreed, that
it may admit into evidence for substantive purposes the prior testimony
of a witness who has since become unavailable as long as the witness
was subject to cross-examination. California v. Green, 399 U.S. 149
(1970). This includes testimony provided at a pre-trial hearing. Id.
at 165-166, citing Barber v. Page, 390 U.S. 719, 725-726 (1968), and
even includes statements to law enforcement officials. Crawford v.
Washington, 541 U.S. 36, 53 (2004).

In fact, the only question in Green and other cases in which the
State seeks to use prior  testimony of unavailable witnesses was whether
the defendant's rights under the 'confrontation clause' of the Sixth
Amendment would be violated by the State's presentation of such evidence.
399 U.S. at 156-160.  Because in this case the unavailable witness was
a defense witness, no confrontaion clause issues are implicated here.
See: Lawson, 193 Ill.App.3d at 398 (confrontation requirement not a
bar where defendant rather than State sought to introduce transcript
of unavailable witness's prior testimony).  Even if the State had a
right to confront witnesses, the Green standards were met in this case.
Montalvo was unavailable at trial and had been subjected to extensive
cross-examination at the Chambers hearing.

A witness is "unavailable" if the party seeking to introduce the
prior testimony has taken steps to secure the presence of the missing
witness at trial in good faith and with due diligence. People v. Rogers,

79 Ill.App.3d 745, 744-745, 398 N.E.2d 1058 (1st Dist. 1979). Montalvo
was unavailable in that the defense diligently sought to obtain her
presence by first subpoenaing her, secondly by filing a motion for
a rule to show cause as to why she should not be held in contempt of
Court, and in the defense motion, defense counsel averred to searhing
for Montalvo by visiting various known addresses and contacting her
friends. (C.229).  The Trial Court also sought to procure her presence
by filing a warrant for her arrest. (R.YYY74) Therefore, Montalvo
was clearly unavailable.

Montalvo was also subject to extensive cross-examination, during
which the State tried to attack her credibility and undermine her
testimony. (R.SS23-49)  In a cross-examination that far outlasted the
direct examination, the State explored Montalvo's bias, motive to lie,
and ability to provide a consistent narrative.  In examining her
relationship with Petitioner, his family and the others charged in
connection with the shooting, making sure to invoke their gang
affiliations. (R.SS31-33).  It challanged her ability to remember times,
dates, and conversations. It questioned the timing of her decision to
come forward. (R.SS38-39) It questioned her decision not to renew the
"Order of Protection" (R.SS37) In other words, the State had ample
opportunity to cross-examine Montalvo. Therefore, the court's
inexplicable decision to bar her testimony could not have stemmed from
any concern of unfairness to the State.

The exclusion of this testimony from trial infringed on Petitioner's
right to present a 'complete defense'. While the trial Court ruled that
Rodriguez's statements to Montalvo were inadmissible, the defense still
wanted Montalvo to testify at trial about Rodriguez's actions, which

showed a connection to the crime. At the hearing, Montalvo testified
that Rodriguez left their home on the night of the incident, shortly
before dusk, wearing a black-hooded sweatshirt. (R.SS15) When he
returned a few hours later, he closed all the blinds in the house.
(R.SS16) In the ensuing days, Rodriguez rarely left home, going only
to the store and returning immediately. (R.SS16-17) After two days,
Rodriguez left at the urging of a friend who told him he had to hide.
(R.SS17) He returned after two days, because, according to Rodriguez,
"Someone else" had been "Charged" for the crime. (R.SS20).

All of this testimony should have been admitted into evidence.
It constituted direct testimony or non-hearsay statements.  Petitioner
should not have been punished, nor his right to present a complete
defense hindered, because of Montalvo's refusal (and unknown reason)
to obey a subpoena or the ineffectiveness of the Court's issued warrant.
There was simply no reason for the trial court to refuse the admission
of either all of the prior testimony, as suggested above, or the relevant
non-hearsay portions  of the prior testimony.

The erroneous decision to bar Rodriguez's statements, the erroneous
decision to exclude Montalvo's prior testimony at the <u>Chambers</u> hearing
was not harmless.

Essential to Petitioner's defense was the idea that, not only
was Petitioner innocent, but it had evidence that Rodriguez committed
the crime.  The defense spent the bulk of its time and energy on the
descriptions of the offender, which did not seem to match Petitioner,
and the defense needed to show that the descriptions did match Rodriguez.
Montalvo's testimony at the pre-trial hearing corroborated the defense
theory that Rodriguez did indeed match the descriptions of the offender.

Montalvo testified not only to what Rodriguez looked like, but also to what he wore the night of the murder-- the Black-hooded sweatshirt that every eyewitness observed. Moreover, Montalvo could testify as to Rodriguez's behavior, which would further convey Rodriguez's guilt to the jury. Therefore, the failure to admit Montalvo's prior testimony was not harmless error.

Petitioner's Due Process right to present a complete defense was severely infringed by the trial court's treatment of Montalvo's testimony. Rodriguez's statements to Montalvo met the <u>Chambers</u> test for reliability, and therefore should have been admitted at trial. When Montalvo (for unknown reasons) became unavailable through no fault of the defense, her prior testimony should have been entered into evidence.

Petitioner's defense depended on implicating Rodriguez, who fit the description given by the eyewitnesses. Therefore the denial of Petitioner's right to present a complete defense prejudiced his case and requires this Honorable Court to Issue the Writ and Reverse and Remand for a new trial at which Montalvo's prior testimony is made part of the evidence.


## Applicable United States Supreme Court Precedent

The Fifth and Sixth Amendments to the Constitution confer upon a defendant a right to a "meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986). This means that the accused has a right to "present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies."

Washington v. Texas, 388 U.S. 14, 17 (1967). This right is a
fundamental element of due process of law. Id. at 19. The right, though,
is not absolute. Crane, Id. See also Taylor v. Illinois, 484 U.S. 400,
484, 108 S.Ct. 646 (1988).


**The Decision of the Illinois Appellate Court was Unreasonable**


Since it is ineffective for counsel not to present evidence of
another's involvement in a crime, See: e.g., Siripongs v. Calderon,
35 F.3d 1308, 1318 (9th Cir. 1994), clearly it denies a Petitioner his
right to present a defense when the Court precludes him from presenting
evidence of another's involvement in the offense.

The defense was wrongly precluded from informing the jury that
Rodriguez, and not Petitioner had commited the murder, and the defense
was wrongly precluded from informing the jury that Rodriguez had left
his home the day of the incident wearing a black-hooded sweatshirt,
and when he came home after the incident, he acted in fear and closed
all the blinds, and didn't leave the residence for days, and was then
urged by a friend to leave and hide, and 'after' another person had
been charged with the offense Rodriguez returned and told his girlfriend
that he returned 'because' another had been arrested and 'charged'
with the murder all of which would have rebutted the prosecution's
case. The defense had an equal right to present a 'complete defense'
that another commited this crime.

The defense was handicapped in responding as a result of the
exclusion of this testimony beforementioned. In the end, the prosecution
was allowed to present a theory, but the defense was not allowed to

-64-

rebut that theory. That ruling denied Petitioner a fair trial.
<u>Washington v. Texas</u>, supra, 388 U.S. at 17. It is an inexplicable
reasoning of the Appellate Court and no excuse for allowing the
prosecution to present evidence of its motive/theory while denying
the defense the opportunity to rebut that evidence. This was plain
error, and requires the issuance of the writ.

The combined effect of all the evidence that was precluded by
the trial court would have been to substantially undercut the State's
theories and innuendos in this case.  Had the defense been allowed to
present the precluded evidence, the results of the proceedings would
have been different. Thus, the Petitioner is thus entitled to the
issuance of the Writ.

## CLAIM II

**Petitioner Was Denied his Right To Due Process And A Fair Trial
When The Trial Court Erred Where It Refused To Exercise Its
Discretion Or Seek Clarification When The Deliberating Jury
Requested A Transcript From Petitioner's Bond Hearing,  Which
Established That Petitioner Had Scratches And Bruises On His Body,
Especially Where The Court Had Previously Granted Three Requests
By The Jury To View Evidence Helpful To The State.**

The involuntariness of Petitioner's alleged confession was an
essential element of the defense, and the transcript from Petitioner's
bond hearing was a key to establishing the fact that Petitioner had
confessed only after the police administered violent beatings to his
chest and stomach.  The inability of the jury to review this evidence
was prejudicial to petitioner, because the transcript showed that
petitioner's attorney did see injuries on his body, and asked Petitioner
to show them to the judge.

The trial court signaled to the Deliberating Jury that this
transcript was inessential when it refused the deliberating jury's
request to view it. After all, the trial court had in the proceding
hours 'granted' the jury's requests for a map of the crime scene (even
though the State had drawn on it in accordance with its 'theory' of
the case), the autopsy report, and Petitioner's medical intake report.
and then, thereafter, denying the jury's request for a piece of evidence
helpful to the defense, the court left the jury with the impression
that the evidence was not important, or not as important as the
incriminating evidence already sent back to them.  The Trial Court's
rationale for denying the request--that the jury requested a "report"
instead of the "transcript"--was based on a misinterpretation of the
jury's request.  The transcript was the only piece of evidence relating

-66-

to this issue, and a jury should not be expected to properly invoke
'terms of art' in a request for evidence.  Therefore, the Court abused
its discretion in denying the jury's request, and a New Trial is
warranted.

It is within the discretion of the trial court to allow or refuse
a jury's request to review testimony, and the court's decision will
not be disturbed on review absent an abuse of discretion. People v.
Pierce, 56 Ill.2d 361, 364, 308 N.E.2d 577 (1974). However, error may
result where the trial court fails to ascertain specifically what the
jury is requesting. People v. Jackson, 26 Ill.App.3d 618, 629, 325
N.E.2d 450 (1st Dist. 1975). In such situations, the trial court is
effectively refusing to exercise discretion in the erroneous belief
that it has no discretion as to the question presented. People v.
Queen, 56 Ill.2d 560, 565, 310 N.E.2d 166 (1974); People v. Autman,
58 Ill.2d 171, 176, 317 N.E.2d 570 (1974).

In Queen, the jury requested "defendant's words on the stand." 56
Ill.2d at 565.  The court denied the request, writing to the jury that
it could not "have any testimony of any witnesses read to you." Id.
The Illinois Supreme Court ruled that, because the trial court mistakenly
believed it was without discretion to consider the request, its handling
of the request was in error. Id. Ruling the error was not harmless, the
court reversed defendant's conviction and remanded for a new trial. Id.
at 566.

Similarly, in Autman, the jury requested either transcripts of
testimony or to have the testimony read to it. 58 Ill.2d at 176. The
court denied the request, and added that it was impermissible "to read

-67-

or play back testimony." Id. The Court, citing Queen, reversed the
defendant's conviction, holding that the trial court's mistaken belief
that it was without discretion to consider the request was erroneous. Id.

In Jackson, the trial court denied the jury's request to view "a
transcript of the trial." 26 Ill.App.3d at 628. The Court found that
the trial court's failure to make a preliminary determination as to
what a jury meant by requesting "transcripts of the trial" indicated
that the court failed to exercise its discretion. 26 Ill.App.3d at 629.
"The discretion envisioned by the court in People v. Pierce [citation
omitted] as indicated by the rationale for adopting the majority view,
would enable the trial court to determine whether a review of the
testimony would be helpful or harmful to the jury's proper deliberations.
Here, the trial court failed to ascertain from the jury the specific
testimony which it wished to review." Id.  The Court reversed the
defendant's conviction and remanded for a new trial. Id. at 631.

Petitioner's case undoubtedly involves a trial court under the
mistaken belief that it had no discretion to consider the jury's request.
The jury requested "Dan Gallagher's bond hearing report taken on March
27, 1999." (R.AAAA286).  Defense counsel argued that the request should
be granted because the jury was obviously requesting a transcript from
the bond hearing. (R.AAAA286). The trial Court disagreed, and stated:

> No. They are referring to a bond hearing report. They don't use
> the word transcript.  They don't say the word transcript.  All
> these juries that I have dealt with have in the past when they
> want a transcript, they ask for a transcript.  If that's what
> they want, a transcript of his testimony, that would be one thing.
> We would be dealing with that issue.  I am not going to read into
> or create a word. I don't think it's form over substance. I rely
> on men's words, what men say, what men ask for on this case [sic],
> or women. And in this case, they asked for basically something that
> doesn't exist, a bond hearing report.  But me telling them that a
> bond hearing report doesn't exist in fact is making like a fact
> finding issue for the jury.  I am not going to do that...If they

want a transcript and they ask for a transcript, then we will
deal with that issue when they ask for it.  Right now, They are
going to receive this response: You have all the evidence.  Continue
to deliberate, signed by me. (R.AAAA286-287).

Defense counsel "objected" and urged the court to inquire into exactly

what the jury wanted because no bond report existed. (R.AAAA287-288).

The Trial Court overruled the objection. (R.AAAA288).

The Court mistakenly believed that the jury was requesting a "Non-

Existent" document, and therefore that it could not consider the request.

This is a situation analogous to <u>Jackson</u>, where there was confusion

as to what the jury wanted, and the court refused to look into it.  Here,

the court erroneously believed that to ascertain the nature of the

request would constitute impermissible "fact finding". (R.AAAA287).

<u>Jackson</u> held however, to clear up confusion with regard to a

request is not only permissible, but required so that a judge may properly

use its discretion. 26 Ill.App.3d at 628.  Without knowing what the jury

wants, a trial court cannot exercise discretion.

The error in this case was even more egregious than those in <u>Queen</u>,

<u>Autman</u>, and <u>Jackson</u>. First, the Court's refusal to consider that the

jury meant "transcript" rather tahn "report" was unreasonable.  All

parties agreed that gallagher did make a report. (R.AAAA288), Thus, The

Court's position was that the jury requested a nonexistent piece of

evidence. Moreover, aside from the use of the word "report", the jury's

request was 'specific' in that it included the "Date" of "March 27, 1999".

(R.AAAA285). Not surprisingly, the Bond Hearing Transcript was dated

"March 27, 1999" (C.123).  That the jury meant "Transcript" rather than

"Report" was obvious; yet, despite the court's statement that it was not

choosing "form over substance," it was requiring the jury to use proper

"terms of art" in its request.  Nevertheless, a reply to the jury asking for clarification would not have been difficult and would have allowed the judge to avoid such an untenable position.  It could then exercise discretion as to whether the bond hearing transcript would help the jury's proper deliberations.

Here, Petitioner was prejudiced by this error because the bond hearing transcript bolstered his testimony that his confession was involuntary, and because the court, by granting <u>all</u> requests for <u>State's</u> evidence and denying the request for <u>defense</u> evidence, signaled to the jury that the former was somewhow more important or weightier than the latter. and third, the Court's response left the jury with a 'false impression' that they had that evidence already.

First, it can be seen from the transcript itself that it was essential to Petitioner's case and should have been reviewed by a deliberating jury.  At the hearing, Petitioner's attorney, Gallagher, stated to the court: "Also, Your Honor, for the record, my client has informed me that he has been beaten by the police and I would also asked the court to take note to the cuts that are on his chest and you can also see that he has some bruises to his arm --to his left arm and he has also informed me that he has been coughing up blood." (C.124-125).  Gallagher was not merely informing the judge of what he was told, but rather, pointing out visible injuries on Petitioner's body.  The transcript clearly corroborated Petitioner's account.  The jury needed to review the transcript because the exact words are important. Gallagher specifically refers to the cuts that "are on" his chest, and that "you can see" the bruises on his arm.  With this information, the jury would have been more likely to believe Petitioner's description of Wojcik's violence.  Therefore, the failure to exercise discretion, which prevented

the jury from examining this evidence, prejudiced petitioner's rights to a fair trial, due process and equal protection of the law.

Secondly, by denying this request after granting three consecutive requests to see evidence harmful to petitioner's case, the court sent a signal to the jury about the importance and weight of the evidence.

It is not hard to imagine the jury's reaction when, after being given the map of the crime scene which 'outlined' the (State's) 'Theory', Loveless's report, and the autopsy report, Then, it received the court's unexplained denial to its request for the transcript/report/document of March 27, 1999 proclaiming that "it had all the evidence" which would have protrayed to the jury that for some reason, it was not entited to consider defense evidence or to give it the same 'scrutiny or weight' as evidence favorable to the State. Therefore, the Court's erroneous decision was compounded by its previous responses to the jury requests.

Finally, it was the utmost importance that the jury review this evidence because the circumstances of the confession were already suspect. For instance, both Petitioner and Santiago's confessions stated that it was their "nephew" whom the Kings rammed, even though they did not share a common 'nephew'. Turano-Michiels, who took the statements, admitted this, but did not look into it. Furthermore, Petitioner's Statement indicated that the altercation that took place before the shooting occurred when he saw the Latin Kings in a Caprice. Yet, Marrero testified that he drove a Pontiac, and that he was not a Latin King. The other two occupants in the car, Lugo and Quinones, also denied any membership in the Latin Kings. Petitioner's statement included a statement indicating that he had a little sister, even though he  did not.  These inconsistencies and problems with the confession, in conjunction with Petitioners claims of coercion, cast serious doubt on

-71-

the confessions voluntariness.  The jury was interested in this issue, and it can be seen from its requests for Loveless's report and the Bond Hearing Report/Transcript of March 27, 1999, and by denying  the jury the right to see the transcript, the Court put an end to this inquiry, and severely prejudiced Petitioner's defense.

Because petitioner's presented defense depended in large part upon establishing that his confession was involuntary and the result of beatings administered by the detectives, a transcript which showed that Petitioner had injuries the day after his confession was 'critical' and 'essential' to the defense.  The Court's refusal to ascertain what the jury wanted and the resulting lack of an exercise of discretion, was prejudicial error warranting the grant of the Writ and remanding this case for a New Trial.  Here, Had the jury been provided the Bond Hearing Transcripts of March 27, 1999, there is a reasonable probability that the jury would have given petitioners testimony at trial some 'credibility' as it was 'supported' by what was evidenced the day after the alleged confession and brought to the attention of the Court, further, there would have been a reasonable probability that the outcome of the proceedings would have been different had the jury been provided the March 27, 1999 Transcript as they requested.

### Applicable United States Supreme Court Precedent

In <u>Chapman v. California</u>, 386 U.S. 18 (1967) provides that Constitutional error may be found harmless beyond a reasonable doubt where the reviewing court can conclude that the particular virdict in question did not rest on the error.

"The inquiry... is not whether, in a trial that occurred without

-72-

the error, a guilty verdict would surely have been rendered, but,
"Whether the guilty verdict actually rendered in this trial was surely
unattributable to the error." (Which has not been concluded by the
State Courts).

### The Decision of the Illinois Appellate Court was Unreasonable

The defense was prejudiced when the Trial Court wrongly informed
the jury that "Thay had all the Evidence" in response to their request
for the Bond Hearing Transcript of March. 27, 1999. by the Court not
'clarifying' exactly what the jury was requesting, but rather, by
actually not addressing the request and inferring that they already
"had all the evidence" and to keep deliberating.. In the end, The jury
was allowed to deliberate and 're-examine' evidence favorable to the
State, but precluded from examining or considering evidence favorable
to the defense. This ruling denied Petitioner a fair trial, and as in
CLAIM I it is likewise inexplicable to explain the reasoning of the
Appellate Court as they contended that Appellant's counsel presented
this claim and pursued confusing and different "factual Allegations"
from it's initial Brief to the Reply Brief., however, the bottom line
is that it was unfair and prejudiced the Petitioner severely by allowing
the prosecutions evidence that tended to support its theory to be
reexamined by the jury when they requested it, but denied the jury's
request to examine the evidence that supported the defense's theory of
the case. Had the jury been allowed to examine the transcript evidence
that the Court erroneously precluded, the results of the proceedings

-73-

would have been different.   Thus, the Petitioner is thus entitled to
the issuance of the Writ.

## CLAIM III

**Petitioner Was Denied His Right To Due Process, Equal protection
And Rights To A Fair Trial Where The Trial Court Allowed The
Admission Of Gruesome Photographs Depicting The Deceased's Brain
And Skull From The Autopsy Which Were Extremely Prejudicial, As
The Photographs Were Not Probative Of Any Facts At Issue.**

The Trial Court erred by permitting the prosecution to inflame
the passions of the jury with the introduction and publication of
various gruesome photographs of garcia's deceased body, including some
photographs of Garcia's exposed brain and skull during the Autopsy.

The photographs were prejudicial and not probative of any facts
in the case.  The defense did not contest the fact that Garcia was
dead, nor did it challange the fact that Garcia died of two gunshot
wounds to the head.  While the court held that the photographs of
Garcia's face were probative the contested issue of close-range firing,
the expert who testified regarding this issue _never_ indicated that the
"tiny" and "minute" abrasions of which this stippling consisted could
be seen on any of these exhibits. Regardless, the two most objectionable
photographs were _irrelevant_ to the issue of close-range firing because
the skin around the wound had already been pulled back. Thus, the
photographs had no probative value, _except to Inflame the passion of
the jury,_ and their introduction was "prejudicial". Because the improper
admission of the photographs was prejudicial, and undermines confidence
that the jury's verdict was a product of fair deliberation, rather than
passion and outrage, reversal and a new trial are warranted by the
Issuance of the Writ of Habeas Corpus.

The decision to admit any photographic evidence rests within the
sound discretion of the trial court, and will not be disturbed absent
an abuse of discretion. <u>People v. Stremmel</u>, 258 Ill.App.3d 93, 118,
630 N.E.2d 1301 (2nd Dist. 1994). Photographs of a decedent are

admissible to prove the nature and extent of the injuries; to establish the position, condition, and location of the body; to prove the manner and cause of death; and to aid in understanding testimony. People v. Heard, 187 Ill.2d 36, 77, 718 N.E.2d 58 (1999).  Gruesome photos are admissible if relevant to establishing a fact in issue in a particular case. People v. Lefler, 38 Ill.2d 216, 221, 230 N.E.2d 827 (1967).

The court must determine whether the probabtive value of the Photographs, in establishing a material fact, is outweighed by the prejudicial value. People v. Garlick, 46 Ill.App.3d 216, 224, 360 N.E.2d 1121 (5th Dist. 1977).  A photograph is improperly admitted if the sole purpose is to inflame the passions of the jurors. Garlick, 46 Ill.App.3d at 224.

In this case, Doctor Nancy Jones testified that she performed the Autopsy on Garcia. (Supp.R.A163). In the course of her testimony, Doctor Jones was asked to describe State Exhibits 45 through 49. (Exhibit 49, while objected to at trial, actually shows bullet fragments and is not an issue here)(Supp.R.A170). According to Jones, Exhibit 45 showed a close-up of the wound in the center of Carcia's forehead. (Supp.R.A175). Exhibit 46 was taken "at the beginning of the internal examination of Mr. Garcia's head, The scalp incision had been made, it's been reflected forward and back so the skull can be seen..."(Supp.R.A175-176).  Exhibit 47 was a close-up of Garcia's left eye, showing the gunshot wound. (Supp.R.A176). Finally, Dr. Jones described Exhibit 48 as such: "[A] photograph that was taken during the internal examination of the head, the skull cap has been removed so that the brain has been exposed, and the bleeding and the damage that was caused to the brain from the bullet coursing through the head can be seen in this photograph." (Supp.R.A176).

On cross-examination, the defense questioned Dr. Jones about her conclusion that the first wound, the forehead wound, showed some stippling indicative of close-range firing. (Supp.R.A178) which Dr. Jones had testified to during the Direct-Examination for the State.

The State conducted a redirect examination which cast doubt on this conclusion by having Dr. Jones to explain "that the stippling might have been caused by 'glass' from the car window, through which the bullet was purported to travel. (Supp.R.A181-182).

Following the trial, the Court granted the State's request to publish State's Exhibit's 45 through 49 over the defense objection that they were "horrendously graphic and gruesome." (R.AAAA166). The Court responded that, according to "the case of People v. Richard Franklin Speck... gruesome crimes make for gruesome photos, but the jury gets to see them." (R.AAAA167)

While the Court admitted that "there has been some modifications of the rule", these modifications pertained to photographs "so catastrophically brutal," such as the castration or beheading of a baby, that "maybe they shouldn't go back to the jury." (R.AAAA167). The Court overruled the defense objection, stating "the jury should be allowed to see the wound and determine whether it was surrounded by stippling or glass. (R.AAAA167).

In fact, People v. Speck, 41 Ill.2d 177, 203, 242 N.E.2d 208 (1968), offered a more nuanced rule than the adage referenced by the trial court here. The Speck Court found that the photographs of the murdered victims' bodies were admissible "Because" they corroborated testimony concerning their location, and the fact that they were bound at the feet was probative of the defendant's premeditation. Id. at 203. The Speck Court did not enunciate the 'standard' claimed by the trial court in

this case where Judge (Kenneth J. Wadas) claimed that in the case of
People v. Richard Franklin Speck...accorded that gruesome crimes make
for gruesome photos, and the jury get's to see them... Instead, Speck
merely stated that "Where photographs are relevant to establish any
fact in issue they are admissible in spite of the fact that they may be
of a gruesome nature...[W]here spectacular exhibits having little
probative value are offered for the principal purpose of arousing
prejudicial emotions they should be promptly excluded." Id. at 202-203.
In fact, this is essentially the law as it stands today. See: People v.
Mercado, 333 Ill.App.3d 994, 1000-1001, 777 N.E.2d 641 (1st Dist. 2002)
(photographic evidence admissible and publishable if relevant to prove
facts at issue, so long as it is not so inflammatory or prejudicial
that it substantially outweighs its probative value).

The photographs allowed to be published and admitted here were
probative of 'nothing' and severely prejudicial which there only  purpose
would be to arouse the passion of the jury.  At no point in Doctor Jones
testimony did she proclaim that 'stippling' was visible in the photographs.
From Dr. Jones testimony, which she described 'stippling' as "very tiny
abrasions," and "tiny minute abrasions," it seems that the photographs
were not probative of stippling whatsoever. (Supp.R.A181, State Exhibit
45) Doctor Jones did not mention stippling while describing what this
photograph showed.  A view of the photograph does not appear to reveal
any stippling. (State Exhibit 45).  It was never established that these
tiny, minute abrasions were visible to the naked eye or to the layman's
eye.

In fact, the stippling issue involved the area around the "Entrance
Wound", the first wound, which was the wound to the forehead shown in
Exhibit 45.   These other three (3)-Photographs, did not even show this

-78-

wound.   Therefore, the trial court abused it's discretion with the
decision that the photo's would go back so the jury could decide
whether the wound showed 'stippling', or whether it showed 'glass from
the window' which had no connection whatsoever to State's Exhibit's #46,
#47, and #48.

A view of the photographic evidence sent back to the jury in this
case confirms that it was meant to inflame, not inform. (State's Exhibit's
45-48).   The jury need not have and should not have been seen Garcia's
skin pulled back from the skull (State's Exhibit 46) as nothing depicted
in this photograph was at issue. The jury need not have and should not
have seen Garcia's exposed "bleeding" and damaged brain. (State's Exhibit
48).   The defense never contested Garcia's death, it never contested the
manner of death, and it never contested the results of the Autopsy showing
Garcia to have died as a result of these gunshot wounds.   Even if the
defense had contested it, a layperson viewing these photographs would see
nothing beyond the Autopsy incisions, the pulled back skin exposing the
skull and brain.

The People v. Speck, case inferred by the judge is cited at 41 Ill.2d
177, 242 N.E.2d 208 (1968) held where photographs are relevant to
establish any fact in issue, they are admissible in spite of the fact that
they are gruesome. See also: People v. Williams, 60 Ill.2d 1, 322 N.E.2d
819 (1975); People v. Newbury, 53 Ill.2d 228, 290 N.E.2d 592 (1972);
People v. Walcher, 42 Ill.2d 159, 246 N.E.2d 256 (1969).

Here, the Court abused it's discretion. The case of People v.
Fierer, 124 Ill.2d 176, 529 N.E.2d 972 (1988) is informative of the
'standards' applied in Illinois. In Fierer, Photos of the murder victim
taken in the autopsy room were properly admitted at trial.   The Fierer
Court applied the rule articulated in People v. Foster, 76 Ill.2d 365, 392

-79-



N.E.2d 6 (1979)-"where photographs are relevant to establish any fact
in issue....they are admissible in spite of the fact that they may be
of a gruesome nature....[T]he major bulwark against prejudicing the
jury is the sound discretion of the trial judge.". In Foster, the trial
judge did not abuse his discretion--the photos were taken after the
body was cleaned of blood and before any autopsy procedure had begun. In
addition they did not show any Autopsy incisions and permitted a clear
view of the victim's wounds. "Although there was no dispute over the
cause of the victims death, issues of self-defense and the defendant's
mental state were vigorously contested. The number and nature of the
victim's wounds were of some relevance to those issues."

Photographs showing autopic incisions, and those which are made
gruesome by Autopsy Procedure, are not admissible. People v. Lefler, 38
Ill.2d 216, 230 N.E.2d 827 (1967).

For argument sake as Petitioner contests vigorously that these
photographs even remotely had any probative value, Even where photographs
of a decedent are relevant to prove facts at issue, they are admissible
and may be shown to the jury only if the nature of the pictures is not
so likely to inflame the passions of the jury that the probative value
is not outweighed by the potential prejudicial impact. People v. Sterling,
357 Ill.App.3d 235, 253, 828 N.E.2d 1264 (1st Dist. 2005). Here, there
is a great probability that these irrelevant Autopsy photographs "inflamed"
the passions of the jury. Autopsy photographs "are highly prejudicial
because they tend to arouse the passions of the jury." People v. Landry,
54 Ill.App.3d 159, 161, 368 N.E.2d 159 (3rd Dist. 1977). Moreover, even
if relevant to aid in the understanding of a pathologist's testimony,
diagrams and drawings can illustrate such testimony without needlessly
arousing the jury's passion with gruesome pictures. Id.

## Applicable United States Supreme Court Precedent

A deliberate and egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant habeas relief, even if it did not substantially influence the jury's verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710 fn.9 (1993). In a case of deliberate prosecutorial misconduct, automatic reversal might well be proper. [] A deliberate effort of the prosecutor to undermine the search for truth is in a category of offenses antithecal to our most basic vision of the role of the State in the criminal process. <u>United States v., Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 3395 (1985).

A prosecutor's introduction of prejudicial photographs will be reviewed under the **Darden/Donnelley** standard. See: <u>Hoxie v. Kirby</u>, 102 F.3d 1239, 1243 (10th Cir. 1997). Thus, when faced with a question where the trial court in error permitted the Introduction of Irrelevant, Improper and Prejudicial Evidence at the Petitioner's Trial, the reviewing Court should likewise determine if the error was caused by deliberate Prosecutorial Misconduct.

## The Decision Of The Illinois Appellate Court Was Unreasonable

The defense was "severely prejudiced" when the trial Court applied erroneous Legal Authority to make a finding that "Gruesome Crimes Make for

-81-

Gruesome photographs" and "The jury should always see these photographs".
this is not only erroneous, but, "outragious" in a legal sense. The
Illinois Courts have continued to avoid Judge Kenneth Wadas's erroneous
application of Authority to conclude the admissibility of "Gruesome
Autopsy Photographs" that have absolutely no probative value whatsoever
in this case, other than, to "inflame the passions of the jury and to
deny the Petitioner a fair trial and deliberation of a jury based on
fair admissible evidence.

Here, these specific photographs have not been individually
addressed by the Appellate Courts of Illinois, instead, they <u>also</u>
erroneously adopted the trial courts statement that "That the photo's
would go back so the jury could decide whether the wound showed
'stippling', or whether it showed 'glass from the window' ----It's
overwhelmingly obvious that the Appellate Court 'failed' to view  the
Photographs (State's Exhibit's 45 through 48), which had they done
so, they would have concluded, not only that all but two photographs
depicting the gunshot wounds to the forehead and eye had any probative
value at all, really <u>only</u> <u>the</u> <u>first</u> photograph of the forehead was
<u>at</u> <u>issue</u>. the rest had absolutely <u>no</u> <u>probative</u> <u>value</u> to any issue in
this case. The Appellate court would have found that these photographs
had nothing to do with any 'stippling' issue concerning close-range
firing, and (Even if) the jury viewed the photographs, it would have
been 'impossible' for a reasonable juror to conclude from these
photographs that 'any' "Stippling" could be seen in them. These admitted
prejudicial photographs served only one purpose and that was to "Inflame"
the passions of the jury, and this Court cannot conclude that these
overwhelmingly prejudicial photographs were unattributable to the jury's
verdict, and thus, the Writ should issue and the Court Remand for a New
Trial.

## CLAIM IV

**Petitioner Was Denied His Right To Due Process And Equal Protection
And Rights Guaranteed By The Constitution When The State Court Abused
Its Discretion In Sentencing Petitioner Who Was A First-Time Offender
To A Maximum 90-Year Term Of Imprisonment Which Is Disportionate To
The Offense And Others Sentenced Under The Same Circumstances.**

Petitioner was convicted of first-degree murder, a crime that in
Illinois is punishable by 20 to 60 years' imprisonment, and aggravated
battery with a firearm, a Class X offense punishable by 6 to 30 years'
imprisonment. 730 ILCS 5/5-8-1(a)(1)(a); (3)(West 1999).

Petitioner, had no prior convictions, received the Maximum 60-year
sentence of imprisonment for murder and the maximum 30-year Maximum
Sentence of imprisonment for the offense of Aggravated battery with a
firearm.

The Court ordered the sentences to run "consecutively, so that
the Petitioner received a 90-year Maximum Sentence.

This Maximum Sentence constitutes an Abuse of Discretion where
the Petitioner had no prior convictions, was 20-years old at the time
he was alleged to have committed the offense, and had rehabilitative
potential.   Accordingly, The Court here should either Grant the Writ
and Remand this case for a New Sentencing Hearing or taylor an
appropriate sentence that is proportionate to the offense.

The Illinois Constitution requires that a sentence be proportionate
to the offense and the rehabilitative potential of the defendant. See:
Illinois Constitution of 1970, Article I, § 11.   The trial court is
generally in the best position to tailor an appropriate sentence, and
as such, the reviewing court will not disturb the trial court's
determination absent an abuse of discretion. See: e.g., People v. O'Neal,
125 Ill.2d 291, 531 N.E.2d 366, 368 (1988). "However, the mere fact

-83-

that the trial court has a superior opportunity to make a determination concerning a final disposition and punishment of a defendant does not mean or imply that a particular sentence is always just and equitable." O'Neal, 531 N.E.2d 366, 368. "[A]n abuse of discretion may be found even where the sentence is within statutory limitations if that sentence is at odds with the purpose and spirit of the law." People v. Evans, 143 Ill.App.3d 236, 492 N.E.2d 1063, 1040 (5th Dist. 1986).

When a sentencing court imposes a sentence it must carefully consider the nature and circumstances of the crime and the background and personal history of the defendant. People v. Maldonado, 240 Ill.App.3d 470, 608 N.E.2d 499, 509 (1st Dist. 1992). Furthermore, it must consider only that information that comes to its attention during the defendant's trial and sentencing proceedings and can not base its sentence "upon prejudice, speculation, and conjecture." People v. Dempsey, 242 Ill.App.3d 568, 610 N.E.2d 208, 227 (5th Cir. 1993).

It is well established that a reasoned judgment as to the proper sentence must be based on the particular circumstances of each case. People v. Bolyard, 61 Ill.2d 583, 338 N.E.2d 168 (1975).

The Illinois Constitution and the Unified Code of Corrections require that the rehabilitative potential of an offender to be taken into consideration. (Ill.Const. 1970, art. I, § 11; 730 ILCS 5/1-1-2. A sentence which has the greatest potential of restoring the offender to a useful and productive place in society, while at the same time adequately punishing the defendant and safeguarding the public, is the sentence which should be imposed. People v. Steffens, 131 Ill.App.3d 141, 475 N.E.2d 606 (1st Dist. 1985).

In this case, the only evidence offered in aggravation was a purported possession of marijuana conviction in Oklahoma which had

-84-

been removed from Petitioner's "Record" as part of a "first-time
Offender program. (R.CCCC34).  The State sought to introduce this
supposed prior offense without a certified statement of conviction,
and the sentencing court properly found that it should not consider
the matter as a prior conviction. (R.DDDD14).  The sentencing court
also found, however, that the factors in "aggravation" 'outweigh'
Petitioner's "Lack of Criminal History".  The Court therefore accorded
the mitigating factors no weight at all, as evidenced by the imposition
of the "Maximum Sentences".  Had the court properly considered the
Petitioner's lack of criminal history and other mitigating factor's,
the court would not have imposed the "Maximum" on each sentence it imposed.

The Illinois Appellate Courts have consistently held that the "lack
of" prior criminal history constitutes grounds for the reduction of a
Maximum Sentence or otherwise Excessive Sentence.  For Instance, In
People v. Ward, the defendant was convicted of Attempt Murder for firing
a gun into a group of Police Officers. 1 Ill.App.3d 888, 889, 275 N.E.2d
256 (5th Dist. 1971). The defendant had no prior convictions, but was
given a sentencing range of 2 to the Maximum 20-years. Id.  The Court held:
"While we find no fault with the minimum of two years imprisonment for
one convicted of attempt murder for shooting several times at police
officers we nevertheless note that defendant has no prior felony conviction
and   believe the proper objectives of sentencing will be better served
if the maximum sentence to twenty years is reduced to six years." Id.

Aside from the fact that Petitioner had no prior criminal history,
Petitioner's background and the witnesses in mitigation demonstrated that
petitioner has a high potential for rehabilitation.

Petitioner's Parents seperated when he was five years old, and according to the evidence and testimony adduced that their relationship involved domestic violence. (C.361). At the impressionable age of only thirteen years old, Petitioner began drinking and using marijuana, and joined the Orchestra Albany Street Gang. (C.363). His Gang involvement was a direct cause of his involvement in the instant proceedings, as the State consistently argued that the shootings were the byproduct of "gang disputes". (R.AAAA176). Witnesses in mitigation described how Petitioner cared for and supported his children, and that he was very respectful, and volunteered at his Church. (R.CCCC39-44). From this Background, it is apparent that Petitioner has rehabilitative potential.

The Court's decision to impose what is in essence a life sentence, however, ensures that any such potential will go to waste. The Court's decisions in this case is a clear abuse of discretion.

Even though the Court went through each of the Statutory factors in aggravation and mitigation, and stated that it considered the mitigation evidence, its reference to that evidence does not conclusively show that the criteria was properly weighed, and does not circumvent review. People v. Choate, 71 Ill.App.3d 267, 389 N.E.2d 670, 675 (5th Dist. 1979). (R.96). A reviewing court has the duty to look beyond the sentencing court's findings "to examine defendant's potential for rehabilitation." People v. Treadway, 138 Ill.App.3d 899, 486 N.E.2d 929, 933 (2nd Dist. 1985), cited with approval by the Illinois Supreme Court in People v. O'Neal, 125 Ill.2d 291, 531 N.E.2d 366, 370 (1988), and in People v. Jones, 168 Ill.2d 367, 659 N.E.2d 1306, 1310 (1995). If a sentence reflects a failure to consider the constitutionallly required objective of rehabilitation. it should be reduced. People v. Rickard, 99 Ill.App.3d 914, 919, 425 N.E.2d 1317 (1st Dist. 1981).

Here, the District Court should find that the trial Court's decision to impose the Maximum Sentences of 60-years and 30-years consecutively is disportionate and excessive and was a clear abuse of discretion considering the evidence before it. And the District Court should grant issuance of the Writ and Remand for a New Sentencing Hearing or reduce Petitioners sentences to an appropriate term of imprisonment that conforms to the constitutional standards that apply herein.

## Applicable United States Supreme Court Precedent

The reasoning articulated by the United States Supreme Court in its decision of Bush v. Gore, 531 U.S. 98 (2000), demonstrates that the Illinois Sentencing Statutes which authorize the sentencing guideline's for the offense's of First-degree murder and Aggravated battery with a firearm fail to ensure that the penalty is not applied in an arbitrary, capricious, disportionate or excessive manner that renders it patently unconstitutional.  In Bush, the United States Supreme Court considered whether the recount procedure adopted by the Florida Supreme Court were "consistent with the obligation to avoid arbitrary and disparate treatment of the members of its electorate." Id. at 205. Analyzing the issue under the Equal Protection Clause, theCourt held that although the State's Legislative Power to select the manner for appointing electors is plenary, having once granted the right, it was obligated to grant it equally. Id. at 104. Bush further held that a State may not by "arbitrary and disparate treatment, value one person's vote over that of another." Id. at 104-105.

-87-

Specifically, Bush held that because counties in Florida had
different standards for manually recounting votes, the process did not
have "sufficient guarantees of equal treatment." Id. at 107.  The Court
rejected the general standard set forth by the Florida Supreme Court,
which commanded the vote counters to consider the "intent of the voter"
because it lacked "Specific standards to ensure its equal application."
Id. at 106.  In order for standards to be sufficient, the Court held
that the State-Wide uniform and consistent rules to determine intent
were necessary. Id.

Similarly here, uniform and consistent rules must be required
before a Sentencing Statute providing for punishment can be deemed
constitutional.  The lack of clear and consistent standards in Florida
impermissibly left the rights of voters subject to the vagueness of
the Statutory interpretation and practices of the county within the
State in which they lived. Likewise, the lack of clear and consistent
standards in Illinois impermissibly leaves the rights of persons deemed
eligible under the bare bones requirements of the sentencing statute
employed here being subject to the vagueness of Statutory interpretation
and practices of each county, as well as between individual judges.

here, there can be no doubt that the circuit Courts decision to
impose the "Maximum" sentences for a first-time offender that had no
criminal Background, and had sufficient rehabilitative potential was
due to the vagueness of the Statutory provisions which were applied
in an arbitrary, capricious, disportionate and excessive manner that
resulted in unfairness and disparate treatment of petitioner. For these
reasons, the District Court should Grant the Writ.

## The Decision Of The Illinois Appellate Court Was Unreasonable

Here, the Appellate Court misinterprets what the circuit court
judge did or did not consider in its determinations of an appropriate
sentence. This Dicision is unreasonable because the record is "void"
of any reference (as they admit) of defendant's age and rehabilitation
potential which is required by the Statute and Illinois Constitution.

Further, the Appellate Court points out that the circuit judge
referenced only (one) sole mitigating factor by stating "[T]he seriousness
of the factors in aggravation greatly outweigh the defendant's one sole
mitigating factor" is inconsistent with the Record as a whole where
additional mitigating factors were present and not considered by the
trial court or the Appellate Court in this case. Therefore, the District
Court should grant the Issuance of the Writ and remand this cause for
a new sentencing hearing where all mitigating factors will be given
due weight and an appropriate sentence rendered which is not disportionate
for a first-time offender, who was under 20 years old at the time of
the offense, and who has very high rehabilitative potential.

### CLAIM V

**Petitioner Was Denied His Constitutional Right To Be Free Of
Unreasonable Searches And Seizures Where 730 ILCS 5/5-4-3 (2004)
Is Unconstitutional.**

Any person convicted or found guilty of a felony under Illinois
Law must submit specimens of blood, saliva, or tissue to be placed in
DNA databases pursuant to 730 ILCS 5/5-4-3(a) & (f)(West 2004). This
Statute violates the Fourth and Fourteenth Amendments of the United
States Constitution and Article I, § 6 of the Illinois Constitution of
1970 where petitioner has a right to be free from Unreasonable Searches
and Seizures  Therefore this Honorable Court should Declare the Statute
Unconstitutional and Order the State of Illinois to Expunge Petitioner's
DNA Record and Destroy and/or Return any Blood Sample's that were
unconstitutionally taken from Petitioner's body, and destroy any alanysis,
or other documents relating to that Blood sample or Record.

The United States Supreme Court has routinely held that 'compelled
blood extractions' are 'searches' for the purposes of the Fourth
Amendment. See: Skinner v. Railway Labor Executives' Association, 489
U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); Schmerber v.
california, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966);
People v. Hall, 352 Ill.App.3d 537, 816 N.E.2d 703 (1st Dist. 2004).

The United States Supreme Court clarified that the Fourth Amendment
prohibits nonconsensual, warrantless and suspicionless searches unless
for the purpose of the search serves a "special need" beyond general
law enforcement. See: City of Indianapolis v. Edmond, 531 U.S. 32, 41-42,
121 S.Ct. 447, 148 L.Ed.2d 333 (2000); ferguson v. City of Charleston,
532 U.S. 67, 83-86, 121 S.Ct. 1281, 149 L.ed.2d 205 (2001); but see:
Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004)

The <u>mandatory</u> extraction of Petitioner's "Blood", an "Intrusion" into his body that is unnecessary, without individualized suspicion, violates the Fourth Amendment because the purpose of taking the petitioner; blood was not for any "special need" <u>beyond general law enforceme</u> in that a "central and indispensable feature" of storing DNA in a database is to achieve the "immediate objective" of solving crimes. <u>See</u>: <u>Ferguson</u>, 532 U.S. at 80.

### Applicable United States Supreme Court Precedent

The beforementioned Statute is Unconstitutional, and the petitioners constitutional rights were violated by the unnecessary intrusion of petitioners body, and the Unconstitutionality of a Statute can be attacked even now since the "unconstitutionality of a Statute is a jurisdictional claim that is not even waived by a guilty plea." <u>United States v. Bell</u>, 70 F.3d 495, 497 (1995). In preserving this issue for review, the Petitioner continues to maintain that this Statute is unconstitutional.

### The Decision Of The Illinois Appellate Court Is Unreasonable.

The Decisions of the Illinois Appellate Court as well as the Illinois Supreme Court in <u>People v. Garvin</u>, 219 Ill.2d 104 (2006) are clearly inconsistent with United States Supreme Court Precedent and long standing precedent, Therefore this Court should grant the Issuance of the Writ and order the Expungement of unlawfully obtained DNA.

## CLAIM VI

**Petitioner Was Denied His Sixth Amendment Right To Counsel Where Police Interrogated Him Following His Arrest And Request For Counsel.**

The Sixth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees a person accused of a crime the right to counsel, as does Article I, Section 8 of the Illinois Constitution of 1970. (U.S. Const. Amend. VI and XIV; Ill. Const. 1970, art I, sec. 8).

The Sixth Amendment right to counsel is triggered 'at or after the time that judicial proceedings have been initiated.."Whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," Fellers v. United States, 540 U.S. 519, 523, (2004) (citations omitted). Further, The Sixth Amendment right to counsel can be triggered based on an Officers Sworn Affidavit to obtain an Arrest Warrant, or by "Prosecutorial Involvement" or by a multitude of other means. as was the case here. The Officer/Detective's Sworn Affidavit and accusation against petitioner, the judge found 'probable cause' to believe that petitioner committed the offense based on a Police Officer's Sworn Affidavit, and issued a [Warrant] for petitioner's [Arrest] and committed him to jail pending the "posting of Bail" or "Trial".

When "adversarial Judicial Proceedings" **commence** or have been **Initiated** against an accused or have been found to commence in a variety of ways--e.g., by charge, indictment, information, arraignment, by Sworn Affidavits, by Prosecutorial Involvement, and by a multitude of other ways--but the rule is not always easy to apply, and the result is many conflicts in decisions amoung the lower State Courts and Federal Courts as was recently noted by the Fifth Circuit in the case of Walter Allen Rothgery v. Gillespie County, Texas, 491 F.3d 293

-92-

(June 29, 2007) which the United States Supreme Court granted
Certiorari on September 27, 2007 (S.CT. No. 07-440) (Which the Supreme
Court in a long opinion found in favor of Rothgery, but said opinion
is currently unavailable to petitioner in this case due to a prison
lockdown and lack of access to the prison Law Library).

Petitioner's right to counsel arose under the Fourteenth Amendment,
which incorporates the protection of the Sixth Amendment. See: Gideon
v. Wainwright, 372 U.S. 335, 342 (1963). For simplicity's sake, the
Petitioner refers to the right to counsel as a Sixth Amendment right.

The facts in this case are that on March 24th, 1999 at approximately
11:00 a.m., Detective's who had been looking for defendant after
"Arresting" co-defendant [Juan Parra] and [Jeremiah Cain] the day before
and 'charging' them with the offenses herein.  The Detective's 'forced'
their way into the residence of [Debbie Daniels] to "Arrest" the
Petitioner (Eruby Arego) and co-defendant [Nicasio santiago], and when
escorting petitioner with [Debbie Daniels] to a Detective's vehicle, it
was obvious that petitioner was no longer a "suspect", but instead an
"Accused" by the Detective's clear statements of "You know what you
did", and "Why did you shoot those people on Belmont?" and further, it is
clear that when Petitioner was made aware of the seriousness of the
charges, he unequivacably "Requested a Lawyer" in the presence of
numerous witnesses, being the first floor tenents [Ms. Jennifer Guzmen]
who according to what she advised another person she would testify that
onMarch 24th, 1999 at about.11:15 a.m. she and her brother were out
walking their family pet observing several unfamiliar cars in front of
their building when they returned from the walk and they were on  the
sidewalk standing next to a dark colored unmarked police car when some
plain clothed police officers escorted [Eruby Abrego](the Petitioner) and

-93-

his sister [Debbie Daniels] out of the building to put them in the
car that they were standing by, and these witnesses overheard an Italian
or Polish looking Officer "Ask" Petitioner "Why he shot those people
on Belmont" and further also heard (Petitioner tell the Officer that
"He didn't shoot anyone on Belmont, and that if that was what this was
about, that Petitioner wanted a Lawyer." and further, these witnesses
also heard the Officer reply: "You'll get a Lawyer when you go to Court,"
these essentially same facts are corroborated by the Affidavit of
[Debbie Daniels].  The Court here should be aware that both witnesses
[Jennifer Guzmen] and [Sonny Rodreguiz] attempted to provide petitioner
with Affidavits to this effect, however, the Stateville Correctional
Center would not process the mail and 'returned' these affidavits to
the witnesses, effectively preventing petitioner from obtaining the
sworn written proof of these allegations, which the I.D.O.C.'s alleged
excuse for returning them to the witnesses is that "the failed to have
Petitioner's Prison Identification Number on the Envelopes" therefore,
this effectively precludes petitioner from obtaining the affidavits.
(Petitioner incorporates his State Post-Conviction Petition and
essential facts enumerated therein as to this claim, See: Attached
Appendix "A", which also includes the Appellate Court Opinion on
Direct Review, and the Affidavit of Debbie Daniels and Petitioner in
support of this claim.)

The History and purpose of the Sixth Amendment, support the
conclusion that the Sixth Amendment guarantees a right to counsel to
defend a person's liberty when that liberty is threatened, as here,
"Adversarial Judicial Proceedings" had "commenced" when there had
been a judicial determination of "Probable Cause" by the "Sworn
Affidavit" of the Officer to obtain the "Search and Arrest Warrants"

-94-

for petitioner and the government had imposed significant restrictions on the petitioner's liberty, and therefore, the right to counsel attaches at the 'initiation of adversarial judicial proceedings--the point at which the petitioner was no longer a "suspect", but became an "Accused"'. Michigan v. Jackson, 475 U.S. 625, 632 (1986); See also: Brewer v. Williams, 430 U.S. 387, at 398 (1977).

Such a rule is supported by the Supreme Court's decision in Argersinger v. Hamlin, 407 U.S. 25 (1972), and its progeny, which hold that a  person is entitled to appointed counsel if the government intends to deprive him of his freedom for even a single day.

Under Supreme Court Precedents, the right to counsel attaches at the initiation of adversarial judicial proceedings. See: e.g.,Brewer v. Williams, 430 U.S. 387, at 398 (1977)(citing cases).  The Court has made clear that adversarial judicial proceedings might commence in any number of ways, such as by "formal charge, preliminary hearing, indictment information or arraignment." Id. but no matter how proceedings might commence, the Court consistently said the right to counsel attaches "As Soon As They Do.".

Thus, in Michigan v. Jackson, 475 U.S. 625 (1986), the court summarily rejected the argument that under Michigan's particular procedures, arraignment did not sufficiently affect the defendant's rights to justify attachment of the right to counsel. See: Id. at 629 n.3.  -- The Court explained that the Sixth Amendment provides a right to counsel once "a person who had previously been just a 'suspect' has become an 'accused', including by formal accusation. Id. at 632.

In contrast, before the initiation of adversarial judicial proceedings, there is no right to counsel.  In Kirby v. Illinois, 406 U.S. 682 (1972), for example, the court held that the right to counsel

-95-

had not attached when <u>kirby</u> was identified in a police lineup shortly after arrest. <u>Id</u>. at 684-85 (plurality op). In <u>Jackson's</u> term's, <u>Kirby</u>-- who had been picked up by the police for carrying another man's social security card and traveler's checks--was merely a "suspect" when his victim came in and identified him. See: <u>Id</u>.

The Court's focus on the initiation of adversary judicial proceedings---the moment of transition between "suspect" and "Accused"--reflects an understanding that varied in facts of specific cases, making it hard to identify a single, specific triggering event at which the right to counsel attaches in all cases, instead, the court should focus on the rule that essentially that the right to counsel attaches <u>whenever</u> the STATE DETERMINES THAT IT SHALL BE ADVERSE TO AN INDIVIDUAL, SEEKING TO DEPRIVE HIM OF HIS LIBERTY. See: <u>Brewer</u>, 430 U.S. at 398; <u>Kirby</u>, 406 U.S. at 689.

It is undisputed that the Detective's in this case, had "<u>Arrested</u>" and "<u>Charged</u>" both [Juan Parra] and [Jeremiah Cain] in the a.m. hours of March 23rd, 1999 and a.m. hours of March 24th, 1999, and based on the incriminating Statements of those two persons sought "Arrest WARRANTS" and "Search WARRANTS" for [Nicasio Santiago] and Petitioner [Eruby Abrego] to likewise be "Charged" with these offenses.  Therefore, it is likewise undisputed that Petitioner was "No Longer" a "Suspect", but was in fact an "Accused" upon "Arrest" at 3626 North Whipple at approximately 11:00 a.m. on March 24th, 1999, and it cannot be disputed that when the Petitioner was told the nature of the offense by Detective [Wojcik] as he was about to be placed in the Detective's vehicle on March 24th, 1999 at approximately 11:15 a.m. and the petitioner unequivacably requested a Lawyer, the Petitioner "Invoked" his "Sixth Amendment" right to counsel.

Further, Petitioner's Fifth Amendment right to counsel was likewise "Invoked" after his arrest, and again when the police transported the Petitioner to jail, placed him in an Interrogation room, and questioned him without any MIRANDA warnings being read to petitioner.

The law does not require a confined, accused person to wait until questioning begins to invoke his right to counsel. See: e.g., Miranda v. Arizona, 384 U.S. 436, 470-74 (1966); United States v. Kelsey, 951 F.2d 1196, 1197-99 (10th Cir. 1991)(defendant's request to talk to his lawyer, after being arrested in his home, invoked his Fifth Amendment right to counsel where the "Exchange" between the police and the defendant made it clear that the police intended to question the defendant "at some point"); United States v. Hbaiu, 202 F.Supp.2d 1177 (D.Kan. 2002)(defendant's statement during traffic stop, "we want a lawyer here", invoked his Fifth Amendment right to counsel; although defendant was not questioned until after he was formally arrested and taken to sheriff's office, his invocation was not "anticipatory"); United States v. Goodson, 22 M.J. 22 (C.M.A. 1986)(defendant asked for a lawyer when he was arrested at 2:30 a.m. and again about daybreak and was told he could not speak to a lawyer; although defendant was not questioned until about noon, approximately 10 hours later, in these circumstances, defendant's pre-Interrogation request for a lawyer invoked his Fifth Amendment right to counsel). As here, Petitioner [Eruby Abrego's] request for a lawyer after being told by Detective [Wojcik] that this arrest was about "Shooting those people on Belmont" invoked his Fifth and Sixth Amendment rights to counsel.  The following Interrogations by the Chicago, Illinois Detective's and Assistant State's Attorney, and the Fruits of those illegal interrogations use at defendant's trial, thus, violated petitioners Constitutional rights

under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and deprived him of a fair trial.

## Applicable United States Supreme Court Precedent

This Claim should be viewed in light of the United States Supreme Court decision in (2008) in the case of Walter Allen Rothgery v. Gillespie County, Texas, 491 F.3d 293 (2007) Cert. Granted. Sept. 27, 2007 (S.Ct. No. 07-440). which a favorable Opinion was issued in June 2008).

## Applicability of State Court Decisions

Petitioner filed his Initial Post-conviction Petition in the Circuit Court of Cook County by mailing the same to the court on May 28th, 2008, however, there has been no rulings on this issue by the Circuit Court or any Illinois Appellate Courts.

But due to the "Federal Habeas Corpus 1-year Statute of Limitation for filing a Petition under 28 U.S.C. § 2254, Petitioner has included this claim and Claim-VII to avoid any Procedural Default allegatiions.

The Court, by Federal provisions can "Stay" the ruling/proceedings on this issue until the State Courts have made their rulings in this regard, thereafter, this Honorable Court should grant the Issuance of the Writ after affording the petitioner an evidentiary hearing on these claims, vacate the conviction and remand for a new traill.

## CLAIM VII

**Petitioner Was Denied His Sixth Amendment Right To Counsel Where His Trial Attorney failed To Investigate And File A Motion To Suppress His Confession On The Ground That Petitioner Requested Counsel Following His Arrest And Prior To Interrogations.**

The failure of petitioner's counsel to fully investigate and thereafter move to suppress his confessions on the basis that it had been obtained through violations of petitioner's constitutional rights to counsel as beforementioned in Claim-VI by Chicago Detective's and the Assistant State's Attorney violated his Constitutional right to the effective assistance of counsel.  The Constitutional right to counsel is a fundamental right aimed at protecting the right to a fair trial or proceeding, and "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, at 686 (1984); quoting Mcmann v. Richardson, 397 U.S. 759, 771 n.14 (1970); People v. Perez, 148 Ill.2d 168 (1992), citing Strickland, "[T]he proper standard for attorney performance is that of reasonably effective assistance." Strickland, 466 U.S. at 687.  To prevail on a claim of ineffective assistance of counsel, a defendant must establish 1) that "counsel's performance was deficient" and fell below an objective standard of reasonableness; and 2) that "the deficient performance prejudiced the defense." Id.  To establish prejudice. "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Petitioner's initial counsel never visited petitioner to discuss the events that resulted in his arrest or Interrogations, counsel

<u>never</u> came to the Cook County Jail to visit petitioner to discuss the case, which is verifiable by Jail visitation records. Counsel became aware that petitioner had been "Physically abused" during Interrogations dur a "Bond Hearing", and actually informed the Court of "Visable-Injuries" seen on petitioners body during the Bond-hearing. Defense counsel filed a Motion to Suppress based on the Facts of the Physical Abuse he had learned about during the Bond-Hearing, but even failed to call necessary witnesses or make any attempts to obtain supporting medical records to further support those Physical Abuse claims.

However, had counsel adequately interviewed petitioner and investigated the circumstances of the Arrest and Interrogations, counsel would have discovered that 1). Petitioner had requested a Lawyer immediately following his arrest in the presence of multible witnesses; 2) That Detective [Wojcik] had advised Petitioner after his requet for counsel that he would be provided a Lawyer when he went to Court; and 3). That the Initial Interrogation at Area 5 Police Headquarters of the defendant were <u>without</u> any <u>Miranda</u> warnings or waivers.

Counsel's failure to investigate and discover these readily available facts, and to thereafter assert them in a Motion to Suppress that, based upon those facts, Petitioner's confession had been obtained in violation of his right to counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 8 of the Illinois Constitution of 1970, which constituted objectively unreasonable dificient performance.

Petitioner's defense was prejudiced by his attorney's deficient performance as previously stated. Although the admission of an illegally

-100-

obtained confession is reviewed for harmless error. <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991), the admission of Petitioner's statements at his trial was not harmless.   His confession was the most significant evidence marshaled against the Petitioner by the prosecution.   The Prosecution repeatedly emphasized Mr. Abrego's statements in its arguments. and all other evidence offered by the State at Petitioner's trial was intended to corroborate the confession, as the numerous physical discriptions of the suspect by eyewitnesses did not fit the physical description of the defendant, the confession was the cornerstone of the case against Petitioner.

Had counsel adequately investigated and presented these claims in a Motion to Suppress, there is a reasonable probability that the trial court would have found petitioner's statements to have been obtained in violation of Petitioner's Fifth, Sixth and Fourteenth Amendment rights to counsel, and ordered those statements, and the fruits of those statements, to be suppressed.

Because of the critical importance of the confessions to the State's case against petitioner, there would have been a reasonable probability that the Suppression of the confession would have led to a different result at petitioner's trial, and petitioner very likely would have been acquitted as was other accused co-defendants in this case. Thus, This Honorable Court should hold an Evidentiary Hearing, and thereafter grant the Writ and remand this case for a New Trial excluding the Statement and illegal fruits obtained therefrom from the jury.

## Applicable United States Supreme Court Precedent

Counsel's deficient performance should be viewed under standards set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

## Applicability of State Court Decisions

Petitioner filed his Initial Post-conviction petition  in the Circuit Court of Cook County by mailing the same to the Court on May 28th, 2008, however, there has been no rulings on this issue by the Circuit Court or any Illinois Appellate Courts.

But due to the "Federal Habeas Corpus 1-year Statute of Limitation for filing a Petition under 28 U.S.C. § 2254, Petitioner has included this claim and Claim-VI to avoid any Procedural Default allegations.

The Court, by Federal provisions can "Stay" the ruling/proceedings on this claim until the State Courts have made their rulings (if any) in this regard, thereafter, this Honorable Court should grant the Issuance of the Writ after affording the petitioner an evidentiary hearing on these claims, vacate the conviction and remand for a new trial.

## CONCLUSION

For the Reasons stated in this Habeas Corpus Petition and Memorandum of Law, It is respectfully prayed that this Honorable Court grant an Evidentiary Hearing on those claims deemed necessary by the Court, and thereafter, Grant the Issuance of the Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 and remand this case for a New Trial, and order any further relief as the Court deems just and equitable.

Dated: On this $8^{nt}$ day
of AUGUST , 2008

Respectfully submitted,

/ERUBY ABREGO #R-34111 (Petitioner Pro-se)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

APPENDIX "A"

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**COUNTY DEPARTMENT-CRIMINAL DIVISION**

PEOPLE OF THE STATE OF ILLINOIS, ]
                                 ]
       Respondent,        ]
                                 ] Case No: 99 CR 9739 (02)
-Vs-                           ]
                                 ] Honorable **Kenneth J. Wadas**
ERUBY ABREGO,            ] Judge Presiding.
       Petitioner.        ]

**PROOF/CERTIFICATE OF SERVICE**

**PLEASE TAKE NOTICE** that on this 28th day of _____ MAY _____, 2008, I have placed the documents listed below in the Institutional Mail, Postage prepaid at the Stateville Correctional Center, being the **Original** and **(2)-copies** of **EACH** document listed, Appropriately addressed to **DOROTHY BROWN**, Clerk, Cook County Circuit Court, Criminal Bureau-Criminal Division, Room 526, 2650 S. California Avenue, Chicago, Illinois 60608 for mailing through the United States Postal Service:

1.   MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS;

2.   MOTION FOR THE APPOINTMENT OF COUNSEL;

3.   MOTION FOR LEAVE TO "AMEND" AND/OR SUPPLEMENT POST-CONVICTION CLAIMS AND ATTACHED AFFIDAVITS;

4.   VERIFIED PETITION FOR POST-CONVICTION RELIEF W/ATTACHMENTS;

5.   PROOF/CERTIFICATE OF SERVICE.

Pursuant to 735 ILCS 5/1-109. I declare under penalty of perjury, that I am the named party/Petitioner in this action, That I have read this Document, and Declare that the Information and Statements made herein are True and Correct to the best of my Knowledge and Belief.
Dated: On this 28th day of _____ May _____, 2008.

**ERUBY ABREGO R-34111 (Petitioner/Affiant)**
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, ]
                                  ]
          Respondent,             ]
                                  ]  Case No: 99 CR 9739 (02)
-Vs-                              ]
                                  ]
ERUBY ABREGO,                     ]  Honorable **Kenneth J. Wadas**
                                  ]  Judge Presiding.
          Petitioner.             ]

## MOTION FOR THE APPOINTMENT OF COUNSEL

**COMES NOW** Petitioner, **Eruby Abrego**, Pro-se, pursuant to 725 ILCS
5/122-4 (West 2006) and hereby moves this Honorable Court to Appoint
counsel to represent petition in these Post-Conviction proceedings. In
Support hereof, Petitioner states:

1.    Petitioner is currectly confined at the Stateville Correctional
Center in Joilet, Illinois under I.D.O.C. Prison Registration Number
R-34111, where he is serving consecutive terms of imprisonment of (60)-
years for First Degree Murder and (30)-years for Aggravated Battery
with a Firearm, which is the subject of this Post-Conviction Petition.

2.    Petitioner is indigent and has no means in which to procure
private counsel for representation in this Post-conviction Proceedings.

3.    This Petition for Post-Conviction Relief raises meritorious
and cognizable Claims of substantial violations of petitioner's
Constitutional rights which would preclude Summary dismissal under
725 ILCS 5/122-2.1 of the Illinois Post-Conviction Hearing Act.

4.    The necessity of contacting witnesses to further investigate
and present additional substantial facts in support of petitioners
Claims for relief would be better accomplished by a skilled professional
and obliviate any appearance of improper contact with potential State
witnesses.

5.    The Appointment of counsel would expediate the dictates of

**(Page 1 of 2 Pages)**

justice and benefit both the Petitioner and the Court.

6.    This petition and Claims therein involve witnesses that are not personally known by petitioner, but have relayed their information known to them to other persons that involve substantial violations of petitioners constitutional rights, and necessary to establish those claims, which must be contacted by a legal professional, which the petitioner at this point does not possess the ability to do, which tasks is better suited for an attorney as decribed in the Post-Conviction Petition.

**WHEREFORE,** Petitioner respectfully prays that this Honorable Court will grant petitioner his Motion and Appoint Counsel herein for  the Petitioners representation in these Post-Conviction Proceedings to conduct the required investigation, contact the named witnesses, and substantially Amend the post-conviction petition accordingly, and further to grant such further discovery necessary to substantiate the Claims as appointed counsel may require.

Respectfully submitted,

ERUBY ABREGO R-34711 (Petitioner)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

## VERIFICATION

I, **Eruby Abrego**, verify and states under penalty of perjury pursuant to 735 ILCS 5/1-109 that I have read the Motion for the Appointment of Counsel and Declare that everything stated herein is True and Correct in substance and in fact to the best of my Knowledge and Belief. **Dated:** On this 28ᵗʰ day of _____ May _____, 2008.

ERUBY ABREGO (Affiant)

**(Page 2 of 2 Pages)**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
                               )
         Respondent,       )
~Vs-                          ) Case No: 99 CR 9739 (02)
                               )
ERUBY ABREGO,           ) Honorable Kenneth J. Wadas
                               ) Judge Presiding.
         Petitioner.        )

## MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

NOW COMES Petitioner Eruby Abrego, Pro-se, Appearing in his own proper person, and respectfully moves this Honorable Court pursuant to 725 ILCS 5/122-4 of the Illinois Post-Conviction Hearing Act to grant Leave to Proceed in Forma Pauparis in these Post-Conviction proceedings due to his indigency. In support hereof, Petitioner states:

1.    The petitioner is unable to provide securities or to pay the fee's and cost associated with these Post-Conviction proceedings due to his indigency.

2.    This Honorable Court has previously determined that the petitioner is indigent within the prescribed meaning of the law.

3.    The petition in good-faith verily believes that he has a just cause of action for post-conviction relief by showing the 'gist' of substantial constitutional violations that effected his substantial rights to due process of law and a fair trial, and right to effective representation.

4.    The petitioner receives no money from pensions, annuities, Life Insurance Payments, Businesses or Inheritances.

5.    The petitioner is not the owner of any Real Estate, Stocks, Bonds, Notes, Bank Accounts, or any other types of Securities other than his Inmate Trust Fund Account maintained by the Illinois Department

of Corrections wherein the Trust Fund is credited with a "State Tip" Each Month of up to ($10.00) for purposes of purchasing Hygene and other necessities.

6.    The petitioner has no other valuable property in which would enable him to pay the fee's and cost associated with these Post-Conviction proceedings.

7.    The petitioner attaches his affidavit to this motion in support hereof.

WHEREFORE, for these stated reasons, It is respectfully prayed that this Honorable Court grant leave to proceed in forma pauperis in these Post-Conviction proceedings.

Respectfully submitted,

ERUBY ABREGO R-34111 (Petitioner)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

(Page 2 of 3 Pages)



State of Illinois)
           ) s
County of Will  )

## AFFIDAVIT OF ERUBY ABREGO

## IN SUPPORT OF MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

I, **Eruby Abrego**, Declare after first being Duly Sworn before a Notary Public that the following Statements are Truthful and Accurate to the best of my Knowledge and Belief, In that:

1. This affidavit is based on my own personal knowledge, and I am available and willing to testify to the Statements made herein;

2. The Circuit Court, as well as the Appellate Court of Illinois have determined that I am indigent involving this case and Appellate Review;

3. I am not the owner of any Real Estate, Automobiles, Stocks, Bonds, Notes, Savings Accounts, Bank Accounts, Inheritances, or any other types of property or securities that would enable me to pay the fee's and cost associated with these post-conviction proceedings;

4. I am ~~incarcerated~~ and ~~the~~ Illinois Department of Corrections maintains an Inmate Trust Fund Account in which each month the Department credits the account with up to ($10.00) for the purpose of purchasing Hygene and other necessities;

5. Affiant verily believes that he has no other means in which to obtain funds to cover the cost of these proceedings.

I, **Eruby Abrego**, Have read this Affidavit and State under Oath or Affirmation under penalty of perjury pursuant to 735 ILCS 5/1-109 that the Statements made herein are Truthful and Accurate to the best of my Knowledge and Belief. **Dated:** On this 28th day of ___May___, 2008

**ERUBY ABREGO R-34111 (Affiant)**
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

(Page 3 of 3 Pages)

(7)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, ]
                                  ]
            Respondent,           ]
                                  ]
-Vs-                              ] Case No: 99 CR 9739 (02)
                                  ]
ERUBY ABREGO,                     ] Honorable **Kenneth J. Wadas**
                                  ] Judge Presiding.
            Petitioner.           ]

## MOTION FOR LEAVE TO "AMEND" AND/OR "SUPPLEMENT" POST-CONVICTION CLAIMS AND ATTACHED AFFIDAVITS.

**NOW COMES** Petitioner, <u>Eruby Abrego</u>. Pro-se, Appearing in his own proper person, and hereby moves this Honorable Court for Leave to Amend and/or Supplement the Post-Conviction Claims and Attached Afidavits, and in support hereof, petitioner asserts and states the following:

1.  Petitioner has proceeded pro-se without the aid of an investigator or skilled attorney.  The Claims presented in this Post-Conviction Petition allege substantial constitutional deprivations of Petitioners constitutional rights, specifically his right to counsel;

2.  Petitioner is incarcerated, and does not have meaningful access to potential witnesses in support of his claims to obtain  the necessary affidavits or statements to attach to the Post-Conviction Petition in a timely manner which is not due to petitioners own culpable negligence but due to the long-delay in mail processing at Stateville Correctional Center, which at times takes up to a (Month) or at times even longer to process "Incoming" mail. which will not allow the petitioner sufficient time to obtain and attach (all) supporting affidavits to the Petition prior to the filing deadline date.

3.  Petitioner has only been told that (3) or more persons "Heard" what petitioner told the police Officers upon arrest as he was being placed in the Detectives Vehicle, and were willing to provide written



Affidavit's to what they observed and heard. The petitioner (via mail) sent out Blank-Form affidavits to be filled out by the potential witnesses. The petitioner "Assumes" to what extent 'each' witness can or will be able to testify, thus, without knowing 'exactly' ceverything respectfully in detail, thus, the claim may need to be adjusted accordingl or the Affidavit's scope may need to be 'supplemented' if necessary.

4.    Petitioner would be prejudiced by not being able to attach supporting affidavits to his Post-conviction petition which would not be due to petitioners own culpable negligence, but rather due to the prisons delay in processing "incoming" mail for weeks and even sometimes longer than a month. This is easily verifiable through the literally "Hundreds" of "Inmate Grievances" filed in Stateville Correctional Center this year concerning "Incoming" Mail Delay.

5.    Petitioner has made every effort known and available to him to obtain and attach every "Affidavit" in a timely manner to his Post-Conviction petition, and petitioner should not be barred from providing and having that evidence considered insupport of his claims in these Post-Conviction Proceedings.

WHEREFORE, Petitioner respectfully prays that this Court grant petitioner Leave to "Amend" and/or "Supplement" the Post-Conviction Claims if necessary, and attach any further "Affidavits" that may support petitioners Claims presented in the petition for the beforestated reasons herein, and grant any further equitable relief as the Court deems appropriate and just.

Respectfully submitted,

DATED: On this 28ᵗʰ day of
_____Mey_____, 2008

ERUBY ABREGO R-34111 (Petitioner)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

(7)

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT—CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ] | |
| ] | |
| Respondent, ] | |
| ] | |
| -Vs- ] | Case No: 99 CR 9739 (02) |
| ] | |
| ERUBY ABREGO, ] | Honorable Kenneth J. Wadas |
| ] | Judge Presiding. |
| Petitioner. ] | |

## "VERIFIED PETITION FOR POST-CONVICTION RELIEF"

Pro-se: *Eruby Abrego* R-34111

ERUBY ABREGO R-34111 (Petitioner)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112
5/28/08

## EVIDENTIARY HEARING REQUESTED

-1-

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, ]
      Respondent, ]
       ]
-Vs- ] **Case No:** 99 CR 9739 (02)
       ]
ERUBY ABREGO, ] Honorable Kenneth J. Wadas,
      Petitioner. ] Judge Presiding.

## "VERIFIED PETITION FOR POST-CONVICTION RELIEF"

NOW COMES Petitioner **Eruby Abrego**, Pro se, Appearing in his own proper person and hereby respectfully Petitions this Honorable Court for Post-Conviction Relief pursuant to the Illinois Post-Conviction Hearing Act (725 ILCS 5/122-1 et seq. West 2006)).

## PETITIONER ACCORDINGLY SEEKS THE FOLLOWING RELIEF

1. LEAVE TO PROCEED IN FORMA PAUPERIS;

2. THE APPOINTMENT OF COUNSEL;

3. LEAVE TO AMEND AND/OR SUPPLEMENT CLAIMS OR AFFIDAVITS;

4. VACATE THIS CONVICTION AND ORDER A NEW TRIAL;

5. ORDER AN EVIDENTIARY HEARING PURSUNT TO 725 ILCS 5/122-6 AT WHICH PROOF WILL BE OFFERED CONCERNING THE ALLEGATIONS OF THIS PETITION;

6. GRANT PETITIONER AUTHORITY, PRIOR TO ANY EVIDENTIARY HEARING, TO CONDUCT DISCOVERY BEARING UPON THE ISSUES RAISED IN THIS PETITION, INCLUDING THE AUTHORITY TO ISSUE SUBPOENAS FOR WITNESSES AND DOCUMENTS; AND,

7. GRANT SUCH OTHER AND FURTHER RELIEF AS MAY BE APPROPRIATE AND JUST.

## CASE INFORMATION

8. Name of Petitioner: Eruby Agrego.

9. Prison Registration Number: R-34111.

-2-



10. Place of Confinement: Stateville Correctional Center, P.O. Box 112, Joliet, Illinois 60434-0112.

11. Offense(s) of Conviction: First Degree Murder and Aggravated Battery with a firearm.

12. Criminal Case Number: 99 CR 9739 (02).

13. Type of Trial: Jury.

14. Presiding Judge: Honorable Kenneth J. Wadas.

15. Date of Sentencing: October 29, 2004.

16. Length of Sentence(s) imposed: Consecutive terms of (60)-Years for the Offense of First Degree Murder -and- (30)-Years for the Offense of Aggravated Battery with a Firearm.

17. Notice of Appeal filed: October 29, 2004.

18. Court to which Appealed: Appellate Court of Illinois, First District.

19. Appellate Court Case Number: 1-04-3259.

20. Disposition of Direct Appeal: Affirmed March 7, 2007. (ATTACHMENT "A")

21. Petition for Rehearing: Denied April 4, 2007. (ATTACHMENT "B").

22. Petition for Leave to Appeal to the Illinois Supreme Court: Denied September 26, 2007 (ATTACHMENT "C").

23. Petition for Writ of Certiorari in the United States Supreme Court Due: December 24, 2007. (NONE FILED).

24. Post-Conviction Due: June 19th, 2008.


## STATEMENT OF FACTS


25. On March 22, 1999, at approximately 5:45 P.M., [Jose Garcia] was shot and killed and [Julio Lugo] was shot in the arm and the buttocks in the area of Belmont and Monticello. (R. YYY110, Supp. R. A12, A37), Shortly before the shooting Julio Lugo was with his eleven year old cousin Isidro Quinones and his Uncle Fred Marrero in which they claimed they were driving to the Market.  At the intersection of Lawndale and

Belmont a car, "Believed" to be a "Gold Chevy", approached the car that Julio was in.  The people in the Gold Chevy made "Gang signals" to Julio and one of them threw a bottle at the car Julio and his relatives were in. (R. YYY 112, Supp. R. A15, A16, A38).  Mr. Marrero knew or believed that the guys threw up the Gang sign for "OA" (the gang Orchestra Albany) and that they put down the crown sign for  the Latin Kings. (R. YYY112, Supp. R. A16). Mr. Marrero continued to drive to the market where he dropped off Julio and Isidro while he drove back around the block. (R. YYY115, Supp. R. A17, A41).

When Julio and Isidro were dropped off, they saw [Ramon Torres] in hi car with his Uncle [Jose Garcia) who was seated in the passenger seat. (R. YYY115, Supp. R. A17, A41) While speaking to Ramon, one of the guys who had been seen in the "gold Chevy" approached, stopping between the tree and Mr. Torres' car and asked Julio what he was. (R. YYY18).  Julio pushed Isidro to the side and the guy, threw his brown hoodie up and took out a gun and started shooting at them. (R. YYY118, YYY147, YYY149, Supp. R. A42).  At least five shots were fired and Julio was shot in the shoulder and the buttocks (R. YYY119, Supp. R. A45).  Mr. Torres tried to tell his Uncle to duck, but instead he turned and looked back. (R. YYY146) as the shots were coming through the car, Jose Garcia was shot and killed. (R. YYY151) A bullet just grazed Mr. Torres' head and the other bullets put holes in his car and shattered the windows. (R. YYY149).  Mr. Torres felt the explosion of glass and there was glass on the dash board and on the seats of the car. (R. YYY160). Mr. Torres drove away from the scene to get his uncle to the Hospital (R. YYY150). The Police arrived and Mr. Torres pulled his car over at 3241 North Milwaukee. Mr. Garcia was already dead. (R. YYY152).  Mr. Garcia died as a result of gunshot wounds to the head. (Supp. R. A177).

-4-

Prior to the incident and shooting on March 22, 1999 [Jason Rodriguez] also known as ["Spirit"] visited (Jeremiah Cain) earlier that day and had obtained the weapon used in this incident, and not the defendant [Eruby Abrego].

After the shooting, at approximately 6:30p.m., Detectives Schalk and Bogucki went to Belmont and Monticello (R. ZZZ30, ZZZ31), and at that location two bullet fragments were recovered. (R. Supp. R. 98, ZZZ32), and at the second crime scene, the Detectives recovered two metal fragments by the car that was parked at the curb. (R. Supp. R. A90, ZZZ32-33).

The detectives went to the hospital to interview [Julio Lugo], [Fred Marerro] and [Isidro Quinones]. (R. ZZZ33). (Julio Lugo) was at that point in critical condition due to his gunshot wounds. However, after interviewing (Mr. Marerro) and (Isidro), the detective's learned the description and location of the suspect "Gold Chevy" that may have been involved in the shooting. The detectives went with [Mr. Marerro] to 4013 West Oakdale where [mr. Marerro] identified the "Chevy Caprice" as possibly the one involved which was parked at that location "**As the car that was involved in the bottle throwing incident**" which occurred just prior to the shooting. (R. Supp. R. A19, ZZZ34).

Detective [Guevara] testified that he and his partner interviewed [Mr. Lugo](R. WW27). [Mr. Lugo gave a description that the shooter was <u>5'8" to 5'10" tall, 200 pounds, and wore a dark jogging suit.</u>(R. WW27).

Officer [Thesedosia Jaks] testified that she obtained a description from an eyewitness. (R. WW31), and according to her report, the description was a "<u>Dark Hispanic, 5'7" tall, 200 pounds, dark curly hair, with a brown hooded sweatsuit.</u>" (R. WW32).

(14)

Officer [Eduardo Rios] testified that he obtained a description of a <u>male Hispanic with a Black Hooded Sweatshirt and Black Jacket</u> (R. WW37).

Detective [Raymond Schalk] testified that he interviewed both (Mr. Lugo) and [Isidro Quinones] (R. WW40), and according to his Report, [Quinones] described the shooter as a"<u>Dark-complected Male Hispanic, 5'9" tall, Black Hair, Wearing a Black Hooded Sweatshirt and Black Jacket</u>. (R. WW41).

The parties stipulated that Detective [Robert Smith] would have testified that [Ramon Torres] informed him that the shooter was <u>A Dark-complected Hispanic, wearing a Black-Zipped Jacket with a Hoody, Dark Jeans and White Shoes, 19 to 20 years old, about 6' tall, 180 pounds</u> (R. WW43).

<u>None</u> <u>of</u> <u>which</u> fit the physical description of the defendant/ Petitioner [Eruby Ebrego].

The next day, on ... 23, 1999 at approximately 1:30 a.m. Detective [Schalk] met with [Juan Parra], and after transporting him to Area 5 the detective spoke to him again. (R. ZZZ36-3.), and after several conversations and physically abusing altercations with [Juan Parra], he was officially arrested and charged and the detectives then looked for defendant [Eruby Ebrego] (R. ZZZ38) and also looked for [Nicasio Santiago] also known as "Peewee" and [Jeremiah Cain].

On March 24, 1999, at approximately 5:00 a.m. [Jeremiah Cain] was arrested at 3935 Diversey. (R. ZZZ38, ZZZ112). Detective [Engle] and [Wojcik] recovered a .357 Magnum fro [Mr. Cain's] room. (R. ZZZ38, ZZZ113), and after the gun was shown to both [Mr. Parra] and [Mr. Cain], the Detectives looked for Defendant [Eruby Ebrego] and [Nicasio Santiago]. (R. ZZZ40, ZZZ116) and after the Detective's recieved a phone call

-6-

CASE NO.    _08cv 4978_

ATTACHMENT NO._____

EXHIBIT   _Appendix A_ + Attachment 6

TAB (DESCRIPTION)  _____

at 11:00 a.m., Detecive's went to 3626 North Whipple to arrest the
defendant [Eruby Abrego] and [Nicasio santiago]. (R. ZZZ42, ZZZ118).

Petitioner/Defendant [Eruby Abrego] testified that he was awakened
by the sound of commotion at the back door of his Sister [Debbie Daniels]
house, and when he got out of Bed he saw Detective[Wojcik] breaking
into the house using a large screwdriver (R. W9). At least four other
Detective's entered and drew their guns, telling everyone to get in
the living room. (R. W13). Detective [Wojcik] asked the defendant his
name and after telling Detecive [Wojcik] that he was [Eruby Abrego],
Detective [Wojcik] stated **"You know what you did"**. (R. W13), The
defendant/petitioner "**denied knowing anything**," and Detecive [Wojcik]
began **arguing** with [Mr. Abrego] and became **"Angry"** and **"Slapped"** [Mr.
Abrego] **"twice in the Face"**. (R. W14). Detective's [Wojcik] and [Engle]
cuffed up [Eruby Arego] and escorted the defendant and his sister [Debbie
Daniels] out of the second floor apartment into the stairwell, the
Detective's again **"Slapped"** [Mr. Abrego] **"in the face"** and began **"Pushing
and hitting** [Mr. Abrego] **With their Elbows"** while going down the stairs
and exiting the building.

As the Detecive's approached their vehicle escorting [Mr. Eruby
Abrego] and [Debbie Daniels], the occupants of the First Floor Apartment
[[Ms. Jennifer Guzmen] and her brother [Sonny Rodriguez] who had been
out walking their pet and were returning to their apartment were standing
near the Detecive's vehicle and 'overheard'Detective [Wojcik] asking
[Mr. Abrego] **"Why he shot those people on Belmont"** and [Mr. Abrego]
responding something to the effect **"That he didn't shoot anyone on
Belmont, and that if that was what this was about, he wanted a lawyer"**,
and  Detecive [Wojcik] advised [Mr. Abrego] **That he would get a Lawyer
when he goes to Court"**. The Detective's then informed [Ms. Guzmen] and

-7-

[Mr. Rodriguez] to step away from the police vehicles as other Detective's were escorting other occupants of the second floor apartment out of the building to be taken to Area 5 for questioning.

After arriving at the Area 5 Police Station, Detectives placed the petitioner in an Interrogation room, handcuffed to the wall and questioned <u>without</u> being read his <u>Miranda</u> rights. (R. W17), during this first session, nobody hit the petitioner. (R. T17), later, Detective [Wojcik] returned, and Defendant/Petitioner continued to deny any involvement in any crimes. (R. W18). Thereafter, Detective [Wojcik] **"Punched defendant 20-25 times in the back, ribs and chest"** (R. W19). almost two hours later, Detective [Wojcik] again returned and told [Mr. Abrego] **"That he would rot in jail because his friends were fingering him"** (R.W20). Detective [Wojcik] did not beat [Mr. Abrego] at this time, and left after 10-15 minutes. (R. W20).

Petitioner was left in the Interrogation room handcuffed to the wall overnight without food, but one female officer did once take the petitioner to the bathroom. (R. W21).

The next day, On March 25th, 1999, Detective [Wojcik] returned and showed [Mr. Abrego] the "Statement's" provided by [Jeremiah Cain] and [Juan Parra] (R. W22). The petitioner read the Statement's and Detective [Wojcik] left (R. W22), by that afternoon, the defendant [Mr. Abrego] had not been taken to the bathroom, and he urinated in the Interrogation Room. (R. W23). Detective [Wojcik] returned later that night and saw the urine. (R. W24). Detective [Wojcik] became very angry and **Beat** [Mr. Abrego] **"By Punching him about 20 more times"** (R. W25). Mr. Abrego was then taken to another Interrogation room, and about 3:00 a.m. Detecive [Wojcik] during the early morning hours of March 26th, 1999 entered the new Interrogation room, and Petitioner [Mr. Agrebo] informed

-8-



Detective [Wojcik] **that he needed medical attention**. (R. W28). Detective [Wojcik] took petitioner to the washroom, where [Mr. Abrego] **"threw up Blood"**. (R. WW29). Detective [Wojcik] then told the petitioner [Mr. Abrego] **"That he could go to the hospital if he confessed"** (R. WW30).

Detective [Wojcik] then took petitioner back to the Interrogation Room and left for a few minutes, when Detective [Wojcik] returned, he brought a lady into the Interrogation room, and [Mr. Abrego] told her what Detective [Wojcik] wanted him to say (R. W31) and he did not mention the **"beatings"** because he was **"afraid"** (R. WW32).

The following day during the scheduled Bond Hearing, Petitioner [Mr. Abrego] lifted his shirt to show the Judge the scratches and marks on his chest and bruises on his arm. (R. W33), and he had told the nurse he was beaten during his physical examination. (R. WW33).

A "Motion to Suppress" was filed by petitioner's initial counsel (C. 38), which only alleged that the Statement was a result of police brutality and therefore involuntary (C. 39).

Petitioner's initial counsel Only spoke to petitioner at scheduled Court Appearances and **never** visited petitioner at the jail or Interviewed petitioner to ascertain the substance of the facts surrounding the petitioners arrest and Interrogations.

After the hearing Court denied the Motion to Suppress, and noting the obvious disregard in preparation of hearings, Immediately [Mr. Abrego] replaced his attorney. The new attorney filed a motion to **"Reopen the Motion to Suppress"**, due to ineffective assistance of counsel. (C. 120) The trial Court denied the motion

At no time did Petitioner Initiate any contact with authorites to be questioned after his arrest and request for counsel. every single contact was "police-initiated".

Petitioner's initial counsel failed to challange the confession as being obtained in violation of petitioner's Sixth Amendment right to Counsel and under the Fifth Amendment right under Miranda.

This Post-Conviction Petition involves claims of Substantial violations of Petitioner's [State] and [Federal] Constitutional rights, and those claims raised are not res judicata or waived even if there is 'some' evidence of the violations in the record, as the claims raised involve evidence 'outside' the record and could be raised for the first time in a Post-Conviction Petition for relief as the appropriate remedy at law.

## STANDARD OF REVIEW

26.  This petition is now before the Court for an initial determination of the legal sufficiency of the petition pursuant to Section 122-2.1 of the Illinois Post-Conviction Hearing Act (hereinafter, the "Act"). 725 ILCS 5/122-2.1 (West 2006); See also: People v. Erickson, 183 Ill.2d 213, at 222, 700 N.E.2d 1027, at 1031-32 (1998). At this initial stage, The Court  is simply  to determine without any input from the State, whether the instant petition is frivolous or patently without merit. People v. Coleman, 183 Ill.2d 366, at 379, 701 N.E.2d 1063 (1998). In this initial examination, the Court is mandated to closely scrutinize  the supporting documentation attached to the petition. People v. Hernandez, 283 Ill.App.3d 312, at 316, 669 N.E.2d 1326, at 1329 (4th Dist. 1996); People v. Lemons, 242 Ill.App.3d 941, at 946, 613 N.E.2d 1234, at 1238 (4th Dist. 1993).

-10-



The Court must recognize that the Act provides a remedy to a criminal defendant who claims that a "substantial" violation of his State or Federal Constitutional rights occurred in the proceedings that resulted in his conviction. People v. Todd, 178 Ill.2d 297, at 309, 687 N.E.2d 998, at 1003 (1997).   A Post-Conviction proceeding is not an appeal (per se) but is, instead, a collateral attack on a prior judgment. People v. Hawkins, 181 Ill.2d 41, at 50, 690 N.E.2d 999 at 1003 (1998).  The purpose of the proceeding is to consider Constitutional issues that have not been or could not have been previously adjudicated. People v. Johnson, 183 Ill.2d 176, at 186, 700 N.E.2d 996, at 1001 (1998).

The Court should further consider the fact that some issues can only be proven by facts outside the record. People v. Piper, 272 Ill.App.3 843, 651 N.E.2d 739 (5th Dist. 1995), or that petitioner has presented new or more complete documentation of his claim which was not available on direct appeal. People v. Barrow, 195 Ill.2d 506, 749 N.E.2d 892 (2001). or that in the Interest of Justice the issue should be reviewed to ensure fundamental fairness at trial. People v. Jones, 174 Ill.App.3d 794, 529 N.E.2d 66 (4th Dist. 1988), or that Ineffective assistance of Counsel claims is better raised in a Post-conviction. See e.g.;: People v. Kunze, 193 Ill.App.3d 708, 550 N.E.2d 284 (4th Dist. 1990); Massaro v. United States, 538 U.S. 500, 155 L.Ed.2d 714 (2003) which held: "Defendants may always raise ineffective assistance of counsel claims on collateral review even where direct appeal record has 'some' evidence sufficient to raise claim sooner because "Post-Conviction" is better mechanism for raising such claims".

The petition may be dismissed at the initial review stage for failure to attach any supporting documentation other than sworn verification if petitioner does not explain why the same was not attached. People v. Collins, 202 Ill.2d 59, 782 N.E.2d 195 (2002). Here, the Court should take Judicial Notice of the Petitioners "MOTION FOR LEAVE TO "AMEND" AND/OR SUPPLEMENT POST-CONVICTION CLAIMS AND ATTACHED AFFIDAVITS". and it should be considered that the Courts have held that a defendant's own affidavit was sufficient to comply with Collins, furthermore, the failure to attach independent corroborating documentation or to explain its absence, may be excused where the only other affidavit which a defendant could be expected to furnish is that of the attorney whose competence is being challanged.

In cases of 'Pro-se' petitioners under sentence of imprisonment for a term of years, [the Supreme Court] has acknowledged that only the 'gist' of a Constitutional claim need be asserted in order to survive dismissal under Section 122-2.1 and to require the Appointment of Counsel under the Act. People v. Coleman, 701 N.E. 2d 1063, at 1071, n.2, Citing: People v. Porter, 122 Ill.2d 64, at 84, 521 N.E.2d 1158 (1988); See also: People v. Seaberg, 262 Ill.App.3d 79, at 82, 635 N.E.2d 126 (1994).

In order to proceed and obtain an Evidentiary Hearing, the Petitioner must demonstarate and establish a substantial violation of his State or Federal Constitutional rights in the proceedings that produced the judgment being challanged. People v. Tenner, 175 Ill.2d 372, at 378, 677 N.E.2d 859, at 862 (1997), Thus, the burden is on the petitioner to set forth violations of his Constitutional rights and to

-12-



support the allegations by Affidavits, Records, or other evidence containing specific facts. <u>People v. Guest</u>, 166 Ill.2d 381, at 389, 655 N.E.2d 873, at 877 (1995).

The Trial Court must make it's Summary Determination after considerir and closely scrutinizing the supporting documentation attached to the petition and considering why any other supporting documentation may not be attached to the petition, without any input from the State and construing well plead allegations as True, determine if the petition fails to state the 'gist' of a substantial constitutional violation, and Summarily determine that the Petition if Frivolous or Patently without merit, in which the Court dismisses the petition pursuant to 725 ILCS 5/122-2.1(a)(2)(West 2006). However, In order to withstand dismissal at the first stage of these Post-Conviction Proceedings, a Petition need only contain a simple statement which presents the 'gist' of a claim for relief.  Requiring Pro-se petitioners for Post-Conviction Relief, who are often persons of limited education, to plead their claims in more precise detail would have the practical effect of depriving many Petitioner's meaningful access to Courts. <u>People v. Dredge</u>, 148 Ill.App.3d 911, 500 N.E.2d 445, at 446, 102 Ill.Dec. 552 (4th Dist. 1986); <u>People v. Jones</u>, 274 Ill.Dec. 707, 791 N.E.2d 1118 (Ill.App. 1 Dist. 2003).

When the Court determines that the Petition does state the 'gist' of a Constitutional Claim for relief, the Court proceeds to the <u>Second</u> stage of the Post-Conviction Proceedings and Appoints Counsel to represent indigent defendants upon motion or request, thereafter giving counsel an opportunity to consult with petitioner, contact potential witnesses and gather whatever further evidence or conduct whatever further investigation is necessary to support petitioners

-13-

allegations that are necessary to fully present and adjudicate

the Claims presented in an "Amended" Petition. 725 ILCS 5/122-2.1(b)

(West 2006).

The State then has the opportunity to respond or file a dispositive

motion to dismiss the petition. 725 ILCS 5/122-5 (West 2006).  The

Third and final stage is conducting and "Evidentiary Hearing". 725 ILCS

5/122-6 (West 2006); People v. Hernandez, 283 Ill.App.3d 312, 669 N.E.2d

1326, 218 Ill.Dec. 800, at 803 (4th Dist. 1996).


## CLAIM ONE OF CONSTITUTIONAL DEPRIVATION

**ERUBY ABREGO'S RIGHT TO COUNSEL WAS VIOLATED BY ILLINOIS DETECTIVES
INITIATING INTERROGATIONS FOLLOWING HIS ARREST ON THE CHARGE OF
FIRST DEGREE MURDER AND AGGRAVATED BATTERY WITH A FIREARM AFTER
   REQUESTING A LAWYER BEFORE BEING TRANSPORTED TO AREA 5 POLICE
HEADQUARTERS VIOLATING PETITIONERS CONSTITUTIONAL RIGHTS UNDER THE
SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION APPLICABLE TO THE
STATES THROUGH THE FOURTEENTH AMENDMENT, WHICH GUARANTEE'S A PERSON
ACCUSED OF A CRIME THE RIGHT TO COUNSEL, AS DOES ARTICLE I, SECTION
8 OF THE ILLINOIS CONSTITUTION OF 1970 –AND– PETITIONER'S ATTORNEY'S
FAILURE TO INVESTIGATE AND FILE A MOTION TO SUPPRESS HIS CONFESSION
ON THAT GROUND DEPRIVED MR. ABREGO OF HIS CONSTITUTIONAL RIGHT TO
THE EFFECTIVE ASSISTANCE OF COUNSEL, FURTHER, COUNSEL WAS LIKEWISE
   INEFFECTIVE FOR FAILING TO INVESTIGATE AND FILE A MOTION TO
SUPPRESS THE CONFESSION ON A "MIRANDA" FIFTH AMENDMENT VIOLATION.**

27.  The Sixth Amendment to the United States Constitution, applicable

to the States through the Fourteenth Amendment, guarantees a person

accused of a crime the right to counsel, as does Article I, Section 8

of the Illinois Constitution. (U.S. Const. amend. VI and XIV; Ill. Const.

1970, art I, sec 8).

The Sixth Amendment right to counsel is triggered 'at or after

the time that judicial proceedings have been initiated..."whether by way

of formal charge, preliminary hearing, indictment, information, or

arraignment'," Fellers v. United States, 540 U.S. 519, 523 (2004)(citations

omitted). Further, The Sixth Amendment right to counsel can be triggered

-14-

based on an Officers Sworn Affidavit to obtain an Arrest Warrant, or
by "Prosecutorial Involvement" or by a multitude of other means. as
was the case here in this case, the **"Officer/Detectives Sworn Affidavit**
**and accusation against petitioner, the Judge found "probable Cause" to**
**believe that petitioner committed the offense based on a Police Officer's**
**Sworn affidavit, and issued a [WARRANT] for petitioner's [ARREST] and**
**committed him to jail pending the "posting of Bail" or Trial".**

When "Adversarial Judicial Proceedings" **commence** or have been
Initiated against an accused ᴼᴿ have been found to commence in a variety
of ways--e.g., by charge, indictment, information, arraignment, by
Sworn Affidavits, by Prosecutorial Involvement, and by a multitude of
other ways-- but the Rule is not always easy to apply, and the result
is many conflicts in decisions amoung the lower State Courts and
Federal Courts as was recently <u>noted</u> by the Fifth Circuit in the
case of <u>Walter Allen Rothgery v. Gillespie County, Texas</u>, 491 F.3d
293 (June 29, 2007) which the United States Supreme Court granted
Certiorari on September 27, 2007 S.Ct No. 07-440. (Still pending).

Abrego's right to counsel arose under the Fourteenth Amendment,
which incorporates the protection of the Sixth Amendment. <u>See</u>: <u>Gideon</u>
<u>v. Wainwright</u>, 372 U.S. 335, 342 (1963). For simplicity's sake, the
petitioner refers to the right to counsel as a Sixth Amendment right.

The facts in this case (As noted in the Statement of Facts) are
that On March 24th, 1999 at approximately 11:00 a.m., Detective's
who had been looking  for defendant after "Arresting" co-defendant
[Juan Parra] and [Jeremiah Cain] the day before and 'charging' them
with the offenses herein the Detective's 'forced' their way into the

-15-

residence of [Debbie Daniels] to "Arrest" Petitioner [Eruby Abrego] and co-defendant [Nicasio Santiago], and when escorting petitioner with [Debbie Daniels] to a Detective's vehicle, it was obvious that petitioner was no longer a "Suspect" but instead was an "Accused" by the Detective's clear statements of "You know what you did", and "Why did you shoot those people on Belmont"? and further, it is clear that when Petitioner was made aware of the seriousness of the charge, he unequivacably requested a Lawyer in the presence of numerous witnesses, being the first floor tenents [Ms. Jennifer Guzmen] who according to her Affidavit [ATTACHMENT "D"] would testify that on March 24th, 1999 at about 11:15 a.m. she and her brother were out walking their family pet observing several unfamiliar cars in front of their building when they returned from the walk and they were on the sidewalk standing next to a dark colored unmarked police car when some plain clothed police officers escorted [Eruby Abrego] and his sister [Debbie Daniels] out of the building to put them in the car, and overheard the Italian or Polish looking police officer "Ask" petitioner "Why he shot those people on Belmont" and further also heard Mr. Abrego tell the Officer that "He didn't shoot anyone on Belmont, and that if that was what this was about that he wanted a Lawyer" and also heard the Officer reply: "You'll get a Lawyer when you go to Court", these essentially same 'facts' are corroborated by the Affidavits of [Sonny Rodreguiz] (ATTACHMENT "E") and Affidavit of [Debbie Daniels] (ATTACHMENT "F"), and that of petitioner (ATTACHMENT "G").

The History and purpose of the Sixth Amendment, support the conclusion that the Sixth Amendment guarantees a right to counsel to defend a person's liberty when that liberty is threatened, as here,



"Adversary Judicial Proceedings" have "Commenced" when there had
been a judicial determination of "Probable Cause" by the "Sworn
Affidavit" of the Officer to Obtain the Search <u>and</u> Arrest Warrants
for petitioner and the government had imposed significant restrictions
on the petitioner's liberty, and therefore, the right to counsel
attaches at the initiation of adversary judicial proceedings--the point
at which the petitioner was no longer a "Suspect", but became an
"Accused". <u>Michigan v. Jackson</u>, 475 U.S. 625, 632 (1986); See also:
<u>Brewer v.Williams</u>, 430 U.S. 387, at 398 (1977).
Such a rule is supported by the Supreme Courts decision in <u>Argersinger
v. Hamlin</u>, 407 U.S. 25 (1972), and its progeny, which hold that a
person is entitled to appointed counsel if the government intends to
deprive him of his freedom for even a single day.

Under Supreme Court precedents, the right to counsel attaches
at the initiation of adversary judicial proceedings. <u>See</u>, e.g., <u>Brewer
v. Williams</u>, 430 U.S. 387, at 398 (1977)(citing cases). The Court has
made clear that adversary judicial proceedings might commence in  any
number of ways, such as by "formal charge, preliminary hearing, indictment,
information or arraignment." <u>Id</u>. but no matter <u>how</u> proceedings might
commence, this court has consistently said the right to counsel attaches
"as soon as they do".

Thus, in <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986), the court
summarily rejected the argument that under Michigan's particular
procedures, arraignment did not sufficiently affect the defendant's
rights to justify attachment of the right to counsel. See <u>Id</u> at 629 n.3.
The Court explained that the Sixth Amendment provides a right to counsel
once "a person who had previously been just a 'suspect' has become
an "accused", including by formal accusation. <u>Id</u> at 632.

-17-



In contrast, before the initiation of adversary judicial proceedings, there is no right to counsel.  In Kirby v. Illinois, 406 U.S. 682 (1972), for example, the Court held that the right to counsel had not attached when Kirby was identified in a police lineup shortly after arrest. Id at 684-85 (plurality op). In Jackson's term's, Kirby--who had been picked up by the police for carrying another man's social security card and traveler's checks--was merely a "suspect" when his victim came in and identified him. See Id.

The Court's focus on the initiation of adversary judicial proceedings --the moment of transition between "suspect" and "Accused"--reflects an understanding that veried in facts of specific cases, making it hard to identify a single, specific triggering event at which the right to counsel attaches in all cases, instead, the Court should focus on the rule that essentially that the right to counsel attaches whenever the STATE DETERMINES THAT IT SHALL BE ADVERSE TO AN INDIVIDUAL, SEEKING TO DEPRIVE HIM OF HIS LIBERTY. See: Brewer, 430 U.S. at 398; Kirby, 406 U.S. at 689.

It is undisputed that the Detective's in this case, had "Arrested" and "Charged" both [Juan Parra] and [Jeremiah Cain] in the a.m. hours of March 23rd, 1999 and a.m. hours of March 24th, 1999, and based on the incriminating Statements of those two persons sought "Arrest WARRANTS" on [Nicasio Santiago] and petitioner [Eruby Abrego] to likewise be "Charged" with these Offenses. Therefore it is likewise undisputed that petitioner/defendant [Eruby Abrego] was no longer a "Suspect" but was in fact an "Accused" upon "ARREST"AT 3626 North Whipple at approximately 11:00 a.m. on March 24th, 1999, and it cannot be disputed (incorporating the Statement of Facts herein) that when the petitioner was told the nature of the offense by Detective [Wojcik]

-18-



at 3626 North Whipple as he was about to be placed in the Detective's
vehicle on March 24th, 1999 at approximately 11:15 a.m.and the petitioners
uneqivable request for a Lawyer, the petitioner "Invoked" his Sixth
Amendment right to counsel.

Secondly Petitioner's Fifth Amendment right to counsel was
likewise invoked' after his arrest, and again when the police
transported petitioner to jail, placed him in an Interrogation room,
and questioned him without any MIRANDA warnings being read to petitioner.

The law does not require a confined, accused person to wait until
questioning begins to invoke his right to counsel. See, e.g., Miranda
v. Arizona, 384 U.S. 436, 470-74 (1966); United States v. Kelsey, 951
F.2d 1196, 1197-99 (10th Cir. 1991)(defendant's request to talk to his
lawyer, after being arrested in his home, invoked his Fifth Amendment
right to counsel where the "Exchange" between the police and the
defendant made it clear that the police intended to question the
defendant "at some point");(United States v. "baiu, 202 F.Supp.2d 1177
D.Kan. 2002)(defendant's statement during traffic stop, "we want a
lawyer here", invoked his Fifth Amendment right to counsel; although
defendant was not questioned until after he was formally arrested and
taken to sheriff's office, his invocation was not "anticipatory");
United States v. Goodson, 22 M.J. 22 (C.M.A. 1986)(defendant asked for
a lawyer when he was arrested at 2:30 a.m. and again about daybreak and
was told he could not speak to a lawyer; although defendant was not
questioned until about noon, approximately 10 hours later, in these
circumstances, defendant's pre-Interrogation request for a lawyer invoked
his Fifth Amendment right to counsel). As here, defendant [Eruby Abrego's]

-19-

request for a Lawyer after being told by Detective [Wojcik] that this
arrest was about "Shooting those people on Belmont" invoked his Fifth
and Sixth Amendment right to counsel.  The Interrogations of [Mr. Abrego]
by the Chicago, Illinois Detectives and Assistant State's Attorney, and
the fruits of those illegal interrogations use at defendant's trial, thus
violated petitioners right to counsel under the Fifth, Sixth and
Fourteenth Amendments to the United States Constitution and Article I,
Section 8 of the Illinois Constitution.

   Thirdly, The failures of petitioners counsel prior to the Suppression
Hearing to fully investigate and thereafter move to suppress his
confessions on the basis that it had been obtained through violations
of his Constitutional rights to counsel as beforementioned by Chicago
Detectives and the Assistant States Attorney violated his Constitutional
right to the effective assistance of counsel.  The Constitutional right
to counsel is a fundamental right aimed at protecting the right to a
fair trial or proceeding, and "the right to counsel is the right to the
effective assistance of counsel". Strickland v. Washington, 466 U.S.
668, at 686 (1984), quoting McMann v. Richardson, 397 U.S. 759, 771 n.14
(1970); People v. Perez, 148 Ill.2d 168 (1992), citing Strickland. "[T]he
proper standard for attorney performance is that of reasonably effective
assistance." Strickland, 466 U.S. at 687.  To prevail on a claim of
ineffective assistance of counsel, a defendant must establish 1) that
"counsel's performance was deficient" and fell below an objective standard
of reasonableness; and 2) that "the deficient performance prejudiced the
defense." Id.  To establish prejudice. "[t]he defendant must show that
there is a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceedings would have been different. A
reasonable probability is a probability sufficient to undermine confidence

-20-



in the outcome." Id. at 694.

    Petitioner's initial counsel never visited petitioner to discuss the events that resulted in his arrest or Interrogations, counsel never came to the Cook County Jail to visit petitioner to discuss the case, which is verifiable by Jail visitation records, Counsel became aware that petitioner had been physically abused during the Interrogation process during   a  related Court appearance, and counsel filed a Motion to Suppress based on those facts, but failed to call necessary witnesses or make any attempt to obtain supporting medical records to support those claims (See also: Petitioner's AFFIDAVIT "ATTACHMENT "G") in support hereof, However, had counsel adequately investigated the circumstances of Mr, Abrego's Arrest and Interrogations, counsel would have discovered that 1). Mr. Eruby Abrego had requested a Lawyer immediately following his arrest in the presence of multible witnesses; 2) That Detective [Wojcik] had advised Mr. Abrego after his request for a Lawyer that he would be provided a Lawyer when he went to Court; and 3) That the Initial Interrogation at Area 5 Police Headquarters of the defendant was without any Miranda warnings or "Waivers".  Counsel's failure to investigate and discover these readily available facts, and to thereafter assert in a motion to suppress that, based upon those facts, Mr. Abrego's confession had been obtained in violation of his right to counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section Eight of the Illinois Constitution of 1970, which constituted objectively unreasonable, deficient performance.

    Mr. Abrego's defense was prejudiced by his attorney's deficient performance as previously stated. Although the admission of an illegally obtained confession is reviewed for harmless error. Arizona v. Fulminante

499 U.S. 279 (1991), the admission of Mr. Abrego's statement at his trial was not harmless.  His Confession was the most significant evidence marshaled against him by the prosecution.  The prosecution repeatedly emphasized Mr. Abrego's statements in its opening and closing arguments.  All other evidence offered by the State at Mr. Abrego's trial was intended to corroborate the confession, as the numerous physical discriptions of the suspect supplied by eyewitnesses did not fit the physical discription of the defendant, the confession was the cornerstone of the case against Mr. Abrego. Had counsel adequately investigated and presented these claims in a motion to Suppress, there is a reasonable probability that the trial court would have found his statements  to have been obtained in violation of Mr. Abrego's Fifth, Sixth and Fourteenth Amendment right to counsel, and ordered those statements, and the fruits of those statements, to be suppressed.  Because of the critical importance of the confessions to the State's case against Mr. Abrego, there would have been a reasonable probability that the Suppression of the confession would have led to a different result at Mr. Abrego's trial, and he very likely would have been acquitted as was other accused co-defendants in this case.

Counsel's deficient performance and the resulting prejudice to Mr. Abrego's defense, thus violated Mr. Abrego's rights to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 8 of the Illinois Constitution of 1970. (U.S. Const., amend. VI, XIV;Ill. Const., 1970, art I, § 8; Strickland v. Washington, 466 U.S. 668 (1984)).

## CONCLUSION

**WHEREFORE,** Petitioner **Eruby Abrego** respectfully prays that this Court:

(a) Vacate his conviction and order a new trial;

(b) Order an evidentiary hearing pursuant to 725 ILCS 5/122-6 at which proof will be offered concerning the allegations of this Petition;

(c) Grant petitioner authority, prior to any evidentiary hearing, to conduct discovery bearing upon the issues raised in this Petition, including the authority to issue subpoenas for witnesses and documents; and,

(d) Grant such other and further relief as may be appropriate and just.

Respectfully submitted,

ERUBY ABREGO R-34111 (Petitioner)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112
5/28/08



## INDEX OF ATTACHMENT'S

ATTACHMENT "A"--Appellate Court Decision of March 7, 2007.

ATTACHMENT "B"--Appellate Court denial of Rehearing (April 4, 2007).

ATTACHMENT "C"--Ill.Supreme Court Denial of Petition for Leave to
                Appeal (Denied: September 26, 2007, No. 104557).

ATTACHMENT "D"--Affidavit of [MS. JENNIFER GUZMAN].

ATTACHMENT "E"--Affidavit of [MR. SONNY RODRIGUEZ].

ATTACHMENT "F"--Affidavit of [MS. DEBBIE DANIELS].

ATTACHMENT "G"--Affidavit of [ERUBY ABREGO].

ATTACHMENT "A"

(Appellate Court Decision of March 7, 2007)

NOTICE
The text of this opinion may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same. O'Toole

**THIRD DIVISION**
**March 7, 2007**

No. 1-04-3259

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County |
| | ) |
| v. | ) |
| | ) |
| ERUBY ABREGO, | ) No. 99 CR 9739 (02) |
| | ) |
| Defendant-Appellant. | ) |
| | ) Honorable |
| | ) Kenneth J. Wadas, |
| | ) Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Eruby Abrego was found guilty of first degree

murder and aggravated battery with a firearm and was sentenced to consecutive prison

terms of 60 and 30 years', respectively. On appeal, defendant contends: (1) the trial

court abused its discretion by excluding certain hearsay testimony that an individual

1-04-3259

other than defendant had confessed to the shooting; (2) the trial court erred by

improperly responding to a note the jury sent to the court during deliberations; (3) the

trial court abused its discretion by admitting "gruesome" photographs of the victim; (4)

his sentence was excessive; and (5) the compulsory extraction and perpetual storing of

his DNA is unconstitutional.

## BACKGROUND

Defendant's conviction was the result of an ongoing conflict between the Insane

Orchestra Albany and the Latin Kings street gangs. The jury found defendant guilty of

shooting Jose Garcia and Julio Lugo. Garcia died as a result of his injuries. On March

22, 1999, at about 5:30 or 5:45 p.m., defendant was riding in a car with several

individuals who belonged to the Insane Orchestra Albany gang. They drove to the area

of Belmont Avenue and Monticello Avenue where they saw another car with members

of the Latin Kings' gang. They flashed gang signs at the Latin Kings, "threw down" the

Latin Kings sign and threw a bottle at their car. The car with the Latin Kings drove

around the corner, and Julio Lugo and his 11-year-old cousin, Isidro Quinones, exited

the car. Lugo and Quinones were walking toward a grocery store when they stopped to

talk to Ramon Torres and Jose Garcia, who were sitting in a nearby car. As they were

talking, defendant approached the group on foot and began shooting, hitting Garcia

and Lugo. Defendant then fled.

Subsequently, defendant was arrested and identified in a lineup by Torres and

Quinones as the shooter. Defendant also signed a court-reported statement admitting

2

1-04-3259

he was the shooter, which was introduced into evidence at trial. The gun used in the

shooting was recovered from a fellow gang member's home.

## ANALYSIS

Defendant first contends that the trial court abused its discretion by excluding

certain hearsay testimony that an individual other than defendant had confessed to the

shooting. Prior to trial, defendant filed a motion pursuant to Chambers v. Mississippi,

410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), to admit statements made by

Jason Rodriguez to his girlfriend, Elizabeth Montalvo, that Rodriguez was involved in

the shooting. The court held a hearing on the matter.

At the hearing, Montalvo testified that on March 22, 1999, she had been living

with Rodriguez for about six months. They also have a child together. On that night,

Rodriguez told Montalvo that he had to take care of something or had to prove

something and asked her to get his black "hoody." Rodriguez left and returned about

four hours later. Montalvo stated that when Rodriguez returned, he appeared very

nervous and closed the window blinds. She asked him what was wrong, but he did not

answer. A couple of days later, Rodriguez's friend came to the house and told

Rodriguez that he needed to hide. Montalvo stated that she would not let Rodriguez

leave until he told her what was "going on." Rodriguez told her that the reason he had

to hide was because he shot a Latin King. He said that he was on Belmont Avenue, by

himself, when he got out of his car and approached some individuals. He heard one of

them say in Spanish "watch that black guy." He approached the group, looked one of

3

1-04-3259

them in the eye and shot at them. He said that he shot two people. Montalvo stated
that she was not sure where on Belmont Avenue the shooting occurred but guessed it
was around Belmont Avenue and Central Park. Montalvo stated that after a few days,
Rodriguez returned and told her that everything was all right because someone else
had been charged with the shooting. Montalvo further stated that after she and
Rodriguez broke up, he stalked her and beat her and told her not to tell anyone what
he had told her. Montalvo described Rodriguez as about 5 feet 11 inches to 6 feet tall
and dark complected with a heavy build. On cross-examination, Montalvo stated that
Rodriguez left the house on the night of the shooting at about 6:30 or 7:30 p.m. When
Rodriguez returned, he was wearing a T-shirt, blue jeans and white gym shoes.

Nicasio Santiago testified that on March 22, 1999, in the afternoon or early
evening, he was riding in a car with Jason Rodriguez in the Logan Square
neighborhood. According to Santiago, defendant was not with them. Santiago and
Rodriguez exited the car and saw a group of Latin Kings around Belmont Avenue and
Monticello Avenue. They exchanged gang signs with the Latin Kings and threw bottles
at their car. He and Rodriguez walked around the corner and saw the Latin Kings' car.
Rodriguez approached the car and the individuals standing near the car and started
shooting at them. He and Rodriguez then fled. Santiago described Rodriguez as
about 5 feet 9 inches tall. On cross-examination, Santiago acknowledged that he had
signed a statement written by an assistant State's Attorney, but stated that the
statement was untrue and the result of police brutality. According to the statement, he

4

1-04-3259

did not implicate Rodriguez in the shooting.

Julio Lugo testified that the shooter was dark complected, was shorter than 5 feet 8 inches or 5 feet 9 inches and was wearing a dark-colored jogging suit. He also described the shooter as "caramel complected."

Detective Guevara testified that he and his partner interviewed Lugo after the shooting and Lugo described the shooter as a Hispanic male in his twenties, 5 feet 8 inches to 5 feet 10 inches tall, weighing about 200 pounds, and wearing a dark-colored jogging suit.

Officer Thesedosia Jaks testified that she wrote a police report from an interview with Ramon Torres and Julio Lugo. The report indicated that the shooter had been described as a dark Hispanic male, 5 feet 7 inches tall, weighing 200 pounds, and wearing a brown sweatsuit with a hoody.

Officer Eduardo Rios testified that he obtained a description of the shooter as a Hispanic male with a black jacket and black hoody.

Detective Raymond Schalk testified that he interviewed Isidro Quinones, who described the shooter as a Hispanic male, 18 to 22 years old, 5 feet 9 inches tall, black hair, dark complected, and wearing a black hoody and black jacket.

The parties stipulated that if Detective Robert Smith would testify, he would state that he interviewed Ramon Torres, who described the shooter as a dark Hispanic male, 19 to 20 years old, about 6 feet tall, 180 pounds, with black hair and wearing a black, zipped jacket with a hoody, and dark jeans and white tennis shoes.

5

1-04-3259

The parties further stipulated that a photograph of Jason Rodriguez from the Chicago police department dated September 16, 1999, indicated that Rodriguez was a black Hispanic male, 5 feet 7 inches tall, weighing 150 pounds, with brown eyes, black hair and a dark complexion.

Following the hearing, the court analyzed the four factors the United States Supreme Court set forth in <u>Chambers v. Mississippi</u>, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, to determine whether Montalvo's testimony was admissible. With regard to the first factor, whether the confession was made spontaneously to a close acquaintance shortly after the crime occurred, the trial court found that there was no question that there was a close relationship between Montalvo and Rodriguez. The court stated however, that because Rodriguez's statement was made two days after the crime occurred, it did not seem spontaneous.

With respect to the second factor, whether the confession was corroborated by some other evidence, the court found that there was not sufficient independent corroboration to the statement. The court stated that Santiago's testimony was not credible and noted that Santiago was

> "one of the most disreputable individuals that has ever testified in this courtroom. On a credibility assessment scale of one to ten, his falls somewhere around zero."

The court also stated that Rodriguez's statement was vague, and although it seemed to be an admission to a shooting, it did not necessarily refer to this shooting. The court

6

1-04-3259

further stated that the description of the shooter as "dark complected" was vague,

because it could mean different things to different people.

With respect to the third factor, whether the confession was self-incriminating

and against the declarant's interests, the trial court found that Rodriguez's statement

was against his penal interests.

With respect to the fourth factor, whether the declarant was available for cross-

examination, the trial court found that the factor was not satisfied.

The court noted in concluding that factor one was only marginally met, factor two

was not met, factor three was met, and factor four was not met. The court further stated

that there was not a sufficient indicia of reliability regarding the statement from

Rodriguez to Montalvo that would make it reliable to give a jury an opportunity to

assess it and assess Montalvo's credibility.

In Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, the

United States Supreme Court found that hearsay statements that satisfy the following

factors may be admissible at trial. The factors a court must consider are whether (1)

the confession was made spontaneously to a close acquaintance shortly after the crime

occurred; (2) the confession was corroborated by some other evidence; (3) the

confession was self-incriminating and against the declarant's interests; and (4) the

declarant was available for cross-examination. Chambers, 410 U.S. at 300-01; 35 L.

Ed. 2d at 312, 93 S. Ct. At 1048-49. These factors are "merely guidelines to

admissibility rather than hard and fast requirements." People v. Tenney, 205 Ill. 2d

7

1-04-3259

411, 435 (2002). "[T]he presence of all four factors is not a condition of admissibility." Tenney, 205 Ill. 2d at 435. Rather, the question to consider is "whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." People v. Bowel, 111 Ill. 2d 58, 67 (1986). "The admission of evidence is within the sound discretion of the trial court, and its ruling will not be reversed" absent an abuse of discretion. Tenney, 205 Ill. 2d at 436.

Here, as the trial court found, we agree that Rodriguez's statement to Montalvo was made to a close acquaintance. We also agree with the trial court that the statement was not exactly spontaneous. Rodriguez's statement was made in response to Montalvo's questions and Montalvo's insistence that he tell her what was "going on" before he went to "hide out." Defendant relies on People v. Tenney, 205 Ill. 2d 411 (2002), in which our supreme court determined that the declarant's statement could be considered spontaneous even though it was in response to his girlfriend's "demand" for an explanation. The court determined that merely because the declarant's girlfriend asked the declarant "what was going on," that "single, simple question did not rob [the declarant's] statement of spontaneity." Tenney, 205 Ill. 2d at 439. The court then distinguished the case from People v. Hampton, 249 Ill. App. 3d 329 (1993), where the hearsay statement was found to be inadmissible because it was made in response to "comments and pointed questioning." Tenney, 205 Ill. 2d at 439. We find that Montalvo's questioning of Rodriguez was more akin to the facts in Hampton than in Tenney. Montalvo stated that she would not let Rodriguez leave until he told her what

8

1-04-3259

was "going on." Montalvo's demand that Rodriguez provide her with an explanation was more than just a single, simple question. It was similar to the comments and pointed questioning in <u>Hampton</u>, in which the declarant's response was not considered spontaneous.

Defendant questions the viability of the <u>Hampton</u> decision, alleging that it was overturned by the federal court. The defendant Hampton filed a petition for a writ of <u>habeas corpus</u> pursuant to 28 U.S.C. §2254 (2000) in federal district court, which the court denied. The Seventh Circuit Court of Appeals vacated the denial of Hampton's petition and remanded the matter to the district court for further proceedings to consider Hampton's claim that his trial counsel was ineffective in failing to file a timely motion to reconsider the trial court's judgment. See <u>Hampton v. Roth</u>, 221 F.3d 1338 (7th Cir. 2000). The untimely motion to reconsider had alleged that Mel Thompson's confession to Constance Catchings that he had committed the crime could be corroborated by the testimony of Johnnie Smith, a newly discovered witness, who claimed that Thompson also confessed to him. The trial court had barred Catchings' testimony pursuant to <u>Chambers</u> because there was no corroboration of the confession. The motion to reconsider had been denied solely on the grounds that it was untimely. Upon remand from the Seventh Circuit, the district court found that Hampton had been prejudiced by his trial counsel's failure to file a timely motion for reconsideration. The district court granted Hampton's petition for <u>habeas corpus</u> but stayed execution of the writ on the condition that the State of Illinois grant Hampton a new trial. See <u>U.S. ex rel. Hampton</u>

9

1-04-3259

corroboration in addition to Santiago's testimony; Rodriguez shot at two people; the shooting occurred on Belmont Avenue; the eyewitness descriptions of the shooter were of a dark-complected Hispanic male between 5 feet 7 inches and 6 feet tall, wearing a black hoody; and the victims were Latin Kings.

Here, as the trial court found, these corroborating details are somewhat vague and could easily refer to a different shooting. The description of the shooter as a dark-complected Hispanic male between 5 feet 7 inches and 6 feet tall is somewhat generic. And, hoody sweatshirts are extremely commonplace. Although the corroborating detail that the shooting occurred on Belmont Avenue is more specific, Rodriguez's statement did not specify where on Belmont Avenue he shot at two people. As the trial court noted, Belmont Avenue runs as far east as the lake and as far west as the City of Chicago's limits. Additionally, the victims' identities as Latin Kings is also more specific, but, not specific enough such it could independently corroborate Rodriguez's statements. Rival gang violence is unfortunately a routine occurrence. Further, there is other contradictory evidence; namely, the time frame when Rodriguez left his home on the night of the shooting. Montalvo stated that Rodriguez left home at about 6:30 or 7:30 p.m. that night. Testimony at trial established that the shooting occurred at about 5:30 or 5:45 p.m. Therefore, we agree with the trial court that this factor is not satisfied.

Considering the third factor, we agree that Rodriguez's statements are self-incriminating and against his interests.

Considering the fourth factor, defendant failed to establish that Rodriguez was

11

1-04-3259

available for cross-examination. The trial court was not presented with any evidence that Rodriguez was available for cross-examination. Therefore, we agree with the trial court's finding that this factor is not satisfied.

In conclusion, we find that only the third <u>Chambers</u> factor was satisfied. The first factor was only somewhat satisfied and the other two factors were not. Although the factors are merely guidelines to admissibility rather than requirements, the absence of the majority of factors in this case leads us to conclude that Rodriguez's declaration was not made under circumstances that provide "considerable assurance" of its reliability. Therefore, we find that the trial court's determination to exclude Montalvo's testimony was not an abuse of discretion.

Despite the trial court's ruling, defendant additionally contends that Montalvo's testimony from the hearing should have been admissible at trial because she failed to respond to a subpoena and thus was unavailable to testify at trial. Defendant further contends that, in the alternative, the trial court should have admitted the nonhearsay portions of Montalvo's testimony. Defendant's contentions are misplaced. Montalvo's testimony was excluded because it was found to be unreliable. Even if she became unavailable to testify at trial, her prior testimony would still be excluded because it did not satisfy the criteria set forth in <u>Chambers</u>. Moreover, her testimony as a whole was found to be unreliable pursuant to <u>Chambers</u>; therefore, it was not an abuse of discretion for the trial court to exclude the nonhearsay portions of Montalvo's testimony.

12

1-04-3259

Additionally, we note that the evidence in this case was not closely balanced. Defendant was positively identified in a lineup by eyewitnesses Ramon Torres and Isidro Quinones, defendant signed a court-reported statement admitting he was the shooter, and the gun used in the shooting was found in a fellow gang member's home.

### JURY NOTE

Next, defendant contends that the trial court erred by improperly responding to a note the jury sent to the court during deliberations.

During deliberations, the jury sent the trial court four notes. The fourth note, which is at issue in this appeal, stated, "[M]ay we see Daniel Gallagher's bond hearing report taken on March 27th, 1999."

Daniel Gallagher was defendant's public defender in bond court on March 27, 1999. Gallagher testified at trial that he did not have any independent recollection of the matter and referred to the transcript from the bond hearing to refresh his recollection. Gallagher testified that according to the transcript, defendant told Gallagher that he had been beaten by police and had been coughing up blood. Also according to the transcript, Gallagher asked the court to note the cuts on defendant's chest and bruises on his arm; however, there was no indication from the transcript whether the judge noted any injuries. The bond hearing transcript was not admitted into evidence at defendant's trial.

The trial court gave the jurors each of the reports they requested in their first three notes. However, after reading the fourth note, the judge and the parties agreed

13

1-04-3259

that a bond hearing "report" did not exist. Defense counsel argued that the trial court

should inform the jury that no report existed. Defense counsel also argued that the

jurors' note indicated that they wanted the transcript from defendant's bond hearing,

and their note erroneously asked for a "report" rather than the "transcript." The court

disagreed with defense counsel, stating that if the jurors had wanted the transcript, they

would have asked for the transcript rather than a report. The court thought it would be

improper to interpret the jury's note by reading into or creating a word that the jury did

not use. The court further stated:

> "[T]o tell them there is no bond hearing report is a finding of fact. I am not
>
> finding any facts in this case. That's what they asked for. We don't have
>
> anything like that. If they want a transcript and ask for a transcript, then
>
> we will deal with that issue when they ask for it."

The court responded to the jurors' note by informing them that they had all the evidence

and to continue deliberating.

Defendant's contention on appeal is not entirely clear. Defendant argues in his

opening brief that the trial court abused its discretion by denying the jury's request for

defendant's bond hearing "transcript." However, defendant argues in his reply brief

that the jury requested the transcript of Gallagher's trial testimony. Defendant's

inconsistent argument may be attributed to the State's argument in its brief that the trial

court's response was proper because even if the jury had requested the bond hearing

transcript, the transcript was not admitted into evidence at defendant's trial and would

14

1-04-3259

not have been available to the jury. Nevertheless, the thrust of defendant's contention on appeal is that the trial court erred in replying to the jury's note because it mistakenly believed that it had no discretion to ascertain what the jury's note meant. Defendant argues that error may result where the trial court fails to ascertain specifically what the jury is requesting because the trial court mistakenly believes it is without discretion to do so. People v. Jackson, 26 Ill. App. 3d 618 (1975); People v. Queen, 56 Ill. 2d 560 (1974); and People v. Autman, 58 Ill. 2d 171 (1974).

The Jackson, Queen and Autman decisions are based on our supreme court's decision in People v. Pierce, 56 Ill. 2d 361 (1974). In Pierce, our supreme court held that it is within the trial court's discretion to allow or refuse a jury's request for a review of testimony. In Jackson, Queen and Autman, the trial courts' responses to the juries' notes were found to be in error because it was clear that they mistakenly believed they were without discretion to consider the juries' request. In Jackson, the jury requested a transcript of the trial, which the trial court denied. This court found on appeal that the trial court failed to ascertain from the jury the specific testimony that it wished to review and failed to fulfill its duty of determining whether a review of the requested testimony would have assisted the jury in its deliberations. Jackson, 26 Ill. App. 3d at 629. In Queen, 56 Ill. 2d at 565, the jury requested "defendant's words on the stand." The trial court replied "'I cannot have any testimony of any witnesses read to you.'" Queen, 56 Ill. 2d at 565. In Autman, the jury requested a transcript of three witnesses' testimony and the trial court simply responded "no."

15

1-04-3259

Here, we disagree with defendant's interpretation of the court's response. We do not believe that the evidence indicated that the court thought it was without discretion to do anything other than to tell the jury to keep deliberating. The court did not state that it had no discretion to inquire into the jury's note. The court simply stated that the report for which the jury asked did not exist, and it was not going to attempt to second-guess the jurors' intentions by reading meanings into words that were not there. Therefore, we agree with the trial court that the proper answer to the jury's note was to inform the jurors that they had all the evidence and they should continue deliberating.

## PHOTOGRAPHS

Next, defendant contends that the trial court abused its discretion by admitting "gruesome" photographs of the victim, Jose Garcia, which deprived him of a fair trial because the photographs were prejudicial and not probative of any fact in issue. Specifically, defendant argues that People's Exhibits 45, 46, 47 and 48 should not have been admitted into evidence.

Dr. Nancy Jones, a forensic pathologist, testified at trial that she performed an autopsy on the victim's body and noted that the victim had two gunshot wounds to the head. She described People's Exhibit 45 as "a close up photograph taken of the gunshot wound that was in the center of [the victim's] forehead to show the unusual appearance of that particular wound." She identified People's Exhibit 46 as "a photograph that was taken at the beginning of the internal examination of [the victim's] head [to show] where the bullet that had caused the injury in the right forehead or the

16

1-04-3259

forehead region had struck the frontal bond and been deflected outward." She
identified People's Exhibit 47 as " a close up photograph taken of [the victim's] left eye,
it shows the location and the appearance of the gunshot wound that was there." She
also identified People's Exhibit 48 as "a photograph that was taken during the internal
examination of the head, the skull cap has been removed so that the brain has been
exposed, and the bleeding and the damage that was caused to the brain from the bullet
coursing through the head can be seen in this photograph. Also, what can be seen is
some of the fractures in the frontal region above the eye that's the base of the skull."

On cross-examination, Dr. Jones testified that one of the wounds had evidence
of close-range firing, whereas the other wound did not. On redirect examination, she
explained that one of the wounds had "very scant or very few numbers of small
abrasions that are present around the wound that appear to be something like
stippling," which could indicate close-range firing. She also explained that a stippling
effect could be caused from something like the bullet hitting glass first and then the
victim. Dr. Jones further stated that she was unable to determine whether one of the
wounds was from close-range firing.

At the close of evidence the State sought to admit People's Exhibits 45, 46, 47
and 48. The defense objected, arguing that the photographs were "horrendously
graphic and gruesome." The court admitted the photographs, finding that they were
relevant to the issue of close-range firing, which was raised by the defense in the
cross-examination of Dr. Jones. The court explained that "these photos are going in

17

1-04-3259

because the jury will get to see the stippling, if it is that, or it is possibly bullet glass from window residue that might have made the tattooing on the face." The court further found that the photographs would augment Dr. Jones' testimony relating to the cause and manner of death.

If photographic evidence is relevant to prove facts at issue and if the probative value outweighs the potential prejudice, the photographs are admissible, even if such photographs are gruesome. People v. Mercado, 333 Ill. App. 3d 994, 1001 (2002). The trial court's admission of photographs will not be reversed absent an abuse of discretion. People v. Rissley, 165 Ill. 2d 364, 403 (1995).

Here, each of the photographs showed the bullet wounds and the damage they caused to the victim's body. They were relevant to illustrate Dr. Jones' testimony as well as to shed light on the issue of close-range firing. Although we agree with defendant to some extent that the photographs can be characterized as "gruesome," that alone does not preclude their admission. See Mercado, 333 Ill. App. 3d at 1001. We are not persuaded by defendant's contention that the photographs were of such a gruesome nature that any prejudice outweighed their probative value.

## SENTENCING

Next, defendant contends that the trial court abused its discretion in sentencing him to the maximum sentence for each offense. Defendant argues that he had no prior convictions, was 20 years old when the crime was committed, and had rehabilitative potential. Defendant asks this court to reduce his sentence to a more appropriate term

18

1-04-3259

or to remand the cause to the trial court for a new sentencing hearing.

The State responds that defendant has waived any challenge to his sentence by failing to file a motion to reconsider his sentence. Although waiver limits a party's ability to raise an argument, it does not preclude our jurisdiction to consider it. People v. Benford, 349 Ill. App. 3d 721, 734 (2004). Accordingly, we will address defendant's contention. We are mindful, however, that we afford great deference to the circuit court's sentencing decision. People v. Fern, 189 Ill. 2d 48, 53 (1999). Absent an abuse of discretion, a sentence within the appropriate range will be affirmed. People v. Coleman, 166 Ill. 2d 247, 258 (1995).

At defendant's sentencing hearing, the defense presented the testimony of three witnesses who attested to defendant's good character. Maria Castro, who is the mother of defendant's two children, testified that defendant was a good parent and always provided for his family. Michelle Bolova, a friend of defendant's family, testified that defendant was a good person and was always very respectful, and she noted that defendant helped organize sports games for kids at the park. Defendant's father testified that he has always had a very close relationship with defendant and defendant was very involved with their church and participated in the local YMCA's activities.

Before imposing sentence, the trial court noted defendant's lack of criminal history in mitigation. In aggravation, the court found that defendant's conduct caused or threatened serious harm, the sentence was necessary to deter others from committing the same crime, and defendant committed the offense to further activities of

1-04-3259

an organized gang. The court also stated

> "[T]he seriousness of the factors in aggravation greatly outweigh the
>
> defendant's one sole mitigating factor. And I think that the fact that the
>
> defendant did not have a prior criminal background somehow and he
>
> should not be rewarded by skipping little league baseball, pony league,
>
> high school ball and college tryout and the major leagues. He chose to
>
> play at the major league level on his first offense, which is murder and
>
> aggravated battery with a firearm."

The court then sentenced defendant to the maximum sentence of 60 years for first

degree murder and 30 years for aggravated battery, with the sentences to run

consecutive to one another.

Here, the sentencing range for the offense of first degree murder was 20 to 60

years. 730 ILCS 5/5-8-1(a)(1)(a) (West Supp. 1999). The sentencing range for the

offense of aggravated battery, a Class X felony, was 6 to 30 years. 730 ILCS 5/5-8-

1(a)(3) (West Supp. 1999). The trial court's sentence was clearly within the statutory

limits. It is also clear the court did consider defendant's lack of criminal history before

imposing sentence. Although the court did not specifically comment on defendant's

age and potential for rehabilitation, the court stated that it had read the presentence

investigation report and had considered the relevant factors before imposing sentence.

The court then weighed these factors with the aggravating factors to determine an

appropriate sentence. Here, defendant was convicted of shooting at a group of

20



1-04-3259

individuals, including one of whom was 11 years old, because of a gang rivalry. We

cannot say that, under these circumstances, the trial court's sentence was an abuse of

discretion.

DNA EXTRACTION

Lastly, defendant contends that the compulsory extraction and perpetual storing

of his DNA pursuant to section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-

4-3 (West 2004)) (Code) violates his constitutional right to be free from unreasonable

searches and seizures.

As defendant correctly acknowledges in his reply brief, our supreme court

recently found section 5-4-3 of the Code constitutional in People v. Garvin, 219 Ill. 2d

104 (2006). We are bound by the supreme court's decision and reject defendant's

contention.

Accordingly, we affirm the judgment of the trial court.

Affirmed.

GREIMAN, J., and CUNNINGHAM, J., concur.

21

ATTACHMENT "B"

(Appellate Court Order of Denial of Rehearing)

O'TOOLE

(56)

No. 1-04-3259

## IN THE APPELLATE COURT
## OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| ERUBY ABREGO, | ) ) | No. 99 CR 9739 (02) |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Kenneth J. Wadas, Judge Presiding. |

### ORDER

**IT IS HEREBY ORDERED** that Defendant-Appellant's petition for rehearing is

denied.

**ORDER ENTERED**

**DATED:** _____ APR 0 4 2007

APPELLATE COURT, FIRST DISTRICT

JUSTICE

JUSTICE

JUSTICE

RECEIVED

APR 0 5 2007

DOCKETING DEPARTMENT
State Appellate Defender
1st DISTRICT

ATTACHMENT "C"

(Illinois Supreme Court Denial of Petition for Leave to Appeal)

[Denied September 26, 2007 No. 104557]

104557

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

September 26, 2007

State Appellate Defender Chicago
203 North LaSalle Street
24th Floor
Chicago, IL 60601

No. 104557 - People State of Illinois, respondent, v. Eruby
Abrego, petitioner. Leave to appeal, Appellate
Court, First District.

The Supreme Court today DENIED the petition for leave to
appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court
on November 1, 2007.



RECEIVED
SEP 26 2007
DOCKETING DEPARTMENT
State Appellate Defender, 1st District

ATTACHMENT "D"

(Affidavit of [MS. JENNIFER GUZMEN])

**ATTACHMENT "E"**

**(Affidavit of [MR. SONNY RODRIGUEZ])**

ATTACHMENT "F"

(Affidavit of [MS. DEBBIE DANIELS])

ATTACHMENT "G"

(Affidavit of [ERUBY ABREGO])

## AFFIDAVIT OF

## ERUBY ABREGO

I, **Eruby Abrego**, the Affiant herein Declare under Penalty of Purjury pursuant to 735 ILCS 5/1-109 that the following Statements are True and Correct in all matters asserted to the best of my own personal Knowledge and Belief, In That:

1. On March 24th, 1999 I was asleep at 3626 North Whipple when I was awakened by a noise at the back door of my sister's residence and I got up to go check it and observed Detective [Wojcik] breaking into the house using a Large screwdriver, there were at least four other plain clothed officers/Detectives that entered the house and drew their guns telling everyone to get in the living room;

2. Detective [Wojcik] asked me who I was and I told him that I was (Eruby Abrego), and detective [Wojcik] stated: "You know what you did" and I denied knowing anything, Detective [Wojcik] began arguing with me until he became "Angry" and after I was cuffed up, with Detective Engle holding me, [Wojcik] 'slapped' me twice in the face, Detective [Wojcik] grabbed my arm and told Detective [Engle] to' bring my sister [Debbie Daniels], we were escorted out of the second floor apartment to the stairwell, Detective [Wojcik] again 'slapped' me in the face and the Detectives began pushing me and hitting me with their 'elbows' as we went down the stairs until we exited the building;

3. We were about to get into the Detective's dark blue unmarked car when Detective [Wojcik] asked me or stated: "<u>Why did you shoot those people on Belmont</u>"? and I responded by stating: "<u>I didn't shoot anyone on Belmont, and that if that is what this is about, I want a Lawyer</u>". and Detective [Wojcik] then told me: "<u>You'll get a Lawyer when you go to Court</u>". The Detective's then told some other people standing on the sidewalk who were the first floor tenents to back away from the car as we were put in the car, My sister and I were taken to Area 5 Police station and put in Interrogation rooms, I was handcuffed to the wall;

4. I was in the Interrogation room only for a short time when Detective [Wojcik] and [Engle] entered the room and without any rights being readto me they began questioning me, I continued to deny any involvement in any such crime. The Detectives left;

5. However, when Detective [Wojcik] returned and again tried to question me and I continued to deny any involvement, Detective [Wojcik] became angry and started hitting me in the back, Chest and ribs about 20 to 25 times, Detective [Wojcik] left the room;

6. About two hours later, Detective [Wojcik] returned to the Interrogation room and stated: "You'll rot in jail because your friends are fingering you", and again I continued to deny any involvement in anything; Detective [Wojcik] only stayed for about ten to fifteen minutes and left;

7.  I remained handcuffed to the wall and was without food or water all night, however a female officer once took me to the bathroom, the next day March 25, 1999 Detective [Wojcik] returned and let me read the Statements of Juan Parra and Jeremiah Cain, telling me I was charged with the murder anyway, that I might as well confess and it would go easier on me, I still continued to deny any involvement, Detective [Wojcik] again left;

8.  I remained in the Interrogation room all day and they would not let me go to the bathroom, and I had to urinate on the floor, and later that night when Detective [Wojcik] returned he saw the urine, and became angry again and started beating me, punching me about 20 more times in my stomach and ribbs. They then took me to another Interrogation room, and about 3:00 a.m. Detective [Wojcik] came back, which would be the early a.m. hours of March 26, 1999, and I told him I needed Medical attention, [Wojcik] took me to the bathroom and told me to clean up, I threw up blood, and Detective [Wojcik] told me that I could go to the hospital if I confessed, I was scared of being hit anymore and wanted help, so I told him I'll say whatever he wants, and [Wojcik] just said tell her the same thing as the others, which I took to mean what [Parra] and [Cain] had said in thier statements, I said Okay, I was then put back in the Interrogation room, [Wojcik] left for only a couple of minutes and returned with this lady, and she asked if I would give a court reported statement, and I said yeah;

9.  I didn't say anything about being beaten at that time because I was afraid of being hurt more if I said anything, the following day however, I was taken before the judge, and I showed him the bruises and marks on my body, ribs and arm where I had been beaten, I also told the nurse when I was going through the physical, and I watched the nurse write down all the apparent injuries on the paper;

10. I was never visited by my attorney, after I told the judge and showed him the injuries, my attorney at another court appearance asked me who had beat me, I explained who did it and when it occurred, and the attorney filed a motion to suppress the statement based on that, but never came to discuss the details or where everything happened before the hearing on the motion, I immediately got another attorney after the hearing as he was totally incmpetent and didn't investigate anything and didn't even interview me about the Interrogation or the arrest prior to the hearing.

I, **Eruby Abrego** Declare that I have read this two page Affidavit, and further Declare under penalty of purjury pursuant to 735 ILCS 5/1-109 that the Statements herein are True and Correct to the best of my Knowledge and Belief. Further affiant sayth not. Dated: This `28th` day of __MAY__ , 2008.

ERUBY ABREGO (Affiant) #R-34111
Stateville Correctional Center
P.O.Box 112
Joliet, Illinois 60434

(Page 2 of 2 Pages)